IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EDWIN P. WILSON, §
§
Plaintiff, §
§
§
v. §
§
LAWRENCE BARCELLA, CHARLES A. §
BRIGGS, THEODORE S. GREENBERG, §
STEPHEN TROTT, DELWYN LOWELL §            CIVIL ACTION NO.
JENSEN, MARK M RICHARD, JAMES L. §            H-05-3646
POWERS, DANIEL K. HEDGES, JANE §
and JOHN DOES I-XX, §
§
Defendants. §
§
§

**PLAINTIFF EDWIN P. WILSON'S CONSOLIDATED RESPONSE TO
DEFENDANTS BARCELLA, BRIGGS, GREENBERG, HEDGES AND
POWERS, JENSEN, RICHARD, AND TROTT'S MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................2

    A.  Allegations In Wilson's Complaint ..............................................................2

    B.  Judge Hughes's Opinion ..............................................................................3

III.  STANDARD OF REVIEW ....................................................................................6

    A.  Allegations Are Taken As True Particularly Where Immunity Is Raised ..............6

    B.  Defendants Have The Burden On An Immunity Motion...............................8

IV.  ARGUMENT .........................................................................................................10

    A.  Wilson Does Not Have To Plead With Greater Particularity ...............................10

    B.  Defendants Do Not Address Wilson's Fourth Or Sixth Amendment Claims .......11

    C.  Absolute Immunity Does Not Shield Abuses Of Office By Prosecutors ..............12

        1.  Functional analysis matters........................................................................15

        2.  Non-advocative functions are not protected ...............................................18

            a.  Withholding exculpatory evidence ...............................................19

            b.  Statements to the media ................................................................28

        3.  Investigatory functions are not protected....................................................29

            a.  Pre-trial investigations .................................................................30

            b.  Investigations during trial .............................................................34

            c.  Post-trial investigations.................................................................35

        4.  Identity as prosecutor does not matter ......................................................38

        5.  Timing does not matter ..............................................................................39

    D.  Briggs Is Not Protected By Absolute Immunity For Witnesses ...........................40

        1.  Non-testimonial conduct is not protected ...................................................41

        2.  Declaration not subject to the judicial crucible .........................................47

    E.  Complaining Witnesses Are Not Protected By Absolute Immunity ...................51

F.      Co-Conspirators Are Not Protected By Absolute Immunity ...............................54

G.      *Heck v. Humphrey* Expressly Permits This Lawsuit.............................................58

H.      Statute Of Limitations Does Not Bar Suit .............................................................59

V.    CONCLUSION........................................................................................................................60

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Adler v. Beverly Hills Hosp.*,
  594 S.W.2d 153 (Tex. App. Ct. 1980) ...............................................................60

*Anderson v. Pasadena Indep. Sch. Dist.*,
  184 F.3d 439 (5th Cir. 1999) ...........................................................................10

*Anthony v. Baker*,
  955 F.2d 1395 (10th Cir. 1992) .............................................................51, 53, 54

*Bird v. W.C.W.*,
  868 S.W.2d 767 (Tex. 1994)..............................................................................50

*Bivens v. Six Unnamed FBI Agents*,
  403 U.S. 388 (1971).............................................................................. *passim*

*Boyd v. Biggers*,
  31 F.3d 279 (5th Cir. 1994) ..............................................................................24

*Brady v. Maryland*,
  373 U.S. 83 (1963)......................................................................................11, 45

*Brandley v. Keeshan*,
  64 F.3d 196 (5th Cir. 1995) ..............................................................................27

*Briscoe v. LaHue*,
  460 U.S. 325 (1983)............................................................................... *passim*

*Broam v. Bogan*,
  320 F.3d 1023 (9th Cir. 2003) .....................................................................21, 22

*Brown v. NationsBank Corp.*,
  188 F.3d 579 (5th Cir. 1999) ............................................................................59

*Bruce v. Wade*,
  537 F.2d 850 (5th Cir. 1976) ............................................................................27

*Brummett v. Camble*,
  946 F.2d 1178 (5th Cir. 1991) ..........................................................................16

*Buckley v. Fitzsimmons*,
  509 U.S. 259 (1993)............................................................................... *passim*

*Burge v. Parish of St. Tammany*,
  187 F.3d 452 (5th Cir. 1999) .......................................................................19, 26

*Burns v. County of King*,
  883 F.2d 819 (9th Cir. 1989) ................................................................... *passim*

*Burns v. Reed*,
    500 U.S. 478 (1991) ................................................................................................ *passim*

*Cannon v. Burge*,
    2006 U.S. Dist. Lexis 4040 (N.D. Ill. 2006) ...................................................... 59

*Carney v. United States*,
    2004 U.S. Dist. Lexis 10617 (N.D. Tex. June 9, 2004) ................................ 19, 41, 43, 46

*Carter v. Burch*,
    34 F.3d 257 (4th Cir. 1994) ............................................................................... 19

*Castellano v. Fragozo*,
    352 F.3d 939 (5th Cir. 2003) ......................................................................... *passim*

*Christopher v. Harbury*,
    536 U.S. 403 (2002) ........................................................................................... 11

*Cignetti v. Healy*,
    89 F. Supp. 2d 106 (D. Mass. 2000) ............................................................ 32, 33, 42

*Cousin v. Small*,
    325 F.3d 627 (5th Cir. 2003) ............................................................................ 27

*Davis v. King*,
    2000 U.S. Dist. Lexis 5366 (N.D. Tex. Apr. 24, 2000) .................................... 35

*Dennis v. Sparks*,
    449 U.S. 24 (1980) ............................................................................................ 55

*Dorman v. Higgins*,
    821 F.2d 133 (2d Cir. 1987) ......................................................................... 47, 50

*Enlow v. Tishmomingo County*,
    962 F.2d 501 (5th Cir. 1992) ....................................................................... *passim*

*Evans v. City of Chicago*,
    231 F.R.D. 302 (N.D. Ill. 2005) ................................................................... *passim*

*Evans v. City of Chicago*,
    2005 U.S. Dist. Lexis 18507 (N.D. Ill. Aug. 29, 2005) ................................. 8, 51

*Foster v. City of Lake Jackson*,
    813 F. Supp. 1262 (S.D. Tex. 1993) *rev'd on other grounds*,
    *Foster v. City of Lake Jackson*, 28 F.3d 425 (5th Cir. 1994) .................... 50, 51, 53

*Franklin v. Fox*,
    2000 U.S. Dist. Lexis 19651 (N.D. Cal. Dec. 22, 2000) ............................... 8, 54

*Genzler v. Longanbach*,
    410 F.3d 630 (9th Cir. 2005) ........................................................................ *passim*

*Geter v. Fortenberry*,
    849 F.2d 1550 (5th Cir. 1988) .......................................................................... 10

- iv -

*Giffin v. Summerlin*,
  78 F.3d 1227 (7th Cir. 1996) ..........................................................................50

*Graves v. Hampton*,
  1 F.3d 315 (5th Cir. 1993) ..............................................................................22

*Gregory v. City of Louisville*,
  2006 U.S. App. Lexis 8792 (6th Cir. Apr. 11, 2006) ............................... *passim*

*Groom v. Fickes*,
  966 F. Supp. 1466 (S.D. Tex. 1997) ...............................................................27

*Gutierrez v. Vergari*,
  499 F. Supp. 1040 (S.D.N.Y. 1980)................................................................12

*Harris v. Roderick*,
  126 F.3d 1189 (9th Cir. 1997) ........................................................................53

*Heck v. Humphrey*,
  512 U.S. 477 (1994).................................................................................58, 59

*Heidelberg v. Hammer*,
  577 F.2d 429 (7th Cir. 1978) ..........................................................................12

*Henzel v. Gerstein*,
  608 F.2d 654 (5th Cir. 1979) ............................................................12, 19, 27

*Hinchman v. Moore*,
  312 F.3d 198 (6th Cir. 2002) .......................................................................6, 47

*Holleman v. McKee*,
  2006 U.S. Dist. Lexis 3405 (S.D. Tex. Jan. 17, 2006) ...................................11

*Houston v. Partee*,
  978 F.2d 362 (7th Cir. 1992) .................................................................. *passim*

*Imbler v. Pachtman*,
  424 U.S. 409 (1976)................................................................................ *passim*

*Jackson v. City of Beaumont Police Dep't.*,
  958 F.2d 616 (5th Cir. 1992) ..........................................................................11

*Jackson v. Dillon*,
  518 F. Supp. 618 (E.D.N.Y. 1981) .................................................................12

*Kalina v. Fletcher*,
  522 U.S. 118 (1997)................................................................................ *passim*

*Keko v. Hingle*,
  318 F.3d 639 (5th Cir. 2003) ................................................................. *passim*

*Kelly v. Serna*,
  87 F.3d 1235 (11th Cir. 1996) ........................................................................59

- v -

*Laub v. Pesikoff,*
    979 S.W.2d 686 (Tex. App. Ct. 1998) .................................................................50

*Long v. Satz,*
    181 F.3d 1275 (11th Cir. 1999) ..............................................................19, 24

*Malley v. Briggs,*
    475 U.S. 335 (1986) ...............................................................................8, 9, 14, 15

*McQueen v. United States,*
    264 F. Supp. 2d 502 (S.D. Tex. 2003) ...............................................................49

*Metoyer v. Connick,*
    2000 U.S. Dist. Lexis 9470 (E.D. La. June 26, 2000) ........................... *passim*

*Milstein v. Cooley,*
    257 F.3d 1004 (9th Cir. 2001) ........................................................... *passim*

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ........................................................................... *passim*

*Moore v. McDonald,*
    30 F.3d 616 (5th Cir. 1994) ................................................................ *passim*

*Mowbray v. Cameron County,*
    274 F.3d 269 (5th Cir. 2001) ..............................................................44, 45, 55

*Niedert v. Rieger,*
    200 F.3d 522 (7th Cir. 1999) .............................................................................50

*Paine v. City of Lompoc,*
    265 F.3d 975 (9th Cir. 2001) .............................................................. *passim*

*Palma v. Atlantic County,*
    53 F. Supp. 2d 743 (D.N.J. 1999) .....................................................................53

*Parkinson v. Cozzolino,*
    238 F.3d 145 (2d Cir. 2001) ..............................................................................19

*Pierce v. Gilchrist,*
    359 F.3d 1279 (10th Cir. 2004) .................................................................25, 44

*Pierce v. Pawelski,*
    2000 U.S. Dist. Lexis 18229 (N.D. Ill. Dec. 11, 2000) ...................................51

*Powell v. Spear,*
    6 Fed. Appx. 739 (10th Cir. 2001) ....................................................................24

*Prince v. Wallace,*
    568 F.2d 1176 (5th Cir. 1978) ...........................................................................12

*Reid v. New Hampshire,*
    56 F.3d 332 (1st Cir. 1995) ................................................................................19

*Rose v. Koch*,
    465 F. Supp. 1157 (E.D.N.Y. 1979) ...............................................................12

*Rykers v. Alford*,
    832 F.2d 895 (5th Cir. 1987) .................................................................36, 37

*San Filippo v. U.S. Trust Co.*,
    737 F.2d 246 (2d Cir. 1984) .................................................................55

*Schultea v. Wood*,
    47 F.3d 1427 (5th Cir 1995) .................................................................10

*Shaw v. Harris*,
    116 Fed. Appx. 499 (5th Cir. 2004)......................................................24

*Siano v. Justices of Massachusetts*,
    698 F.2d 52 (1st Cir. 1983)......................................................................12

*Smith v. Department of Human Servs.*,
    2000 U.S. App. Lexis 25016 (10th Cir. Oct. 6, 2000) ......................................8

*Spivey v. Robertson*,
    197 F.3d 772 (5th Cir. 1999) .................................................................51, 54

*Spurlock v. Thompson*,
    167 F.3d 995 (6th Cir. 1999) .................................................... *passim*

*Spurlock v. Thompson*,
    330 F.3d 791 (6th Cir. 2003) .................................................... *passim*

*Steeves v. McGrath*,
    2000 U.S. Dist. Lexis 1706 (N.D. Ill. Feb. 11, 2000)......................................53

*Stephenson v. Reno*,
    28 F.3d 26 (5th Cir. 1994) .................................................................58, 59

*Strength v. Hubert*,
    854 F.2d 421 (11th Cir. 1988) .................................................................50, 53

*Strong v. City of Dallas*,
    2002 U.S. Dist. Lexis 840 (N.D. Tex. Jan. 17, 2002)......................................50

*Switzer v. Burkes*,
    115 Fed. Appx. 751 (5th Cir. 2004)......................................................59

*Sykes v. James*,
    13 F.3d 515 (2d Cir. 1993) .................................................................49

*Tate v. Grose*,
    412 F. Supp. 487 (E.D. Pa. 1976) ..........................................................12

*Thomason v. SCAN Volunteer Servs.*,
    85 F.3d 1365 (8th Cir. 1996) .................................................................49

*Thompson v. Connick*,
    2005 U.S. Dist. Lexis 36499 (E.D. La. Nov. 15, 2005).................................................26, 27

*Truvia v. Julien*,
    2005 U.S. Dist. Lexis 539 (E.D. La. Jan. 11, 2005) ........................................................26

*Truvia v. Julien*,
    No. 04-0680 (E.D. La. Sept. 24, 2004) ...........................................................................26

*United States v. Wilson*,
    289 F. Supp. 2d 801 (2003) ........................................................................... *passim*

*United States v. Wilson*,
    565 F. Supp. 1416 (S.D.N.Y. 1983)................................................................................7

*United States v. Wilson*,
    721 F.2d 967 (4th Cir. 1983) ......................................................................... *passim*

*United States v. Wilson*,
    732 F.2d 404 (5th Cir. 1984) ......................................................................... *passim*

*United States v. Wilson*,
    750 F.2d 7 (2d Cir. 1984) ...............................................................21, 22, 24, 25

*United States v. Wilson*,
    901 F.2d 378 (4th Cir. 1990) ......................................................................... *passim*

*United States v. Wilson*,
    1996 U.S. App. Lexis 2538 (4th Cir. Feb. 7, 1996)..................................... *passim*

*Waugh v. Curtis*,
    1993 U.S. App. Lexis 1472 (9th Cir. 1993)...................................................................13

*Wheeler v. Cosden Oil & Chem. Co.*,
    734 F.2d 254 (5th Cir. 1984) ..............................................................................48, 49, 50

*White v. Frank*,
    680 F. Supp. 629 (S.D.N.Y. 1988).....................................................................47, 53, 54, 55

*White v. Frank*,
    855 F.2d 956 (2d Cir. 1988) ............................................................................................53

*Wilson v. Garcia*,
    471 U.S. 261 (1985)........................................................................................................59

*Wilson v. United States*,
    Criminal No. 1:82CR212 (E.D. Va. Mar. 9, 2006)........................................................49

## STATUTES

D.C. Code § 12-301(8).........................................................................................................59

D.C. Code § 12-302(a)(3) ...................................................................................................59

## MISCELLANEOUS

BLACK'S LAW DICTIONARY (7th ed. 1999) ...................................................................47

Plaintiff Edwin P. Wilson files this consolidated response in opposition to Defendants' seven different motions to dismiss his *Bivens* claims pursuant to Fed. R. Civ. P. 12(b)(6).

## I.     INTRODUCTION

The U.S. Supreme Court has restricted absolute immunity to prosecutors who perform specific functions under the careful watch of the Court.  Defendants in this action conspired out-of-court to investigate Wilson, fabricate evidence against him, use it in trial, and withhold exculpatory evidence from Wilson, his lawyers, and the Courts in violation of the U.S. Constitution.  Judge Hughes in vacating Mr. Wilson's Houston conviction "identified about two dozen government lawyers who actively participated" in "offering a false affidavit" and failing to disclose exculpatory evidence.  *United States v. Wilson*, 289 F. Supp. 2d 801, 811 (S.D. Tex. 2003).  These individuals are now defendants.  Having conspired to deprive Mr. Wilson of his constitutional rights they now claim immunity.  Should those former government lawyers have absolute immunity?

No, the Supreme Court has vastly curtailed prosecutorial absolute immunity over the past three decades, recently holding that absolute immunity "does not shield abuses of office."  *See infra* at 12-15.  Courts following these precedents have denied absolute immunity to prosecutors who withhold exculpatory evidence (*see infra* at 19-28), make statements to the media (*see infra* at 28-29), or participate in investigations (*see infra* at 29-38).  Defendants' similar actions are therefore not protected and the allegations of the complaint are fully supported by Judge Hughes' findings of such abuses.  *See infra* at 12-40.

Does Briggs have immunity for his out-of-court, non-testimonial actions or for submitting a false declaration that was material to Mr. Wilson's conviction?

No, Briggs does not have absolute immunity.  Case law denies absolute immunity to witnesses who fabricate evidence and withhold exculpatory information out-of-court.  *See infra* at 41-47.  Nor does Briggs have immunity for his false declaration because it was impossible for Wilson to submit competing affidavits since exculpatory information had not been produced to

him.  Wilson could not challenge the accuracy of Briggs's declaration in court because the necessary "truth-finding tools" were not available.  *See infra* at 47-51.

## II.    STATEMENT OF FACTS

### A.    Allegations In Wilson's Complaint

Edwin P. Wilson sues Defendants under *Bivens v. Six Unnamed FBI Agents,* 403 U.S. 388 (1971), for violating his Constitutional rights.  FAC[1] ¶¶ 224, 350-53.  Defendants withheld critical exculpatory evidence from Wilson, his lawyers, and nine different courts.[2]  In addition, Defendants fabricated and introduced into the Texas trial a false declaration sworn by Defendant Briggs; the Texas jury relied heavily upon this declaration to convict Wilson.  *Id*., ¶¶ 5, 144-46, 184.  As a result of Defendants' actions, Wilson was ultimately convicted in Virginia and New York (*id*., ¶¶ 2, 233-34); prosecuted in a D.C. trial that ended in acquittal; wrongfully imprisoned for 22 years; robbed of property and wealth; separated from his family; defamed in the eyes of the public; deprived of business opportunities; and alienated from the nation that he had faithfully served.  *Id*., ¶¶ 1, 15, 18-62, 71, 72-75, 77, 85, 339, 341-43.

Defendants acted in concert through meetings and other activities.  *Id*., ¶¶ 3, 10-11, 23, 29, 36, 41, 48, 54, 60, 185-232, 243, 292, 300, 347.  In short, they acted in a conspiracy.  *Id*., ¶¶ 15, 153, 184.  Defendants covered up the lies told in the Briggs declaration at the Texas trial.[3]  The Briggs declaration falsely claimed that Wilson had no official contacts with the CIA after his formal retirement.  *Id*., ¶¶ 144-45.  Defendants introduced the Briggs declaration in the Texas trial to refute Wilson's defense that he had collaborated with the CIA on his work in Libya.  *Id*., ¶¶ 143-44.  Although Wilson had formally retired from the CIA in 1971 (*id*., ¶¶ 4, 81), he

---

[1] "FAC ¶ ___" as used herein refers to the paragraphs in the First Amended Complaint unless otherwise noted.

[2] FAC ¶¶ 3, 21, 23, 27, 29, 30, 35, 40, 42, 45, 46, 51, 53, 54, 57, 58, 59, 60, 62, 149, 150, 153-154, 177, 187, 192, 194-97, 199, 208, 239-42, 245-91, 294-95, 297-99, 305-12, 322, 325-31, 335-36, 340, 344-47.

[3] FAC ¶¶ 5, 41, 46, 48, 52, 58, 62, 67, 143-48, 150, 154, 179, 184, 185-208, 310-12, 347-48.

- 2 -

continued to work on high-level assignments around the world at the CIA's request.[4]  What the CIA could not do alone, Wilson did for them.[5]

Because the CIA needed Wilson in Libya, he traveled there at the CIA's request to track down an international terrorist.  *Id*., ¶¶ 90-92.  Wilson entered into business relationships with the Libyan government with CIA approval.  *Id*., ¶¶ 92-93, 213, 237-38, 247, 248, 250, 276, 279, 312.  The CIA asked Wilson to gather specific information and report back to them.  *Id*., ¶¶ 92, 104, 250, 277.  He did so.[6]  Wilson kept top officials in the government apprised of his activities in Libya.  *Id*., ¶¶ 92, 93, 113, 247-48, 267, 274.  The CIA realized they could count on Wilson to finance CIA projects in Libya and around the world.  *Id*., ¶¶ 94, 104, 248, 293, 331, 334-35.

But when Wilson was accused in the newspapers of selling explosive timers and murdering a Chilean diplomat around 1977, the CIA started to distance itself from him in the public eye.  *Id*., ¶¶ 95-101, 103, 113, 175.  The government still gathered intelligence from Wilson even as Defendants targeted him for prosecution in the early 1980s.  *Id*., ¶¶ 103, 113-14, 119.  Defendants ultimately imprisoned Wilson by fabricating and introducing the Briggs declaration into the Texas trial and withholding exculpatory evidence from courts in several different jurisdictions.  *Id*., ¶¶ 1, 3.

**B.**     **Judge Hughes' Opinion**

In a powerful opinion condemning Defendants' misconduct, Judge Hughes of this Court vacated Wilson's Texas conviction due to "the lie" told in the Briggs declaration and the Defendants' withholding of exculpatory evidence – all in violation of Wilson's Constitutional rights under the Fifth and Sixth Amendments.  *United States v. Wilson*, 289 F. Supp. 2d 801, 814-15, 817-18 (2003).  Judge Hughes ruled that the "government has through February 6, 2004

---

[4] FAC ¶¶ 4, 10, 82, 85, 86-88, 90-94, 101, 102, 106, 107, 109-13, 146, 150, 154, 211-13, 253-55, 258, 259, 260, 261, 264, 265, 266, 270, 271-72, 279, 283, 290-91, 293, 333.

[5] FAC ¶¶ 4, 10, 102, 251, 252, 254, 255, 259, 260, 263, 264, 265, 271, 286-89.

[6] FAC ¶¶ 92, 102, 113, 114, 116, 143, 213, 237, 250, 269, 274, 277, 278, 279.

to initiate a new trial" against Wilson in Texas.  *Id*. at 818.  The government chose not to re-try him.

Judge Hughes found that Wilson had been convicted in Texas with a declaration that "proved nothing but a lie" but was nevertheless "material" to the jury's decision.  *Id*. at 807-08 ("the jury asked the judge to re-read the Briggs affidavit to them.  An hour after the re-reading, the jury found Wilson guilty"); *id*. at 814 (declaration "was material to affect the jury's deliberations"); *id*. at 815.  Wilson argued in the Texas trial that he sold explosives to Libya as part of his continuing work for the CIA after his formal retirement in 1971.  *Id*. at 802.  Wilson argued "that he was collecting intelligence for the CIA about Soviet military operations in Libya and about Qaddafi's regime."  *Id*. at 807.[7]  The prosecutors refuted Wilson's defense with a declaration in which Briggs "swore that – with one exception – the CIA did not ask Wilson to work for it after he officially stopped working there."  *Id*. at 807, 811-12 (describing Greenberg, Sporkin, Powers' roles).  They "deliberately deceived the Court."  *Id*. at 813.

Prosecutors and CIA officials – including Defendants in the present suit – "admitted internally that the affidavit was false," and they knew of "solicitations and projects on which Wilson worked for the CIA ***after*** 1971."  *Id*. at 807 (emphasis in original).  Defendants knew that Wilson had post-retirement contacts with the CIA:  "[t]here were, in fact, over 80 contacts, including actions parallel to those in the charges."  *Id*.  Even "before Wilson's Texas trial started, the prosecutors knew that the CIA had employed Wilson in 1974 and 1975" to (i) deliver two desalinization plants to Egypt, (ii) find a home for a former Laotian general in the United States, (iii) obtain body armor for the Iranian shah's body guards, (iv) "trade explosives or weapons … with Libya", and (v) help Saudi Arabia build pistol ranges.  *Id*. at 812-13.  Wilson set up front companies to "mask his intelligence gathering broad" on behalf of the CIA "with the agency's knowledge and approval."  *Id*. at 802.  From 1971 to 1976, Wilson "had professional and

---

[7] More specifically, Wilson "claimed that from 1976 through 1979, he gave the CIA (a) profiles of Libyan officials, (b) information about Libya's nuclear capability, (c) possible coup information, and (d) Libyan military mobilization along the Egyptian border."  *Id*. at 807.

personal relationships with CIA employees.  The CIA even took over one of his projects." *Id*. at
803.

Wilson's collaboration with the CIA was well known to the government in the late 1970s
and early 1980s.  DOJ officials knew that "Wilson was a contract employee of the CIA as
recently as summer or early fall of 1976." *Id*. at 804.  The CIA Deputy Director of Operations
said in the late 1970s "that he could always count on Wilson to finance agency projects that
required immediate action" and that "his office continued to have 'operational discussions' with
Wilson during which it asked for – and shared – information." *Id*. at 804.  Around 1981, the
U.S. Attorneys for Eastern District of Virginia and Washington, D.C. "investigated" and
"confirmed that Wilson had continued to work for the CIA after 1971." *Id*. at 805.  The CIA
Director informed the U.S. House of Representatives that there was a "one linear inch" thick list
of "known contacts between CIA and Edwin Wilson." *Id*. at 805.  In late 1982, the government
was aware of "the CIA's continuous 'use' of Wilson and his company – as a contact, an expert, a
supplier – at least thirteen distinct times from 1972 through 1977." *Id*. at 805.  Both Barcella (*id*.
at 803, 806) and Briggs (*id*. at 805-06) investigated and learned about Wilson's post-retirement
contacts with the CIA prior to any of his prosecutions.  Therefore, they knew that "[o]ne CIA
officer discussed with Wilson that sending tons – yes, tons – of explosives to a hostile power
could be authorized if this country got good enough information in exchange." *Id*. at 813.  They
also knew that the CIA had "paid to send an employee of Wilson's to Libya." *Id*. at 813.

Defendants withheld this exculpatory information, and more, from Wilson, his lawyers,
and the courts.[8]  Immediately after the Texas conviction, Richard urged Jensen to disclose
exculpatory information to Wilson's lawyers, the Texas trial judge, or both.  *Id*. at 808.  Richard
and Jensen discussed disclosure in "meetings" with other Defendants but, ultimately, they "never

---

[8] *Id*. at 802 ("The government discussed among dozens of its officials and lawyers whether to correct the
testimony.  No correction was made – not after trial, not before sentencing, not on appeal, and not in this review.");
*id*. at 809 ("actively and actually concealed" exculpatory information); *id*. at 811 ("direct evidence that proves
falsity was not available to him before trial, at trial, or after trial") ("two dozen government lawyers … actively
participated in the original non-disclosure to the defense, the false rebuttal testimony, and the refusal to correct it");
*id*. at 812-13.

- 5 -

told the trial court or Wilson's counsel that [they] had knowingly used false evidence." *Id*. at 807-08; *id*. at 809 ("withheld from Wilson the memoranda … that listed his post-employment associations with the CIA as well as all direct documents generated from his work with the agency"); *id*. at 802 (refused to disclose records of [Wilson's] continued association with the agency"). On appeal to the Fifth Circuit, Defendants still "did not acknowledge ***directly or indirectly*** that [they] knew that the Briggs affidavit was false." *Id*. at 808-09 (emphasis in original).

By not giving Wilson "the papers" that documented his work for the CIA, Defendants violated "his right to compulsory process" under the Sixth Amendment. *Id*. at 814. The withheld information "would have been invaluable to his defense and its credibility." *Id*. at 814. Judge Hughes concluded that if the jury had known of "the lie" in the Briggs declaration, it would have "precluded" a guilty verdict. *Id*. at 814-15, 817. Judge Hughes found that Defendants' "fabrication of false data" created a "fundamentally unfair process" for Wilson. *Id*. at 815. If exculpatory information had been produced to Wilson, as it should have, the "documents certainly would have impeached the Briggs affidavit." *Id*. at 815-16. The Briggs declaration violated Wilson's Sixth Amendment right "to confront the witnesses against him." *Id*. at 816. Judge Hughes concluded that Wilson had not received the Constitutional "process that is due." *Id*. at 817.

## III.   STANDARD OF REVIEW

### A.   Allegations Are Taken As True Particularly Where Immunity Is Raised

On a 12(b)(6) motion, all allegations of the complaint must be accepted as true, and this is particularly true where immunity is invoked as a defense. *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997) ("[i]n determining immunity, we accept the allegations of [plaintiff's] complaint as true"); *Buckley v. Fitzsimmons*, 509 U.S. 259, 261 (1993) (same); *Metoyer v. Connick*, 2000 U.S. Dist. Lexis 9470, at *2, 27 (E.D. La. June 26, 2000) ("Plaintiff's factual allegations are accepted as true for purposes of the pending motion" on absolute immunity); *Hinchman v. Moore*, 312

F.3d 198, 205 (6th Cir. 2002) (court "must accept as true [plaintiff's] factual assertions" regarding qualified immunity of police officer).

In *Buckley*, the U.S. Supreme Court made the necessary and "important assumption[]" in considering absolute immunity that the plaintiff's "allegations are entirely true." 509 U.S. at 261. Accordingly, the U.S. Supreme Court stated that "[o]ur statement of facts is therefore derived entirely from [plaintiff's] complaint." *Id.* Any "ambiguity" in the facts must be resolved in Wilson's favor. *See Genzler v. Longanbach*, 410 F.3d 630, 642 (9th Cir. 2005) (resolving factual ambiguity in favor of plaintiff).

Defendants nevertheless repeatedly ignore these clear precedents, and they try to lay out their own facts and re-characterize and mischaracterize the facts described in Wilson's complaint. Briggs Mot. at 10-11 n.4 (raising 14 factual points that do not appear in Wilson's complaint), 14 ("We have already set out in the margin an outline of the facts that would emerge if this case were to proceed to discovery or trial …."), 23-24 (not involved before or after Houston); Barcella Mot. at 10 (Wilson's claim "centers on" Briggs declaration), 10 n.10 (unaware of Briggs declaration and contents and phone recordings were not exculpatory), 12; Trott Mot. at 3 n.1; Jensen Mot. at 5; Richard Mot. at 8 n.4; Powers and Hedges Mot. at 1 (omitting D.C.), 3 (wife),[9] 4, 12 ("Plaintiff had ample opportunity to … offer rebuttal evidence"), 13 (wife); Greenberg Mot. at 8-9 (grouping facts), 8 ("all of Greenberg's conduct at issue here occurred subsequent to indictment and prior to the resolution of Wilson's appeal"). Briggs introduces new evidence that directly contradicts Wilson's pleadings.[10]

At this stage, the Court may not be able to determine Defendants' immunity claims because there are "disputed factual issues … regarding [the Defendants'] role in actively

---

[9] Powers and Hedges claim Wilson tried to kill his ex-wife. *See* Powers and Hedges Mot. at 3, 13. This is not in Wilson's complaint. Neither is it in the decision, *U.S. v. Wilson*, 565 F. Supp. 1416, 1420 (S.D.N.Y. 1983), that Powers and Hedges cite as their source. Wilson did not attempt to kill his ex-wife and this purported crime was part of Defendants' attempts to frame him, but Wilson does not seek to invalidate the New York conviction in this suit.

[10] *Compare* Briggs Mot. at 11 n.4 ("when Mr. Briggs signed the affidavit, he believed it to be true"), ("following his execution of the affidavit, Mr. Briggs had no part in, and was never aware of, any discussions about whether it should be corrected") *with* FAC ¶ 62 (Briggs knew affidavit was false when he signed it), *id.*, ¶¶ 217-18 (Sporkin passed analysis of declaration's falsity on to Briggs, after Texas trial).

instigating, encouraging, and/or perpetuating [Wilson's] prosecution, as well as regarding the events that transpired prior to the grand jury testimony" and Defendants' failure to disclose exculpatory evidence. *Enlow v. Tishmomingo County*, 962 F.2d 501, 511-512 (5th Cir. 1992).[11] Because of these and other disputed "material fact questions," this Court must deny Defendants' motions to dismiss. *Enlow*, 962 F.2d at 503 (affirming denial of defendant's motion for summary judgment because material fact questions remained); *id.* at 513 ("The facts as to Wall's asserted immunity defenses must be determined at trial").

Wilson's allegations against "complaining witness" Defendants – including Barcella and Greenberg – must survive at this stage because the very "determination of who is a complaining witness is a question of fact and thus, should not be resolved on a motion to dismiss." *Evans v. City of Chicago*, 2005 U.S. Dist. Lexis 18507, at *28 (N.D. Ill. Aug. 29, 2005); *Franklin v. Fox*, 2000 U.S. Dist. Lexis 19651, at *8-9 (N.D. Dec. 22, Cal. 2000) (refusing to dismiss claim with factual "dispute" as to whether defendant was complaining witness); *Smith v. Department of Human Servs.*, 2000 U.S. App. Lexis 25016, at *6 (10th Cir. Oct. 6, 2000) (determining whether defendants were complaining witnesses "depended on the resolution of factual issues that would be improper under Rule 12(b)(6)").

## B.      Defendants Have The Burden On An Immunity Motion

Defendants bear the burden of showing that absolute immunity is justified. *Burns v. Reed*, 500 U.S. 478, 496 (1991) ("we conclude that respondent [prosecutor] has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police"); *Houston v. Partee*, 978 F.2d 362, 366 (7th Cir. 1992); *Spurlock v. Thompson*, 330 F.3d 791, 796 (6th Cir. 2003) ("[t]he burden is on the official seeking protection to prove that absolute immunity is justified").

---

[11] Cases brought under 42 U.S.C. § 1983, as in *Enlow*, are analogous to Wilson's *Bivens* claims, and the immunity analysis is the same. *See, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 340 (1986) ("it is 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials'") (quoting other cases).

Defendants must shoulder their burden of demonstrating why absolute immunity, or even qualified immunity, is justified.  It is not sufficient for Defendants to make conclusory statements[12] that they are protected by absolute immunity.  As discussed in Section (IV)(C), *infra* at 15-29, the former prosecutor Defendants must "carr[y] their burden of establishing that they were functioning as 'advocates.'"  *Buckley*, 509 U.S. at 274; *Burns*, 500 U.S. at 486 ("the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question"); *Gregory v. City of Louisville*, 2006 U.S. App. Lexis 8792, at **25 (6th Cir. Apr. 11, 2006) ("The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question"); *Milstein v. Cooley*, 257 F.3d 1004, 1008 (9th Cir. 2001).  Defendants "seek[ing] absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope."  *Malley*, 475 U.S. at 340.  As demonstrated below, Defendants have not shown that they were functioning as advocates, as narrowly defined by the U.S. Supreme Court, in each and every instance described in Wilson's complaint.

Defendants must rebut the presumption against granting government officials absolute immunity.  *Spurlock*, 330 F.3d at 796 ("This Court generally presumes 'that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties'"); *Partee*, 978 F.2d at 368.  Allowing a government official to hide behind absolute immunity "is the exception rather than the rule."  *Spurlock*, 330 F.3d at 796.  This rare protection "has been extended sparingly" and "the person asserting it must demonstrate his clear entitlement to it."  *Metoyer*, 2000 U.S. Dist. Lexis 9470, at *23.[13]

---

[12] *See, e.g.*, Barcella Mot. at 14 ("None of the conduct related to these activities is a proper subject of this suit.") (citing no case law), 16 ("All of these activities are advocatory in nature.") (citing no case law); Richard Mot. at 8 ("textbook examples of conduct to which absolute immunity applies") (citing no case law); Trott Mot. at 5 ("fall comfortably within the boundaries") (citing no case law); Briggs Mot. at 2, 14, 20-21, 22 ("it obviously would make no sense") (citing no case law), 23 ("perjury can hardly be an end in itself") (citing no case law), 23 (not involved before or after Houston), 25 ("there were no non-immune acts"); Powers and Hedges Mot. at 8 ("unquestionably fall within the range of activities"), 13 ("threat to national security").

[13] Defendant Barcella argues that this Court's decision will be subject to interlocutory appeal if it denies his motion to dismiss.  Barcella Mot. at 5 n.6.  But any such appeal will be dismissed if it "turns on disputed material fact issues."  *Keko v. Hingle*, 318 F.3d 639, 642 n.3 (5th Cir. 2003).  Moreover, if Defendants next choose to argue for the defense of "qualified immunity," then those arguments will have to wait for the trier of fact.  *Kalina*, 522 U.S. at 122 ("whether qualified immunity would apply was a question of fact"); *Malley*, 475 U.S. at 341 (qualified

## IV.    ARGUMENT

### A.    Wilson Does Not Have To Plead With Greater Particularity

Wilson is not required to satisfy a "heightened pleading standard," as Defendants contend.  Barcella Mot. at 12; Richard Mot. at 3; Greenberg Mot. at 2-3.  This standard applies to overcome assertions of *qualified* immunity."  *See, e.g.*, *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 441, 443 (5th Cir. 1999) ("heightened pleading standard in order to overcome the defense of *qualified* immunity) (emphasis added); *see also Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988) (qualified immunity) (cited in Richard Mot. at 3).  It is well understood that qualified immunity requires a court to look at the merits of a claim.  *Kalina*, 522 U.S. at 122 ("whether qualified immunity would apply was a question of fact"); *Schultea v. Wood*, 47 F.3d 1427, 1433-34 (5th Cir 1995) ("the court may, in its discretion, insist that a plaintiff file a reply tailored to an answer pleading the defense of qualified immunity").  Here, however, Defendants have not raised qualified immunity as a defense.

Even if Wilson were required to satisfy Rule 9b, he pleads detailed information regarding the identities, roles, and activities of each Defendant in depriving him of his Constitutional rights.  FAC ¶¶ 19-62, 110-14, 118-19, 121, 123-39, 144-50, 153-54, 156-71, 176-232, 240-42, 243-46, 292-317, 326-40, 341-43, 347-48.  In short, his pleadings meet any heightened pleading standard.  *See, e.g.*, *Anderson v. Pasadena Indep. Sch. Dist.,* 184 F.3d 439, 444 (5th Cir. 1999) (plaintiff met heightened pleading standard when he "establish[ed] a causal connection between defendants' actions and decisions and the alleged constitutional violations").

Absolute immunity does not require this Court to look at the merits.  Consequently, a heightened standard of pleading is not required to resolve Defendants' motions to dismiss on the basis of absolute immunity, and a "short and plain statement of his complaint" suffices for Wilson's suit against former public officials.  *Schultea*, 47 F.3d at 1433.  Defendants fail to cite a

---

immunity may be resolved on summary judgment); *Gregory*, 2006 U.S. App. Lexis 8792, at *62 ("question for the jury"); *id*. at 63 (reversing summary judgment where "there exists a genuine issue of material fact about whether [examiner] Katz intentionally withheld exculpatory information").

single case that holds a heightened pleading standard is required on a motion to dismiss based upon absolute immunity.[14]

## B.  Defendants Do Not Address Wilson's Fourth Or Sixth Amendment Claims

Because Defendants do not address Wilson's Fourth or Sixth Amendment claims,[15] their motions to dismiss must be rejected at the outset.  Wilson pleads infringement of his rights under the Fourth,[16] Fifth,[17] and Sixth Amendments.[18]  The *Bivens* decision provides a remedy for the infringement of each Constitutional right.  Because "it is important, in a civilized society, that the judicial branch of the Nation's government stand ready to afford a remedy in these circumstances" (*Bivens*, 403 U.S. at 411 (concurring)), the *Bivens* decision allows a plaintiff such as Wilson "to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Constitutional] Amendment[s]."  *Id.* at 397; *see also Bivens*, 403 U.S. at 395 ("Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.").  Here, where Wilson was deprived of his rights under three separate Constitutional Amendments, he is "entitled" (*id.* at 397) to recover separately under each one.

---

[14] *Holleman v. McKee*, 2006 U.S. Dist Lexis 3405 (S.D. Tex. Jan. 17, 2006) (cited in Greenberg Mot. at 3) asked a prisoner to provide more detailed information regarding a defendant's *qualified* immunity which, as noted in Section III(B), *infra* at 8, is a fact-based matter requiring a higher level of specificity than required here.  *See also Jackson v. City of Beaumont Police Dep't.*, 958 F.2d 616 (5th Cir. 1992) (qualified immunity) (cited in Greenberg Mot. at 3).  The *Holleman* plaintiff failed to provide any information whatsoever regarding the defendant's role in assaulting him (*Holleman*, 2006 U.S. Dist. Lexis, at *2-3, 6-7) whereas Wilson describes Defendants' specific activities, particular meetings, and precise meeting dates.

[15] *See, e.g.*, Barcella's Mot. at 1 ("he claims that Defendants violated his Fifth Amendment right to due process"), 13; Powers and Hedges Mot. at 1 ("they violated his Fifth Amendment constitutional right to due process"), 6 ("In general, Plaintiff complains the Defendants violated his Fifth Amendment rights."); Greenberg Mot. at 8; Briggs Mot. at 14, 22.

[16] Wilson sues under the Fourth Amendment for unreasonable seizures, including the IRS jeopardy assessment. *See, e.g.*, FAC ¶¶ 9, 39, 123-41 (stealing $510,000), 159, 313-17.

[17] Here, Wilson sues under the due process clause of the Fifth Amendment for fabricating evidence and withholding exculpatory information in the D.C. prosecution, Texas proceedings, and IRS prosecution (FAC ¶¶ 10, 14, 337, 339).  *See, e.g.*, *Castellano v. Fragozo*, 352 F.3d 939, 955 (5th Cir. 2003) ("[t]he manufacturing of evidence and the state's use of that evidence along with perjured testimony to obtain Castellano's wrongful conviction indisputably denied him rights secured by the Due Process Clause"); *Wilson*, 289 F. Supp. 2d at 815-816; *Brady v. Maryland*, 373 U.S. 83 (1963).  Wilson also sues for violation of his Constitutional right to access to courts, derived in part from the Fifth Amendment.  *Christopher v. Harbury*, 536 U.S. 403 (2002); *Evans v. City of Chicago*, 231 F.R.D. 302 (N.D. Ill. 2005).

[18] Wilson sues under the Sixth Amendment for compulsory process violations.  *See, e.g.*, FAC ¶¶ 10, 13, 326, 329-31, 224 ("Wilson did not have and was not given the papers that showed what he knew …. This position vitiates his right to compulsory process"); *id.* ¶ 97 (adverse publicity), *id.* ¶ 105 (same).

## C.     Absolute Immunity Does Not Shield Abuses Of Office By Prosecutors

Defendants argue they have absolute immunity for prosecuting Wilson, regardless of whether they acted with malice or dishonesty, and that "the scope of absolute prosecutorial immunity is broad."[19]  Absolute immunity does not "shield abuses of office" by prosecutors. *Kalina*, 522 U.S. at 127.  Because Defendants' motions are frozen in time with case law from the 1970s, such as *Imbler v. Pachtman*, 424 U.S. 409 (1976)[20] and its out-of-date progeny from yesteryears,[21] this Court should pay special heed to several recent decisions of the U.S. Supreme Court on prosecutorial absolute immunity.

In several decisions that came down after *Imbler*,[22] the U.S. Supreme Court severely restricted the scope of absolute immunity.  In the first, *Mitchell v. Forsyth*, 472 U.S. 511 (1985),

---

[19] Jensen Mot. at 1 ("need to protect prosecutors from civil liability"), 7-9; Richard Mot. at 2, 5 ("scope of absolute prosecutorial immunity is broad"), 7 ("even when the prosecutor's conduct is alleged to be egregious, malicious or intentional"); Barcella Mot. at 7; Powers and Hedges Mot. at 11; Greenberg Mot. at 14; Trott Mot. at 5, 7.

[20] *See, e.g.*, Jensen Mot. at 9 ("[t]his Court need go no further than the Supreme Court's decision in *Imbler*"); *id.* at 1, 3, 7-11, 14; Powers and Hedges Mot. at 6-11, 13-15 (citing *Imbler*); Barcella Mot. at 5, 7-8, 11, 13, 14 (all citing *Imbler*); Greenberg Mot. at 3, 9-11, 14, 15, 17 (all citing *Imbler*); Richard Mot. at 2, 5-7, 9-11 (all citing *Imbler*).

[21] *Prince v. Wallace*, 568 F.2d 1176, 1178-79 (5th Cir. 1978) (cited in Powers and Hedges Mot. at 8); *Henzel v. Gerstein*, 608 F.2d 654, 657 (5th Cir. 1979) (cited in Powers and Hedges Mot. at 7-8, 10-11); *Tate v. Grose*, 412 F. Supp. 487, 488 (E.D. Pa. 1976) (cited in Powers and Hedges Mot. at 10); *Heidelberg v. Hammer*, 577 F.2d 429 (7th Cir. 1978) (cited in Powers and Hedges Mot. at 12); *Rose v. Koch*, 465 F. Supp. 1157 (E.D.N.Y. 1979) (cited in Powers and Hedges Mot. at 12); *Gutierrez v. Vergari*, 499 F. Supp. 1040 (S.D.N.Y. 1980) (cited in Powers and Hedges Mot. at 12); *Jackson v. Dillon*, 518 F. Supp. 618 (E.D.N.Y. 1981) (cited in Powers and Hedges Mot. at 12); *Siano v. Justices of Massachusetts*, 698 F.2d 52 (1st Cir. 1983) (relying upon *Briggs v. Goodwin*, 569 F.2d 10 (D.C. Cir. 1977) and other 1970s cases) (cited in Powers and Hedges Mot. at 12).  None of these decisions withstand the subsequent three decades of U.S. Supreme Court decisions.

[22] *Imbler v. Pachtman*, 424 U.S. 409 (1976), held that absolute immunity only protects a prosecutor acting "within the scope of his prosecutorial duties." *Id.* at 420, 423.  The *Imbler* Court had "no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430-31.  The decision was narrowly confined to "initiating a prosecution and in presenting the State's case." *Id.* at 431.  Despite its irrelevance to most of the activities described in Wilson's complaint, *Imbler* has been widely cited by Defendants.  It is both factually and legally distinct.  First, it does not reach the "investigatory" and non-advocative misconduct at issue in Wilson's case.  *Imbler* focused on the prosecutor's evaluation of evidence and his subsequent use of that evidence "at trial." *Id.* at 416.  Wilson sues over a much wider range of misconduct.  The *Imbler* Court "did not attempt to describe the line between a prosecutor's acts in preparing for those functions [i.e., initiating a prosecution and presenting the State's case], some of which would be absolutely immune, and his acts of investigation or 'administration,' which would not." *Buckley*, 509 U.S. at 270.  Second, *Imbler* did not deal with prosecutors who act outside the scope of their duties.  The *Imbler* prosecutor did not fabricate evidence; he simply evaluated evidence that was shown to him.  Third, *Imbler* did not address a prosecutor who failed to reveal exculpatory evidence on appeal.  To the contrary, the *Imbler* prosecutor turned over exculpatory information to the plaintiff at a critical time, resulting in a stay of the plaintiff's execution only weeks before his scheduled death. *Id.* at 412-13 n.5.  By contrast, Wilson's Defendants never revealed exculpatory information.  Fourth, the *Imbler* prosecutor was personally involved whereas Wilson's Defendants withheld exculpatory evidence while his trials and appeals were conducted by lawyers licensed in different jurisdictions.  For all of these reasons, to say nothing of *Imbler*'s status as a relic after thirty years of Supreme Court jurisprudence, the decision is not persuasive here.

- 12 -

the Court held that even the nation's highest prosecutor, the U.S. Attorney General, does not have absolute immunity to authorize a wiretap without a court warrant.  In the second, *Burns v. Reed*, 500 U.S. at 496, the Court held that a prosecutor who told police it would be appropriate for them to hypnotize a shooting suspect during their investigation did not have absolute immunity.  In the third, *Buckley v. Fitzsimmons*, 509 U.S. 259, the Court held that prosecutors who shopped around for an expert who would match the plaintiff's shoes with a "bootprint" found on the murder victim's door did not have absolute immunity.  In the most recent, *Kalina*, 522 U.S. at 129-131, the Court held that prosecutors who testify to the truth of factual statements in an affidavit submitted to a court are not protected by absolute immunity.[23]  The *Kalina* court further held that "[o]ur later cases have made it clear that it is the interest in protecting the **proper** functioning of the office, rather than the interest in protecting its occupant, that is of primary importance."  *Id*. at 125 (emphasis added).

The rationale of these cases from the past thirty years is that the "judicial process" has its own "safeguards" (*Kalina*, 522 U.S. at 492) to ensure the sanctity of the truth-seeking process. Absolute immunity is only available for prosecutorial "actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct."  *Burns*, 500 U.S. at 494.  Because "no court ha[s] the power to control or restrain" the "out-of-court activities" of prosecutors, giving them absolute immunity for out-of-court conduct would "impede the self-correcting nature of the judicial system."  *Spurlock*, 330 F.3d at 800. Therefore, absolute immunity has very "limited availability" to the former prosecutor Defendants.  *Milstein v. Cooley*, 257 F.3d at 1009 (denying absolute immunity to prosecutors who framed plaintiff, pressured witness to testify falsely, filed false crime report, made statements to media); *Waugh v. Curtis*, 1993 U.S. App. Lexis 1472, at *8 (unpublished) (9th Cir. 1993) ("[a]bsolute prosecutorial immunity is not unlimited in scope").

---

[23] Defendant Jensen misstates the holding of *Kalina*.  Jensen Mot. at 10 n.8 ("in *Kalina*, the Court held that the prosecutor's activities in connection with … *affidavit containing false statements*[] are the actions of an advocate that are protected by absolute immunity"); 11.  Although the *Kalina* prosecutor had immunity for filing the information and moving for an arrest warrant, she did not have immunity for "personally attesting to the truth of the averments in the certification" containing false statements. *Kalina*, 522 U.S. at 129; *see also id*. at 130-31.

Defendants unanimously request absolute immunity.  But the "norm" for federal officers sued in civil litigation over their out-of-court misconduct is "qualified immunity."  *Malley v. Briggs*, 475 U.S. at 340 (qualified immunity is "norm" for executive officers).  Defendants buck this "norm" by trying to super-size their shield from qualified immunity (which, facts will later show, they do not have either) to absolute immunity, which clearly does not apply to their non-advocative, investigative, and administrative functions.  *Kalina*, 522 U.S. at 507-8; *Burns*, 500 U.S. at 493; *Buckley*, 509 U.S. at 273; *Mitchell*, 472 U.S. at 517.  Courts have clarified that "absolute immunity is the exception rather than the rule."  *Spurlock v. Thompson*, 167 F.3d 995, 1003 (6th Cir. 1999).  Afraid of being held to the standard of ordinary government officials, the former prosecutor Defendants exclaim that the integrity of the judicial system would be at risk if they were exposed to civil liability.[24]  This argument cannot prevail.  *Kalina*, 522 U.S. at 131 ("petitioner argues that denying her absolute immunity will have a 'chilling effect' on prosecutors in the administration of justice ... We are not persuaded."); *Mitchell*, 472 U.S. at 520; *Partee*, 978 F.2d at 368.

Public policy is best served by protecting Defendants with qualified immunity which "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley*, 475 U.S. at 341; *see also Spurlock*, 330 F.3d at 796 ("This Court generally presumes 'that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'"); *Burns*, 500 U.S. at 486-87 ("presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties"); *Buckley*, 509 U.S. at 278 ("the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties").  Qualified immunity ensures that prosecutors will think more carefully about what they are doing outside the courtroom.  *Burns*, 500 U.S. at 495 ("Although the absence of absolute immunity for the act of giving legal advice may cause prosecutors to consider their advice more carefully,

---

[24] *See* Richard Mot. at 7-8 (undermines prosecutors); Powers and Hedges Mot. at 7 (same), 12-15; Trott Mot. at 4; Barcella Mot. at 7; Greenberg Mot. at 9-10.

'where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate.'").

Because Defendants are alleged (if not found by Judge Hughes) to have been in knowing violation of the law, qualified immunity is not available to them. *Spurlock*, 330 F.3d at 801 n.3 (no qualified immunity for prosecutor who violated "clearly established ... right" and "any reasonable official would know [prosecutor's] conduct was constitutionally inappropriate"). This argument will have to wait until summary judgment or trial. *Malley*, 475 U.S. at 341; *Enlow v. Tishomingo County*, 962 F.2d at 513 ("[t]he facts as to Wall's asserted immunity defenses must be determined at trial" because there are disputed facts).[25] For the following reasons, absolute immunity is not available to the Defendants for many of their activities.

### 1.       Functional analysis matters

Defendants argue they have immunity for every action they took.[26] To determine whether immunity exists, courts look at the "nature of the function performed." *Kalina*, 522 U.S. at 127 n.13 (1997); *Buckley*, 509 U.S. at 269 (same); *Mitchell*, 472 U.S. at 521 (same); *Burns*, 500 U.S. at 506. Each function performed by a prosecutor must be analyzed separate and apart from his other activities. *Milstein*, 257 F.3d at 1008 ("separate acts … must be considered individually"); *Partee*, 978 F.2d at 366 ("[w]e do not decide whether a *prosecutor* is entitled to absolute immunity; we decide whether a prosecutor *performing a particular function* is entitled to absolute immunity") (citation omitted). In its most recent decision on the topic, the U.S.

---

[25] There is a two-step inquiry in reviewing a defendant's claim for qualified immunity. First, courts look at whether the plaintiff asserts a violation of a known constitutional right and, second, whether the right was so clearly established at the time in question that a reasonable official in the defendant's position would have known he was violating plaintiff's constitutional rights. *Gregory*, 2006 U.S. App. Lexis 8792, at *15 (citing cases). Wilson plainly alleges violations of the Fourth, Fifth, and Sixth Amendments (FAC ¶¶ 9, 10, 13, 14, 39-42, 47, 52-53, 57, 58, 60, 105, 123-141, 149-150, 190-191, 198-202, 208, 224, 228, 294-295, 299, 301-307, 309-310, 326, 329-331, 337, 339,  and his complaint reveals that Sporkin, Richard, and the other Defendants were clearly aware of their violations (FAC ¶¶ 213-232).

[26] *See* Barcella Mot. at 5 (misconduct "was undertaken as part of his role as an advocate"), 6 ("[e]ach of these allegations concerns conduct fundamental to a prosecutor's advocatory role during the judicial phase of the criminal process"). 7-8 (prosecutors have "broad" immunity for almost anything they do), 11, 16; Richard Mot. at 2, 5 (same), 6 ("supervisory prosecutors"); Greenberg Mot. at 7, 10, 19 (Virginia prosecutor); Trott Mot. at 4 ("for all actions undertaken"); Jensen Mot. at 8 (advocate).

Supreme Court confirmed that the "functional" approach to absolute immunity goes way back in time:

> [E]xamining the nature of the function performed is not a recent innovation.  In [a case from 1880] we stated "whether the act done by [a judge] was judicial or not is to be determined by its character, and not by the character of the agent."

*Kalina*, 522 U.S. at 127 n.13.  Despite the fact that *Kalina* is the most recent case from the U.S. Supreme Court on the topic of absolute immunity for prosecutors, the Defendants have not quoted or even cited *Kalina* in their motions to dismiss.  Only Defendant Richard cites *Kalina*, but he does so for two uncontested purposes – one, to support the proposition that Wilson's allegations must be accepted as true at this stage (Richard Mot. at 3) and, two, to argue that prosecutors have absolute immunity when they perform conventional duties under the court's vigilant supervision (Richard Mot. at 8).  None of the Defendants recognizes that *Kalina* refused absolute immunity to a prosecutor who fabricated a false statement and, thereby, performed the function of a complaining witness (*see* Section IV(E), *infra* at 51-54) rather than prosecutor.

Defendants in this action have performed many functions – some protected by absolute immunity and some not.  *Genzler v. Longanbach*, 410 F.3d at 643 ("A prosecuting attorney may perform many roles, or functions ....  Not all of these roles are protected by absolute immunity.").  Only a small number of functions are actually protected, including "[p]reparation of witnesses for trial"; "appearance at a probable cause hearing and before a grand jury"; "evaluation of the evidence assembled by the police" (*Spurlock*, 330 F.3d at 797); filing charges[27]; deciding "whether to file an information"; deciding "which witnesses to call"; deciding "whether and when to prosecute" (*Imbler*, 424 U.S. at 431 n.33); and "appearing before a judge and presenting evidence in support of a motion for a search warrant" (*Burns*, 500 U.S. at 491).  The underlying

---

[27] *See Brummett v. Camble*, 946 F.2d 1178, 1181 (5th Cir. 1991) (citing *Imbler v. Pachtman*, 424 U.S. at 431 n.33 (1976)).  Defendant Trott and others cite *Brummett* in support of their argument for absolute immunity (Trott Mot. at 4; Powers and Hedges Mot. at 11), but the *Brummett* decision only provided immunity to a prosecutor for his role in "filing charges."  *Brummett*, 946 F.2d at 1181.  Wilson does not allege that Trott filed charges against him.  *Brummett* is weak precedent for Powers and Hedges because the holding rested on statute of limitations rather than immunity.  *Id*. at 1184.  Further, *Brummett* relies mostly on the 1970s *Imbler* decision and makes no reference to *Kalina*, 522 U.S. 118 or *Buckley*, 509 U.S. 259 and only mentions in passing *Burns*, 500 U.S. 478. The *Brumett* plaintiff was never tried or convicted.  *Brummett*, 946 F.2d at 1180.

- 16 -

rationale is that a prosecutor is "protected 'in connection with his duties in functioning as a prosecutor.'" *Spurlock*, 330 F.3d at 797. But courts have "bounded absolute immunity within the precise confines of adversarial judicial proceedings." *Keko v. Hingle*, 318 F.3d at 642-43. Absolute immunity is "designed to free the *judicial process.*" *Burns*, 500 U.S. at 494. Consequently, "prosecutors will only receive absolute immunity for activities that were an 'integral part of the judicial process.'" *Spurlock*, 330 F.3d at 797.[28]

It is axiomatic that "prosecutors are not entitled to absolute immunity for 'investigative' or 'administrative' acts" when they step outside their functions as an "advocate," as strictly defined. *Id*. at 798 (quoting *Burns*, 500 U.S. at 483 n.2 486). Unprotected functions include: "out-of-court statements made by a prosecutor at a press conference" (*Buckley*, 509 U.S. at 277-78 and FAC ¶¶ 341-343, 348); authorization of warrant-less wiretaps (*Mitchell*, 472 U.S. 511); provision of legal advice to the police (*Spurlock*, 330 F.3d at 798); statements made in an affidavit supporting an application for an arrest warrant (*id.*); failure to disclose exculpatory information on appeal (*Partee*, 978 F.2d at 368 and FAC ¶¶ 6, 40, 52-53, 60, 147-150, 185-228, 243-245, 299, 306-307, 309-310); "searching for the clues and corroboration that might give him probable cause" (*Kalina*, 522 U.S. at 126); and advising the police on the acceptability of an "investigative technique" (*Burns*, 500 U.S. at 481). The underlying rationale is that "a prosecutor will only receive absolute immunity for activities that were an 'integral part of the judicial process'" (*Spurlock*, 330 F.3d at 797) because the judicial process provides "truth-finding tools" (*Moore*, 30 F.3d at 619) to root out the truth and expose fraud.

When the former prosecutor Defendants acted "out-of-court," (*see* FAC ¶¶ 11, 21-23, 29, 35-36, 39, 41-42, 46-48, 53-54, 59-60, 110-114, 119, 121-141, 146-149, 154, 163, 166-170, 182-183, 185-232, 243-244, 293-294, 297, 300-305, 313-317, 325-327, 332-335, 341-342) they were

---

[28] Wilson does not seek liability against the following persons for the following activities: Hedges and Powers for making statements in the Texas court; Greenberg for making statements in the Virginia court (FAC ¶ 235 (opening statement in Virginia trial); *id.* ¶ 240 (arguments in Virginia trial), *id.* ¶ 242 (same)); Barcella for making statements in the D.C. court; Hedges for filing the 1984 appeals briefs in the Fifth Circuit; Barcella for filing briefs in D.C.; Hedges and Powers for selecting and evaluating (but not for fabricating) evidence to be used at the Texas trial; Barcella for selecting (but not for fabricating) evidence to be used at the D.C. trial; Greenberg for selecting (but not fabricating) evidence to be used at the Virginia trial.

- 17 -

not subject to the "truth-finding tools" of the courthouse.  Because "no court ha[s] the power to control or restrain [prosecutors'] out-of-court activities" (*Spurlock*, 330 F.3d at 800), civil liability must fill the void to hold these rogue prosecutors accountable.

### 2.    Non-advocative functions are not protected

Defendants characterize all of their activities as "advocacy" on behalf of the government.[29]  Defendants argue for a broad reading of "advocate" such that even a prosecutor who fabricates evidence or performs misconduct is still an "advocate" on behalf of the government.  Barcella Mot. at 5, 6, 8, 16; Greenberg Mot. at 10; Jensen Mot. at 8.  But case law rejects this broad reading.  *Kalina*, 522 U.S. at 126.

Because "one of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor," prosecutors do not have absolute immunity when they perform functions that are not intimately tied to advocacy within the courthouse. *Burns*, 500 U.S. at 496; *Spurlock*, 330 F.3d at 798.  The concept "advocate" is narrowly construed.  When a prosecutor makes press statements, he may perform the ordinary functions of his office but he is "not acting as an advocate [] when he h[o]ld[s] a press conference ... or when he allegedly fabricate[s] evidence."  *Kalina*, 522 U.S. at 126 (internal citation omitted).

Prosecutors' "acts [are] not done in their role as advocates" when they fabricate evidence, file a false crime report, or investigate a crime.  *Milstein*, 257 F.3d at 1006, 1011-1013 and *see* FAC ¶¶ 22, 28, 35, 39, 42, 46, 47, 53, 59, 62, 110-114, 119, 121, 144-145, 159, 170, 181, 203-204, 206, 213, 294-295, 313-315, 345, 347.  Even the U.S. Attorney General is not protected when he "engage[s] in the performance of national defense functions rather than prosecutorial functions."  *Kalina*, 522 U.S. at 127 (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).  The U.S. Supreme Court has trumpeted that prosecutors will be liable for performing activities that are "an integral part of a prosecutor's job" but non-advocative in function.  *Buckley*, 509 U.S. at 278.  In

---

[29] *See* Barcella Mot. at 5 (misconduct "was undertaken as part of his role as an advocate"), 6 ("[e]ach of these allegations concerns conduct fundamental to a prosecutor's advocatory role during the judicial phase of the criminal process"), 7-8 (prosecutors have "broad" immunity for almost anything they do), 11, 16; Richard Mot. at 2, 5 (same), 6 ("supervisory prosecutors"); Greenberg Mot. at 7, 10, 19 (Virginia prosecutor); Trott Mot. at 4 ("for all actions undertaken"); Jensen Mot. at 8 (advocate).

other words, prosecutors who do everything in their power to help the government win a case are often not protected by absolute immunity. Two clear examples of non-advocative functions for which Defendants do not have absolute immunity are withholding exculpatory evidence and making statements to the media.

### a.     Withholding exculpatory evidence

Defendants argue they should have absolute immunity for withholding exculpatory evidence from Wilson, his lawyers, and the courts.[30]   In actuality, Defendants are "liable for allowing the untrue testimony to go uncorrected" in Virginia, Texas, D.C., and New York, particularly on appeal. *Carney v. United States*, 2004 U.S. Dist. Lexis 10617, at *32-33 (N.D. Tex. June 9, 2004) (failure to correct untrue testimony is not protected by absolute or qualified immunity but *Carney* plaintiffs did not factually demonstrate that testimony was false); *Spurlock*, 330 F.3d 791; *Partee*, 978 F.2d 362; *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 480 n.11 (5th Cir. 1999); *Evans v. City of Chicago*, 231 F.R.D. 302, 24-28 (N.D. Ill. 2005).

Defendants lack immunity for withholding evidence from appellate courts and Wilson when "they were not personally prosecuting the appeal." *Partee*, 978 F.2d at 366.  Once prosecutors have completed a trial and the "appeal ha[s] been passed on to others in the [prosecutor's] Office," the original prosecutors who handled the trial no longer "function[] as prosecutors" on the case. *Id*.  Public policy mandates that courts should not immunize

---

[30] Defendants cite cases granting absolute immunity to prosecutors who ***personally*** handled the appeals briefs at the same time they withheld exculpatory evidence. *See Parkinson v. Cozzolino*, 238 F.3d 145 (2d Cir. 2001) (cited in Barcella Mot. at 9, Greenberg Mot. at 8, 11, 15, 18, Trott Mot. at 4-5; Powers and Hedges Mot. at 9); *Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (upholding *Partee* but noting that *Carter* prosecutor "was handling the post-conviction motions and the initial direct appeal") (cited in Greenberg Mot. at 18; Jensen Mot. at 14 n.12; Powers and Hedges Mot. at 9); *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (cited in Powers and Hedges Mot. at 9); *Henzel v. Gerstein*, 608 F.2d at 656 (cited in Barcella Mot. at 9, 11; Greenberg, Mot. at 10-14, 18; Powers and Hedges Mot. at 7, 8, 9, 10, 11; Richard Mot. at 5, 6, 7, 10; Trott Mot. at 4-6; Jensen Mot. at 11, 13); *Reid v. New Hampshire*, 56 F.3d 332, 338 n.13 (1st Cir. 1995) (same) (cited in Barcella Mot. at 11; Greenberg Mot. at 15, 16; Richard, 5, 10, 13; Jensen Mot. at 14 n.12).  Regarding Defendants' misconduct during appeals, Wilson only seeks liability against those prosecutors who did not personally handle the appellate briefs but nevertheless withheld exculpatory information from those jurisdictions. *Partee*, 978 F.2d at 365-366; FAC ¶¶ 40-42, 47, 52-53, 60, 57-58, 150, 190-191, 228, 299, 301-307, 309-310.

prosecutors who do not personally work on appeals briefs but nevertheless withhold exculpatory information:

> [T]here are few safeguards to prevent the abuses of power alleged in this case … In this case, ... the judicial process was largely unavailable as a check against the abuses that occurred.  No court could restrain the out-of-court activities of the defendant prosecutors when they were no longer involved in the case.  Since the alleged prosecutorial abuses took place after conviction, the safeguards normally available at trial could not control the defendant prosecutors' alleged unconstitutional conduct.  Because the defendant prosecutors made no appearance in the Illinois Appellate Court and withheld the exculpatory evidence from that court, that system provided no opportunity to prevent an unjust result.…
>
> The defendant prosecutors have not convinced us that absolute immunity for their suppression of Sumner's statement and the three confessions is necessary for the continued efficient functioning of our criminal justice system.  Making prosecutors answer for their post-prosecution acts that were not related to the prosecution will not hamper them in initiating a prosecution or in presenting the state's case.

*Id*. at 368.  The *Partee* holding is important both for its thorough analysis of the public policy behind absolute immunity and, also, for its application to facts that are similar to Wilson's.  Specifically, *Partee* prosecutors discovered from a cooperating witness that two other people were the murderers – not the plaintiff who was convicted.  *Id*. at 364.  Nevertheless, *Partee* prosecutors "stonewall[ed]" for years by withholding this exculpatory information from appeals briefs and appellate oral arguments.  *Id*.  The *Partee* prosecutors were not personally involved in the appeals process because they were "not list[ed]" in the appellate court decisions, they did not file the government briefs, and they did not argue the appeals.  *Id*. at 366 n.3.  Even after another person had confessed to the murder, the *Partee* prosecutors "amazingly, [] did not disclose any of this information to [plaintiff] Houston, Brown or their attorneys."  *Id*. at 365.  It is no less amazing that Wilson's defendants failed to disclose evidence for over twenty years.

Defendants withheld exculpatory information in appeals briefs filed with the Fourth Circuit.  FAC ¶¶ 299, 309.  None of the Defendants, except for Greenberg, was listed in the 1983 and 1990 published Fourth Circuit opinions.  *See U.S. v. Wilson,* 721 F.2d 967, 968 (4th Cir.

1983); *U.S. v. Wilson*, 901 F.2d 378, 378 (4th Cir. 1990).  The omission of every Defendant's name means that Defendants, excepting Greenberg, were not personally involved in writing or arguing the Fourth Circuit briefs.  Consequently, they do not have absolute immunity for withholding exculpatory information from the Fourth Circuit.  *Partee*, 978 F.2d at 366.  Defendants continued "stonewalling" for six more years until the next decision from the Fourth Circuit.  *U.S. v. Wilson*, 1996 U.S. App. Lexis 2538 (4th Cir. Feb. 7, 1996) (unpublished).  None of Defendants' names appeared on the Fourth Circuit's decision in 1996.  *Id.*, at *1.  Therefore, all Defendants lack absolute immunity for withholding exculpatory information as late as 1996 and beyond.  *Partee*, 978 F.2d at 366 n.3 and surrounding text (no absolute immunity for prosecutors who did not argue appeal, did not file appeal brief, and were not listed on appellate decision).

Defendants did not disclose exculpatory information in the Fifth Circuit appeals briefs.  FAC ¶¶ 150, 307, 310.  Only Hedges's name appears on the Fifth Circuit decision from 1984.  *See U.S. v. Wilson*, 732 F.2d 404, 405 (5th Cir. 1984).  Excepting Hedges, Defendants lack absolute immunity for withholding exculpatory information in relation to the Fifth Circuit appeals briefs.  Defendants' names do not appear on the Second Circuit decision regarding Wilson's appeal of his New York conviction; neither does Hedges's name.  *See U.S. v. Wilson*, 750 F.2d 7 (2d Cir. 1984).  Consequently, the Defendants do not have absolute immunity for withholding information in relation to the New York appeals briefs.  *Partee,* 978 F.2d at 366.

Defendant Trott withheld or was aware of the withholding of exculpatory information from each jurisdiction.  FAC ¶¶ 26-28, 30, 226, 306.  Wilson seeks damages from Trott for withholding exculpatory evidence from courts in Virginia, Texas, D.C., and elsewhere.[31]  As a non-advocate, Trott did not have absolute immunity for these claims.  *Partee*, 978 F.2d at 366 n.3 and surrounding text.[32]  He did not personally work on any of the appeals briefs.  FAC ¶ 30.

---

[31] *Contra* Trott Mot. at 3 n.1 ("Wilson does not allege that Judge Trott took any action that deprived Wilson of due process in his appellate proceedings before the Fourth Circuit").

[32] Trott cites *Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003), to argue for absolute immunity (Trott Mot. at 4) but the holding of that case refused absolute immunity to the defendants.  Instead, the *Broam* court gave the plaintiffs an opportunity to amend their complaint to provide more information.  The *Broam* court noted that

Trott played no role in researching, writing, or drafting the government's response to Wilson's appeal to the Fifth Circuit. *Id.* ¶ 302. Hedges alone worked on the 1984 Fifth Circuit appeals brief. *Id.* ¶¶ 301-04. Trott was not consulted on Hedges's draft of the Fifth Circuit appeals brief at or around 1984. *Id.* Trott never saw the government's response prior to filing. *Id.* Trott's name did not appear on the Fifth Circuit or Fourth Circuit appellate decisions. *See Wilson*, 732 F.2d at 405; *Wilson*, 901 F.2d at 378; *Wilson*, 1996 U.S. App. Lexis 2538, at *1; *Wilson,* 721 F.2d at 968. Nor does it appear that Trott was licensed in Texas, New York, D.C., or Virginia.

Defendant Barcella was an Assistant United States Attorney in Washington, D.C. where he still practices law. There is no evidence that he was licensed to practice in Texas, New York, Virginia, or in the IRS proceedings. Barcella did not personally work on the Second, Fourth, or Fifth Circuit appeals. He did not research or write the 1984 Fifth Circuit appeal brief, which Hedges handled alone. FAC ¶¶ 302, 304. Barcella's name does not appear on the appellate decisions.[33] Barcella failed to disclose exculpatory information to trial courts and appeals courts.[34] Barcella knew that a key witness had exculpated Wilson even ***before*** the D.C. grand jury was convened. *Id.* ¶¶ 292-93 (grand jury convened on August 25, 1980), *id.* ¶ 294.

---

qualified immunity, at best, may have been all that was available to the defendant prosecutor. *Broam*, 320 F.3d at 1033. Further, the *Broam* court cited with approval the *Partee* rationale that prosecutors are not immune for withholding exculpatory information from appellate briefs. *Broam*, 320 F.3d at 1031. The *Broam* court was off the mark in its dicta that prosecutors have immunity for investigative activity undertaken in cooperation with police. *Broam*, 320 F.3d at 1033. This mistake can only be attributed to the *Broam* court's improper reliance upon two cases from the early 1980s that pre-date several important U.S. Supreme Court decisions on the same topic. In *Buckley*, 509 U.S. at 276, the Court clarified that prosecutors do not have immunity when they shop around for experts and otherwise perform investigative functions. In *Burns*, 500 U.S. at 493-96, the Court held that prosecutors do not have immunity when they tell police officers that it would be appropriate to hypnotize a suspect to gather information. The allegations in *Broam* are similar to the investigative functions in *Buckley* and *Burns* and, if it had been properly informed by *Burns* and *Buckley*, the *Broam* court would have issued different dicta. Trott and others also cite *Graves v. Hampton*, 1 F.3d 315, 318 n.9 (5th Cir. 1993) (Trott Mot. at 5; Powers and Hedges Mot. at 11) which relates exclusively to a prosecutor's use of evidence at trial; the case says nothing about withholding evidence on appeal.

[33] *See Wilson*, 732 F.2d at 405; *Wilson*, 901 F.2d at 378; *Wilson*, 1996 U.S. App. Lexis 2538, at *1; *Wilson*, 750 F.2d at 7; *Wilson,* 721 F.2d at 968.

[34] FAC ¶¶ 39, 40 ("pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence acquired before, during and after Wilson's Houston criminal trial"); *id.* ¶ 41 ("supported the effort to keep the courts and Wilson's defense from discovering the evidence"); *id.* ¶ 42 (false affidavit); *id.* ¶ 165 (refused to disclose); *id.* ¶¶ 169, 190-91 ("Hedges then consulted separately with AUSA Powers, Greenberg and Barcella about the Tanes memorandum … they concluded the Tanes memorandum did not constitute new evidence and there was no need for disclosure"); *id.* ¶¶ 209, 213-14, 226-28, 243, 294-95, 297 (failed to disclose interview). Barcella not only failed to disclose on appeal, but he also failed to disclose prior to and during various trials. *Id.* ¶ 42 (D.C.), *id.* ¶ 293 (D.C.), *id.* ¶ 292 (D.C. grand jury indictment); *id.* ¶ 294 (forced witness to sign false affidavit on Aug. 4, 1980), *id.* ¶ 295 (D.C. trial commenced on March 2, 1983), *id.* ¶ 297.

- 22 -

Defendant Greenberg was not licensed in Texas, and he did not personally work on the Fifth Circuit briefs. His name did not appear in the Fifth Circuit published decisions. *See U.S. v. Wilson*, 732 F.2d at 405. In fact, Hedges turned down Greenberg's offer to work on the Fifth Circuit briefs, and Greenberg never reviewed a final draft of the brief. FAC ¶¶ 302, 304. Greenberg failed to disclose exculpatory evidence to the Fifth Circuit and other courts. *Id.* ¶¶ 147, 187-89, 190-191 ("concluded the Tanes memorandum did not constitute new evidence and there was no need for disclosure"); *id.* ¶¶ 213-14, 221, 226-28, 231. Even before the Virginia trial, Greenberg knew of exculpatory information that he never divulged to Wilson or his lawyers. *Id.* ¶¶ 285-89. Greenberg did not personally work on the 1996 Fourth Circuit appeal, and his name did not appear on the 1996 Fourth Circuit decision. *See U.S. v. Wilson*, 1996 U.S. App. Lexis 2538. He failed to disclose during and before trials, as well. FAC ¶ 47 ("Greenberg was completely aware, at the time the evidence was discovered, that it was exculpatory and needed to be disclosed to Wilson and the courts; however, he intentionally and knowingly failed to disclose"); *id.* ¶¶ 48, 167-68.

Defendant Powers was not licensed to practice outside Texas, and he did not personally work on briefs or trials in all nine different courts. But he failed to disclose exculpatory evidence to all of them.[35] In addition, Powers did not personally work on the Second or Fifth Circuit appeals briefs. His name did not appear on the 1984 Fifth Circuit published decision. *See Wilson*, 732 F.2d at 405. Nor did Powers personally work on the Virginia appeals, and his name did not appear on the Fourth Circuit decisions. *See Wilson*, 901 F.2d 378; *Wilson*, 1996 U.S. App. Lexis 2538, at *1, *Wilson,* 721 F.2d at 968.

Defendant Hedges was not licensed to practice in all nine courts where Wilson's matters were pending, and he did not personally work on briefs and trials in all nine courts. But Hedges nevertheless withheld exculpatory evidence from all of them. Hedges was "quite adamant on a

---

[35] *Id.* ¶¶ 52-53 ("Powers was completely aware, at the time the evidence was discovered [after the Texas trial], that it was exculpatory and needed to be disclosed to Wilson and the courts; however, he intentionally and knowingly failed to disclose"); *id.* ¶ 191 ("Hedges then consulted separately with AUSA Powers, Greenberg and Barcella about the Tanes memorandum … they concluded the Tanes memorandum did not constitute new evidence and there was no need for disclosure"); *id.* ¶¶ at 193, 213-14, 227-28.

- 23 -

non-disclosure course" (FAC ¶ 220) and thereby failed to disclose exculpatory evidence.[36]

Hedges did not personally work on the Fourth or Second Circuit appeals.  Hedges's name did not

appear on the Fourth Circuit decisions.  *See Wilson*, 901 F.2d at 378; *Wilson*, 1996 U.S. App.

Lexis 2538, at *1; *Wilson,* 721 F.2d at 968.  Defendants Hedges and Powers cite inapposite case

law to support their withholding of exculpatory evidence.[37]

Defendant Richard was not licensed to practice in Texas, New York, or Virginia.

Richard failed to disclose exculpatory evidence after the Texas trial, despite his own recognition

that he and his colleagues "must" make disclosure.[38]  Richard did not personally work on the

Second, Fourth, or Fifth Circuit appeals.  Richard did not review the final draft of the Fifth

Circuit or other appellate briefs.  *Id*. ¶¶ 302, 304.  Hedges alone worked on the Fifth Circuit

briefs.  *Id*. ¶¶ 301-04.  Richard's name does not appear on the Second, Fourth, or Fifth Circuit

decisions.[39]  Richard disclaims liability for the Virginia or New York proceedings (Richard Mot.

---

[36] *Id*. ¶ 57 ("Hedges was pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence"); *id*. ¶ 58 ("Hedges knew exculpatory evidence existed before the Houston trial, knew exculpatory evidence was discovered after the Houston trial, and that the Briggs affidavit was false"); *id*. ¶¶ 59-60, 190-91 ("Hedges then consulted separately with AUSA Powers, Greenberg and Barcella about the Tanes memorandum … they concluded the Tanes memorandum did not constitute new evidence and there was no need for disclosure"); *id*. ¶¶ 213, 226.

[37] Powers and Hedges Mot. at 9 (citing *Powell v. Spear*, 6 Fed. Appx. 739, 741 (10th Cir. 2001) (unpublished). Powers and Hedges do not mention that *Powell* is an unpublished decision.  The *Powell* prosecutor had turned over exculpatory information by the time of trial (*Powell*, 6 Fed. Appx. at 741) whereas Wilson's Defendants never turned over exculpatory evidence.  The *Powell* decision does not describe the evidence that had been withheld before trial or indicate whether it was material.  The case of *Long v. Satz*, 181 F.3d at 1279 (cited in Powers and Hedges Mot. at 9) was a *per curiam* decision that, quite simply, was wrongly decided.  The *Long* court was trapped in the 1970s.  *Long*, 181 F.3d at 1278-79 (citing *Imbler* but none of the four subsequent decisions of the U.S. Supreme Court on absolute immunity).  The *Long* prosecutor who had withheld information also handled the appeals and, for that reason, he may have had immunity.  The case of *Boyd v. Biggers*, 31 F.3d 279, 285 (5th Cir. 1994) (cited in Powers and Hedges Mot. at 10, 11) did not involve allegations that a prosecutor withheld or even knew of exculpatory information; allegations were limited to the prosecutor's role in convicting the plaintiff at trial. *Boyd*, 31 F.3d at 281, 284 n.6.  The suit in *Shaw v. Harris*, 116 Fed. Appx. 499, 500 (5th Cir. 2004) (cited in Powers and Hedges Mot. at 11) was dismissed because the plaintiff was still incarcerated.  *Shaw*, 116 Fed. Appx. at 500 ("all of those claims are barred by Heck").  Wilson is out of jail and *Heck* no longer bars his suit.  *See* Section (IV)(F), *infra* at 58.

[38] FAC ¶ 149 ("Richard … urged United States Assistant Attorney General, head of the criminal division, Delwen Lowell Jensen, 'I think we must make a disclosure – either to the judge or the defense attorney (a third option is to disclose to both)' … Richard concluded, 'disclosure is, unfortunately, necessary'"); *id*. ¶¶ 186-89 ("Rosenfield [] wrote a memorandum to DAAG Mark Richard for DOJ's Criminal Division entitled 'Duty To Disclose Possibly False Testimony.'  The four page memorandum summarized approximately 15 cases, including Supreme Court case law, directed to the DOJ and CIA's use of the false testimony"); *id*. ¶¶ 190, 198-202 (aware of mandatory duty to make disclosure); *id*. ¶¶ 203-05; 208-09; 213, 215-17, 219 ("On June 8, 1983, Sporkin wrote to DAAG Richard seeking another meeting … 'of the interested parties' … 'so that the issues raised in connection with the Briggs affidavit can be finally resolved'"); *id*. ¶¶ 200, 220, 227-28, 243.

[39] *See Wilson*, 750 F.2d 7; *Wilson*, 732 F.2d at 405; *Wilson*, 901 F.2d at 378; *Wilson*, 1996 U.S. App. Lexis 2538, at *1; *Wilson,* 721 F.2d at 968.

- 24 -

at 8 n.4) but Wilson seeks recovery from Richard for his role in withholding exculpatory evidence from courts in each jurisdiction.  *See, e.g.*, FAC ¶ 306.

Defendant Jensen failed to disclose exculpatory evidence after the Texas trial.  FAC ¶¶ 201-02 ("Richard urged Jensen, 'I think we must make a disclosure – either to the judge or the defense attorney (a third option is to disclose to both)'"); *id.* ¶¶ 208; 215-16; 220; 227-28. Defendant Jensen did not personally work on the Second, Fourth, or Fifth Circuit appeals. Jensen's name did not appear on those appellate decisions.[40]  Even after he left the employ of the government, Jensen continued to withhold exculpatory evidence despite the fact that he no longer worked as an "advocate" for the government in any sense whatsoever.  Wilson rejects any contention that Jensen is not liable for withholding exculpatory information after the summer of 1983.  Jensen Mot. at 5 n.4, 8.

Because they acted in supervisory capacities, Defendants Trott, Richard, Greenberg, Jensen, Barcella, and Briggs do not have absolute immunity for supervising other lawyers, government officials, and agents.[41]  Defendants do not have absolute immunity for poor supervision or "deliberate indifference to the risk that [] subordinates would introduce false evidence" and otherwise fail to disclose exculpatory information.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (no absolute immunity for supervising prosecutor who knew or should have known that false evidence was used to prosecute criminal charge); *Gregory v. City of Louisville*, 2006 U.S. App. Lexis 8792 (6th Cir. 2006) (recognizing that if plaintiff shows supervisors "somehow encouraged or condoned the actions of their inferiors" then they are similarly liable) (holding that plaintiff, unlike Wilson, had failed to introduce any evidence

---

[40] *See Wilson*, 750 F.2d 7; *Wilson*, 732 F.2d at 405; *Wilson*, 901 F.2d at 378; *Wilson*, 1996 U.S. App. Lexis 2538, at *1; *Wilson,* 721 F.2d at 968.

[41] *See, e.g.*, FAC ¶¶ 20-22 (Jensen, Richard), *id.* ¶ 23 (Jensen, Trott), *id.* ¶¶ 26-29 (Trott), *id.* ¶ 27 (Trott, Richard), *id.* ¶ 28 (Richard, Trott), *id.* ¶ 33 (Richard), *id.* ¶ 34, (Richard, Jensen, Trott), *id.* ¶ 35 (Richard, Jensen), *id.* ¶ 36 (Richard), *id.* ¶ 47 (Richard, Greenberg), *id.* ¶ 121 (Richard created "Wilson Trial Team"), *id.* ¶ 123 (Richard, Barcella), *id.* ¶ 149 (Jensen), *id.* ¶ 179 (Jensen), *id.* ¶ 187 (Richard), *id.* ¶ 199 (Richard), *id.* ¶ 200 (Richard), *id.* ¶¶ 201-02 (Jensen), *id.* ¶ 205 (Richard), *id.* ¶ 208 (Jensen), *id.* ¶ 209 (Richard), *id.* ¶¶ 210-11 (Briggs); *id.* ¶ 213 (Richard), *id.* ¶¶ 215-16 (Jensen), *id.* ¶ 218 (Briggs); *id.* ¶ 219 (Richard), *id.* ¶ 220 (Jensen), *id.* ¶ 226 (Trott), *id.* ¶ 227 (Jensen), *id.* ¶ 244 (Briggs), *id.* ¶ 300 (Richard), *id.* ¶ 302 (Trott), *id.* ¶¶ 303-05 (Trott, Richard), *id.* ¶ 327 (Richard), *U.S. v. Wilson*, 901 F.2d 378 (Greenberg worked as "Acting Chief" of DOJ Criminal Division).

- 25 -

regarding supervisors' roles); *Thompson v. Connick*, 2005 U.S. Dist. Lexis 36499, at \*15-17; *Buckley*, 509 U.S. at 272 ("At the time of this witness shopping the assistant prosecutors were working hand in hand with the sheriff's detectives under the joint supervision of the sheriff and State's attorney.").[42]

None of the Defendants researched, wrote, or argued the briefs in the IRS litigation against Wilson which resulted in the loss of $23 million. FAC ¶¶ 317-22. Barcella assisted the IRS with research by providing them with many classified materials that should not have been otherwise disclosed. *Id*. ¶¶ 313-15, 327, 341. Barcella's inappropriate disclosures were "dirty linen" that Defendants never brought to light. *Id*. ¶ 342. Throughout the 1980s, 1990s and even the present, Defendants have failed to disclose exculpatory information to the Tax Court regarding Wilson's legitimate financial involvement with the CIA. *Id*. ¶ 325.

Neither prosecutors nor police detectives have absolute or qualified immunity for withholding, suppressing, or hiding exculpatory evidence. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 480 n.11 (5th Cir. 1999). The prosecutor in *Imbler* turned over exculpatory evidence as soon as he uncovered it, resulting in a stay on the plaintiff's imminent execution. 424 U.S. 412-13 n.5.[43] The *Imbler* prosecutor had acted "from a belief that 'a prosecuting attorney has a duty to be fair and see that all true facts, whether helpful to the case or not, should be presented.'" *Id*. at 413. Because they withheld exculpatory evidence, Defendants do not have

---

[42] In *Genzler v. Longanbach*, 410 F.3d at 644 (cited in Trott Mot. at 6; Richard Mot. at 6), the court held that prosecutors who "gather information" from witnesses and "possibly encourage[] [them] to lie" do not have absolute immunity because they function as investigators. *Id*. at 642. But the *Genzler* supervisors were not directly involved in fabricating evidence or withholding evidence on appeal, as are Defendants in this action. In *Truvia v. Julien*, 2005 U.S. Dist. Lexis 539 (E.D. La. Jan. 11, 2005) (cited in Trott Mot. at 6; Jensen Mot. at 13 n.11), the plaintiff sued supervisor prosecutors for their overarching policies and failure to train subordinates. *Truvia*, 2005 U.S. Dist. Lexis 539, at \*4-5; *Truvia v. Julien*, No. 04-0680, slip op. at 8-10 (E.D. La. filed Sept. 24, 2004) ("policies/procedures of the District Attorney and his office"). Wilson does not sue Defendants for general "policies/procedures" but for directly fabricating evidence and withholding exculpatory evidence on appeal. His claims for legal liability are entirely different from the ones in *Truvia*.

[43] *Contra* Greenberg Mot. at 14; Barcella Mot. at 7-8 (claiming *Imbler* stands for proposition that prosecutors have absolute immunity for intentionally withholding exculpatory evidence). The *Imbler* court did not address whether immunity protects prosecutors who do not work on the case on appeal. This question was answered in the negative by courts drawing from later decisions by the U.S. Supreme Court. *Partee*, 978 F.2d 362; *Spurlock*, 167 F.3d 995.

absolute immunity for acting outside the "crucible of the judicial process" where there was no "check" to "restrain [their] out-of-court activities." *Burns*, 500 U.S. at 496.

In arguing that they are entitled to withhold exculpatory evidence, Defendants rely most heavily upon *Imbler* and a handful of cases that rest upon the *Imbler* decision, including *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979);[44] *Cousin v. Small*, 325 F.3d 627 (5th Cir. 2003);[45] *Groom v. Fickes*, 966 F. Supp. 1466 (S.D. Tex. 1997);[46] *Brandley v. Keeshan*, 64 F.3d 196, 201 (5th Cir. 1995);[47] and others.[48]  *Henzel* was decided in 1979 before the U.S. Supreme Court steadily curtailed absolute immunity for prosecutors over three decades of jurisprudence.  *See Mitchell*, 472 U.S. 511 (authorizing wiretap); *Kalina*, 522 U.S. 118 (filing affidavit); *Burns*, 500 U.S. 478 (guiding investigation); *Buckley*, 509 U.S. 259 (choosing expert).  In each case, the

---

[44] *See* Barcella Mot. at 9, 11; Greenberg, Mot. at 10-14, 18; Powers and Hedges Mot. at 7, 8, 9, 10, 11; Richard Mot. at 5, 6, 7, 10; Trott Mot. at 4-6; Jensen Mot. at 11, 13.  The vintage of *Henzel* renders it poor precedent since it came before four more recent U.S. Supreme Court cases on absolute immunity. *Henzel*, 608 F.2d at 656.  The *Henzel* decision gives no detailed information on the withholding of information.  *Id*. at 657.  Was it material information?  Who withheld it?  Did they disclose it at some point?  Did they withhold it on appeal?  None of these questions are answered, as they must be, for *Henzel* to serve as useful precedent.

[45] The *per curiam* opinion of *Cousin v. Small*, 325 F.3d 627 (5th Cir. 2003) is the most cited case in Defendants' briefs (second only to *Imbler*) to support their contention that prosecutors have absolute immunity to withhold evidence.  *See* Barcella Mot. at 8, 9, 11, 13; Greenberg Mot. at 8, 10, 11-15, 17; Richard Mot. at 2, 5, 6, 7, 8, 9, 10, 11; Trott Mot. at 5; Jensen Mot. at 12; Powers and Hedges Mot. at 7-11.  But *Cousin* is inapposite for several reasons.  First, *Cousin* relies on the 1976 case of *Imbler*, fails to discuss three subsequent Supreme Court cases (*Kalina*, *Burns*, *Mitchell*), and misconstrues a fourth (*Buckley*).  Because it rests on old case law, *Cousin* is not persuasive.  Second, the *Cousin* prosecutors personally worked on the case and, also, failed to disclose exculpatory evidence during trial.  *Cousin*, 325 F.3d at 635.  Wilson's Defendants did not work on his case during the appeals process.  *Partee*, 978 F.2d 362.  Third, the *Cousin* record indicates that the witness's own lawyer suggested he should lie at the plaintiff's trial in order to get a better sentencing deal.  *Cousin*, 325 F.3d at 634.  Unlike Wilson's Defendants, the *Cousin* prosecutor swept in after the police had done their work to evaluate the witness and prepare him for trial.  *Id*.  Fourth, Cousin was decided on the merits in a summary judgment motion with the benefit of a full "record."  *Id*. at 632 n.3 and accompanying text, *id*. at 633.  *Cousin* shifted the burden to the plaintiff to establish a genuine issue of disputed material fact.  *Id*. at 632-33.  Although this may be the correct approach on summary judgment (*Thompson v. Connick*, 2005 U.S. Dist. Lexis 36499, at *4 (E.D. La. Nov. 15, 2005)), it is not correct for Defendants' motions to dismiss.  Defendants have the burden, not Wilson.  *See* Section III(B), *supra* at 8-10.

[46] *See* Barcella Mot. at 5, 8, 11; Greenberg Mot. at 3, 10-14; Jensen Mot. at 3.  The *Groom* court held that prosecutors do not have absolute immunity when they receive "exhibits during the investigative phase." *Groom*, 966 F. Supp. at 1473 n.5 and accompanying text.  At such times, the prosecutor's "conduct was both prosecutorial and investigative, in nature." *Id*. at 1473.  But the *Groom* court dismissed the suit on other grounds – namely, because the plaintiff could not show "how he was harmed" or "deprived [] of a fair trial." *Id*. at 1473-74.  Without harm, the *Groom* court found the plaintiff "ha[d] not set forth any such violations." *Id*. at 1474.  Wilson amply pleads harm from Defendants' misconduct in Texas and elsewhere and, as noted in *Groom*, Defendants lack absolute immunity for "investigative" misconduct.

[47] *See* Greenberg Mot. at 11, 14; Richard Mot. at 7.  *Brandley* lacks persuasive power because it offers virtually no discussion and cites only *Imbler* from 1976 without reference to subsequent U.S. Supreme Court cases on absolute immunity for prosecutors.  *Brandley*, 64 F.3d at 201.  In addition, the *Brandley* plaintiff provided no evidence that the prosecutor defendant had actually suppressed evidence or intimidated a witness.  *Id*. ("probably").

[48] *See, e.g.*, *Bruce v. Wade*, 537 F.2d 850, 852 (5th Cir. 1976) (citing *Imbler*) (cited in Richard Mot. at 6; Powers and Hedges Mot. at 9).  The *Bruce* opinion was decided about the same time as *Imbler*.

- 27 -

defendants likely argued that they were acting as "advocates" in a general sense because they performed activities on behalf of the government.  But the U.S. Supreme Court refused to define "advocate" so broadly.  The court instead narrowed *Imbler*'s broad phraseology into today's restrictive concept of absolute immunity.

Not only did Defendants withhold evidence but, as in *Partee*, most of them did not work on the appeals.  FAC ¶¶ 52, 150, 156, 211-12, 225-28.  After the Texas trial, there was "very little sentiment in DOJ to do anything about the Briggs' [sic] affidavit."  *U.S. v. Wilson*, 289 F. Supp. 2d at 812.  Many Defendants were "investigating [their] perjury" after Wilson was convicted in Texas but while the case was still on appeal.  *Id*. at 809.  Defendants "could have told the court of appeals."  *Id*.  But they did not.  Defendants did not disclose exculpatory information – "not after trial, not before sentencing, not on appeal, and not in this [1999] review."  FAC ¶¶ 345-47, 167-68 ("none of this [exculpatory] information was disclosed by the DOJ during the Alexandria, VA pretrial conferences on October 29 and November 5, 1982"); 169 ("On November 5, 1982 … Greenberg … obtained the Official Inquiry from the CIA describing Wilson's post-retirement work for the CIA.").

### b.   Statements to the media

The U.S. Supreme Court clearly held in *Buckley*, 509 U.S. at 277 that prosecutors' "statements to the media are not entitled to absolute immunity."  Such statements are at issue here, particularly with respect to Barcella who was a media hound.  *See* FAC ¶¶ 341-43, 348.  Barcella slipped confidential materials to Peter Maas as part of his collaboration on the resulting book, "Manhunt" (*id*. ¶¶ 341-43), that severely injured Wilson's reputation and continues to do so, even today, as the book is sold and resold through Amazon.com and other retail outlets.  Greenberg made press statements, some of which appear in the Ted Koppel "Nightline" video cited in Wilson's complaint (*id*. ¶ 348), for which he lacks absolute immunity.  *Id*. ¶ 348.  The "Nightline" video segment contains footage from the early 1980s in which then-prosecutor Greenberg makes damaging pronouncements about Wilson as he is surrounded by journalists

and microphones.  For all these media statements, Defendants who made them lack absolute immunity.

In *Buckley*, the prosecutor had "made false assertions that numerous pieces of evidence, including the bootprint evidence, tied [plaintiff] to a burglary ring that committed the Nicarico murder."  *Id*. at 276.  The prosecutor released mug shots of the plaintiff, which were shown on television and newspapers.  *Id*.  The *Buckley* Court found no historical precedent to justify giving absolute immunity to a prosecutor's statements to the media.  *Id*. at 277.  The rationale was that "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor."  *Id*.  A prosecutor does not act as an "advocate for the State" when he speaks to the media.  *Id*. at 278 (citation omitted); *Milstein*, 257 F.3d at 1007 (telling media, "That's what you get when you step over the line.") (telling media after appeals, plaintiff "is still smarting from the fact that the system – in an effort to preserve the integrity of the criminal trial process – successfully exposed his alleged criminal misconduct").  Defendants are therefore not absolutely immune for their much more damaging comments about Wilson to the media.  FAC ¶ 3.

### 3.      Investigatory functions are not protected

Defendants argue they have absolute immunity for conducting investigations.  Trott Mot. at 7-8; Greenberg Mot. at 10-11, 13, 16-17; Barcella Mot. at12-14; Jensen Mot. at 10; Richard Mot. at 4, 6.[49]  Defendants "are not entitled to absolute immunity" for their investigative activities, resulting in violations of Wilson's Fifth and Sixth Amendment rights.  *Spurlock*, 330 F.3d at 798; *Mitchell*, 472 U.S. 511; *Burns*, 500 U.S. at 496; *Milstein*, 257 F.3d at 1006, 1011.  Exculpatory information raised in the course of each investigation should have been disclosed to Wilson, but none of it was turned over.  Defendants fabricated evidence and pressured witnesses – e.g., Briggs and Quintero – to lie in the course of investigations that supported prosecutions against Wilson.  The former prosecutor Defendants do not have absolute immunity for those

---

[49] Powers and Hedges, alone, do not argue they have absolute immunity for their investigative roles.

instances in which they "approached" a witness "for the purpose of inducing [the witness] to agree to testify falsely" against Wilson. *Milstein*, 257 F.3d at 1006, 1011 ("any investigating was done in the role of detective rather than advocate"). Therefore, they are liable to Wilson for pre-trial, trial, and post-trial investigations described below.

### a.   Pre-trial investigations

Defendants argue they are immune for pre-trial investigations. Greenberg Mot. at 10-11, 16-17; Barcella Mot. at 12-14; Richard Mot. at 6. Defendants gathered information, withheld the resulting exculpatory evidence, and pressured witnesses – *e.g.*, Quintero and Briggs – to testify falsely against Wilson in the D.C. and Texas trials, respectively. FAC ¶¶ 39, 45, 50, 51, 56, 105, 113-14, 119, 155, 158-59, 165, 169, 172-73, 181-82, 292-96. Defendants do not have absolute immunity for these pre-trial investigations resulting in violations of Wilson's Fifth and Sixth Amendment rights. *Castellano v. Fragozo*, 352 F.3d 939, 958 (5th Cir. 2003); *Genzler v. Longabach*, 410 F.3d 630, 640 (9th Cir. 2005); *Gregory*, 2006 U.S. App. Lexis 8792, at *34; *Buckley*, 509 U.S. at 272, 274 ("shopped for" right person to testify at trial); *Spurlock*, 330 F.3d at 801; *Milstein*, 257 F.3d at 1011.

Defendants knew from pre-trial investigations that Wilson had worked for the CIA after his supposed retirement, but they failed to disclose these facts. FAC ¶ 155 ("As early as 1977, the FBI informed the DOJ Wilson was still a contract employee of the CIA. [citation] The DOJ recorded this information in a memorandum and circulated it among its prosecutors"); *id*. ¶ 158. Even before trials in Virginia, Texas, or anywhere else, Defendants had investigated Wilson when they "interviewed the CIA officer Donnelly/Larson" and discovered "multiple records of Wilson's services for the CIA after his retirement in 1971." *Id*. ¶¶ 172-73, 182. While gathering this information, Defendants also "unlawfully suppressed exculpatory information" that should have been given to Wilson for trials in D.C., Virginia, and Texas. *Gregory*, 2006 U.S. App. Lexis 8792, at *61. Defendants do not have immunity for these investigatory actions and, to the extent they debate the facts, the question of immunity must go to a jury. *Id*. at 62.

- 30 -

Defendant Barcella conducted pre-trial investigations, and then withheld the exculpatory evidence that he gathered, in violation of Wilson's Fifth and Sixth Amendment rights.[50]  When Barcella interviewed Wilson in Rome and exchanged numerous phone calls with Wilson, he performed investigative functions without absolute immunity.  *Buckley*, 509 U.S. at 263, 273-74 (no absolute immunity for interrogating suspects and seeking friendly expert).

Barcella does not have absolute immunity for the "investigatory act" of pressuring Quintero to testify falsely against Wilson in D.C.  *Spurlock*, 330 F.3d at 801 ("pressuring a witness prior to the commencement of a prosecution to testify falsely is not an act of advocacy, but rather an investigatory act"); *Milstein*, 257 F.3d at 1011 (denying absolute immunity to prosecutors "acquiring known false statements from a witness for use in a prosecution").  Barcella personally investigated Wilson's alleged role in the assassination of a Libyan dissident, *i.e.*, the charges against Wilson in D.C.  FAC ¶¶ 292-95.  Long before Wilson's trial in Washington, D.C., before the D.C. grand jury had even indicted Wilson, and even weeks before the D.C. grand jury had commenced, Barcella knew from Quintero, a key witness, that Wilson had not ordered the assassination.  *Id*. ¶¶ 292-96.  This exculpatory information was never given to Wilson or his lawyers.  *Id*. ¶ 297.  In fact, Barcella asked the witness to sign a false statement that Wilson had paid him money to assassinate Muhayshi.  *Id*. ¶ 295.  It was a lie.  Barcella offered the witness a U.S. passport if he would sign the false statement.  *Id*. ¶¶ 294, 296.  Barcella acted as an investigator by interviewing the key witness (normally, a job for the FBI) and coercing that same witness into signing the false affidavit.  *Id*. ¶¶ 292-96.  None of this was done pursuant to Barcella's responsibilities as a prosecutor, evaluating and selecting evidence presented to him by the FBI.  Barcella stepped outside the boundaries of his office to conduct his own investigations.  *Id*. ¶ 159 (Barcella convened grand jury for investigative purposes); *Wilson*,

---

[50] FAC ¶ 39 ("Barcella helped … supervise the DOJ [pre-trial] investigation"); *id*. ¶¶ 105; 113 ("interviewed him in Rome, Italy, in July 1981"); *id*. ¶ 114 ("Over three days in Rome, Wilson provided information [to Barcella and others]"); *id*. ¶ 119 ("From approximately 1978-1979 through 1986, Barcella was the Assistant United States Attorney in charge of the investigation of Wilson."); *id*. ¶ 165 ("Barcella and at least one other individual had tape recorded conversations with Wilson").  Indeed, before the Virginia, Texas, or other trials took place, Barcella had already learned about Wilson's contacts with the CIA.  *Id*. ¶ 169 ("On November 5, 1982 … Barcella … obtained the Official Inquiry from the CIA describing Wilson's post-retirement work for the CIA.").

289 F. Supp. 2d at 809 (in 1981, Barcella "quizzed the CIA about Wilson" as part of his own ongoing investigation). Moreover, Barcella's role as a "grand jury adviser" or prosecutor seeking information in a grand jury "empaneled for investigative purposes" in Washington, D.C. is not entitled to absolute immunity. *Milstein*, 257 F.3d at 1012.

Defendant Greenberg conducted pre-trial investigations.[51] His functional role in altering information from a variety of sources is not entitled to absolute immunity. *Buckley*, 509 U.S. at 263, 273-74. Greenberg's role as a "grand jury adviser" or prosecutor seeking information in a grand jury "empaneled for investigative purposes" in Virginia is not entitled to absolute immunity. *Milstein*, 257 F.3d at 1012.

Defendants Powers and Hedges participated in investigations prior to the Texas trial.[52] Their functional roles investigating witnesses and fabricating evidence are not immunized. *See Buckley*, 509 U.S. at 273-74. Powers and Hedges' roles as "grand jury adviser[s]" or prosecutors seeking information in a grand jury "empaneled for investigative purposes" in Texas are also not entitled to absolute immunity. *Milstein*, 257 F.3d at 1012.

The U.S. Supreme Court held that a prosecutor is not acting, functionally, as prosecutor when "searching for the clues and corroboration" or when he "plans and executes a raid on a suspected weapons cache." *Kalina*, 522 U.S. at 126. Defendants' fabrication of evidence was part and parcel of their investigative work. In *Cignetti v. Healy*, 89 F. Supp. 2d 106, 114 (D. Mass. 2000), the Court held that prosecutors do not have absolute immunity when fabricating evidence:

> The defendants, however, do not have absolute immunity for the claim that they fabricated the composite tape evidence [that was later used in a hearing]. Cignetti alleges that the defendants in making the tape recording deliberately excluded certain calls and

---

[51] FAC ¶¶ 45, 105. Indeed, before the Virginia, Texas, or any other trials took place, Greenberg had learned from the government about Wilson's contacts with the CIA. *Id.* ¶ 169 ("obtained the Official Inquiry from the CIA describing Wilson's post-retirement work for the CIA"); *id.* ¶ 181 (encouraged CIA officials to fabricate evidence); *id.* ¶ 182.

[52] FAC ¶ 50 ("Powers helped … supervise the DOJ investigation into Wilson's alleged illegal activities [prior to trial], [during the] criminal trial, and after"); *id.* ¶ 51 (Powers); *id.* ¶ 56 (Hedges).

> reordered the sequence of other calls in order to create inculpatory
> evidence of wrongdoing.

*Cignetti*, 89 F. Supp. 2d at 114; *see also Castellano*, 352 F.3d at 958 ("Courts have also held that

non-testimonial pretrial actions, such as the fabrication of evidence, are not within the scope of

absolute immunity because they are not part of the trial.").

Defendants do not have absolute immunity for pre-trial and post-trial "investigatory"

notes" and memos which "would have been significant for cross-examination" if they had been

properly produced to [Wilson's] lawyer, as required by the Sixth Amendment.  *Gregory*, 2006

U.S. App. Lexis 8792, at *34 (no absolute immunity for officers' pre-trial investigatory notes).

As the Sixth Circuit found, "[t]he notes could have affected the prosecution's willingness to

continue toward trial" or appeal and "[t]heir very existence, even if not introduced as evidence at

trial, affected Plaintiff's criminal prosecution independent of the officers' testimony."  *Id*.  Even

if the former prosecutor Defendants made the decision (protected by absolute immunity) to use

particular evidence at one of Wilson's trials, they are not thereby protected for their previous

"investigative work":

> A prosecutor may not shield his investigative work with the aegis
> of absolute immunity merely because, after a suspect is eventually
> arrested, indicted, and tried, that work may be retrospectively
> described as "preparation" for a possible trial; every prosecutor
> might then shield himself from liability for any constitutional
> wrong against innocent citizens by ensuring that they go to trial.
> When the functions of prosecutors and detectives are the same, as
> they were here, the immunity that protects them is also the same.

*Buckley*, 509 U.S. at 276.[53]  The U.S. Supreme Court held that prosecutors acted as investigators

without absolute immunity when they shopped around for an expert who would match the

plaintiff's shoes with a "bootprint" found on the door of a murder victim.  *Id*. at 262, 272.

Defendant "prosecutors were working hand in hand with the sheriff's detectives under the joint

---

[53] Defendants Briggs, Powers, Hedges, Jensen, Trott, and Greenberg all fail to cite, mention, or discuss *Buckley*.  It is a significant case – not only because it comes from the U.S. Supreme Court but because it distinguishes "advocacy" activities from investigative or administrative activities.  Its holding sharply curtails the absolute immunity granted in *Imbler*.  Rather than omit *Buckley*, Defendant Barcella chooses to misconstrue *Buckley* as providing a "broad scope of absolute prosecutorial immunity."  Barcella Mot. at 8.  In fact, *Buckley* positively narrowed the scope of immunity that was provided by the earlier *Imbler* decision.  Specifically, *Buckley* held that prosecutors do not have absolute immunity for investigative work prior to trial or for their statements to the media.  509 U.S. at 276, 277.

- 33 -

supervision of the sheriff and State's attorney" in trying to find the right expert.  *Id*. at 272.

Defendants Greenberg, Barcella, Powers, Hedges, and others similarly worked "hand in hand"

with Briggs and CIA officials to conjure up false testimony against Wilson.  FAC ¶¶ 14, 42, 46,

62, 67, 121, 145, 154-155, 170, 179, 181-183.  Consequently, they are shorn of absolute

immunity for these violations of the Fifth Amendment.

The Ninth Circuit has held that prosecutors who meet with a witness engage in "police-

type investigative work, not quasi-judicial advocacy" even if the witness subsequently testifies at

trial.  *Genzler*, 410 F.3d at 640.  The *Genzler* prosecutors took "notes" that reflected the

witness's "narrative" about what happened – a narrative that changed from the earlier reports

that she had given to the police.  *Id*. at 640-41.  Prosecutors who "gather information" from

witnesses and "possibly encourage[] [them] to lie" do not have absolute immunity because they

are acting as investigators rather than advocates.  *Id*. at 642.  Defendants cannot evade liability

for their investigative work vis-à-vis CIA records (*Wilson,* 289 F. Supp. 2d at 813), the Rome

interview with Wilson, meetings with Quintero, and other instances.  It does not matter that the

"meetings" with Quintero, Wilson, and others may have been "to some degree related to trial

preparation."  *Id*. at 643.

**b.  Investigations during trial**

Defendants argue they have absolute immunity for their investigations during trial.

Greenberg Mot. at 13; Barcella Mot. at 12.  For the same reason Defendants are not entitled to

absolute immunity for pre-trial investigations, they are not protected for investigations during the

Texas and other trials.  *Buckley*, 509 U.S. at 273-74 n.5.  Because the Defendants were

"engag[ing] in police investigative work" during the Texas trial, they are not protected by

absolute immunity.  *Id*.  Specifically, they do not have absolutely immunity for pressuring CIA

officials to fabricate the false declaration against Wilson.  FAC ¶¶ 14, 46, 62, 67, 145, 154.  In

*Milstein*, 257 F.3d at 1011, the Ninth Circuit denied absolute immunity to prosecutors for

"acquiring known false statements from a witness for use in a prosecution."

- 34 -

Defendant Greenberg was an AUSA for Virginia.  FAC ¶ 44.  But Greenberg actively worked on the Texas case during the trial in an administrative or investigative capacity.[54]  As a prosecutor, his proper functions included the selection and evaluation of evidence.  But those functions plainly do not include the manipulation of evidence.  He was not functioning as an "advocate" in Texas, New York, or D.C.  Greenberg does not have absolute immunity for advising the CIA on how to review records of Wilson and, then, on how to draft the Briggs declaration summarizing that evidence.  *Burns*, 500 U.S. at 481 and FAC ¶¶ 46, 67, 154; *Wilson,* 289 F. Supp. 2d at 812.  Just as the *Burns* prosecutor told police that they could hypnotize a suspect to ask her about some shootings, Greenberg advised the CIA that they could cut, paste, and revise the language of the Briggs declaration without any legal complications.  *Burns*, 500 U.S. at 481-82; FAC ¶¶ 46, 54.  Both the *Burns* prosecutor and Greenberg went beyond mere evaluation of evidence, advised law enforcement officials on legal matters, and exposed themselves to civil liability.

Both Hedges and Powers condoned CIA officials' preparation of the Briggs declaration, introducing it into the Texas trial.  FAC ¶¶ 14, 50, 56, 144, 154.  Just as the *Burns* prosecutor lacked absolute immunity for advising police officials, they too lack absolute immunity for advising, shaping, and reviewing the CIA records.  *Burns*, 500 U.S. at 481-82.  The contrary case law cited by Hedges and Powers is inapposite.[55]

### c.    Post-trial investigations

Defendants argue they have absolute immunity for post-trial investigations.  Richard Mot. at 4; Trott Mot. at 7; Greenberg Mot. at 17; Jensen Mot. at 12.  Because "[f]unctionally, a

---

[54] *Id*. ¶¶ 45-46 ("Greenberg directed the CIA to redact exculpatory evidence from its documents and supervised the fabrication of the Briggs affidavit knowing the affidavit was false when prepared and when red to the jury during Wilson's Houston criminal trial."); *id*. ¶ 154 ("Greenberg, and CIA attorneys and officials, working in concert, falsified an affidavit [for the Texas trial]").

[55] The plaintiff in *Davis v. King*, 2000 U.S. Dist. Lexis 5366 (N.D. Tex. Apr. 24, 2000) (cited in Powers and Hedges Mot. at 11), unlike Wilson, was unable to show that the prosecutor defendant had fabricated evidence.  But the *Davis* court indicated that prosecutors who fabricate evidence do not have immunity, even though prosecutors introducing fabricated evidence at trial may be immune when the fabricated evidence is prepared and passed on to them by somebody else.  *Id*., at *5.  Power and Hedges helped fabricate the Briggs declaration and other evidence, all of which fell outside their advocacy-based decision to use the lies at trial.

prosecutor who injects himself into a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate," Defendants are not protected by absolute immunity. *Spurlock*, 330 F.3d at 799; *see also Buckley*, 509 U.S. at 273-74, 274 n.5.

Wilson's complaint is rife with instances in which each Defendant participated in a post-trial investigation into "the possibility of misconduct during the trial" and "assist[ed] in the administrative investigation by providing information," none of which is protected by absolute immunity. *Spurlock*, 330 F.3d at 800. *See* FAC ¶¶ 11, 166, 228 ("group acted in concert to generate and then withhold exculpatory evidence from Wilson"); *id.* ¶ 230 ("Another handwritten note details the prosecution's continued efforts to further investigate CIA IG Taylor's reported 80 plus service contacts Wilson had with the CIA post-retirement").

Defendant Jensen participated in the post-trial investigation.[56]  Defendant Richard participated in the post-trial investigation.[57]  Richard now argues that he is immune for his supervisory role in overseeing the "line prosecutors" who actually appeared in court.  Richard Mot. at 6 (citing *Rykers v. Alford*, 832 F.2d 895, 896-897 (5th Cir. 1987)).  But *Rykers* says nothing of the sort.  The *Rykers* decision merely granted immunity to a U.S. Attorney and three unidentified Assistant U.S. Attorneys for their functional role in seeking an arrest warrant. *Rykers*, 832 F.2d at 896.  The *Rykers* decision said nothing about whether the U.S. Attorney had appeared in court or whether the Assistant U.S. Attorneys had appeared in court.  *Id.*  The decision did not mention whether the U.S. Attorney had supervised the other three prosecutors.

---

[56] *See id.* ¶ 22 ("Jensen, along with CIA General Counsel Sporkin and [Deputy Assistant AG] Richard, directed the investigation into new evidence discovered after Wilson's Houston criminal trial proving that the key affidavit presented in this case (the 'Briggs affidavit') was fraudulent"); *id.* ¶¶ 23, 34 ("Jensen … co-supervised the DOJ's coordinated effort to keep Wilson [and nine different courts] … from discovering exculpatory evidence acquired … after Wilson's Houston criminal trial"); *id.* ¶ 35 ("Jensen [] assisted in directing the investigation into new evidence discovered after Wilson's Houston criminal trial … new evidence proved Wilson had been working for the CIA during the period of time the DOJ and CIA affirmatively stated he was not").

[57] *See id.* ¶ 28 ("Richard [] directed the investigation into new evidence discovered after Wilson's Houston criminal trial proving the Briggs affidavit was fraudulent"); *id.* ¶ 33 ("Richard was Deputy Assistant Attorney General during the DOJ's investigation into Wilson's alleged illegal activities, Wilson's criminal trial and after"); *id.* ¶ 34 ("Richard co-supervised the DOJ's coordinated effort to keep Wilson, [and nine different courts] from discovering exculpatory evidence acquired … after Wilson's Houston criminal trial"); *id.* ¶ 35 ("Richard … assisted in directing the investigation into new evidence discovered after Wilson's Houston criminal trial"); *id.* ¶ 149 ("[Richard] also suggested that '[i]f we don't make the disclosure we must first examine what purports to be the universe of contacts and 'paper' our own files with our findings…'"); *id.* ¶¶ 198-99.

*Id.*  In short, *Rykers* does not support the proposition for which Richard cites it.  The most Richard can honestly say about *Rykers* is that it provided absolute immunity to prosecutors for the limited function of seeking an arrest warrant.  *Contra* Powers and Hedges Mot. at 11 (citing *Rykers* as protection for fabrication of evidence and use of perjured testimony").

Defendant Trott participated in post-trial investigations.[58]  At the time, Trott was not "evaluat[ing]" evidence presented to him by law enforcement, as he argues (Trott Mot. at 7-8), for use in pre-trial or trial proceedings but rather he and the Defendants were working hand-in-hand with CIA officials to conduct the post-trial investigation.  FAC ¶¶ 27-28, 185-226; *Wilson,* 289 F. Supp. 2d at 802, 807-810.  Those are entirely different functions from the "evaluation" mentioned in *Buckley*, 509 U.S. at 273 (cited in Trott Mot. at 8).  Indeed, the *Buckley* Court held that prosecutors who "conducted" a joint investigation with police, evaluated the strength of various expert witnesses, and finally chose one of the witnesses for trial were not simply "evaluating" evidence – they were "performing essentially the same investigatory functions" as detectives.  *Id.* at 263, 272 ("prosecutors were working hand in hand with the sheriff's detectives").  Trott and the other Defendants were just as much performing "investigatory functions."

Defendant Barcella participated in the post-trial investigation.[59]  Barcella was not licensed in Texas, he did not appear in court in Texas, and he did not try the case in Texas. Defendant Greenberg was an AUSA for Virginia (FAC ¶ 44), but he participated in post-trial investigations and withheld exculpatory information gathered in those investigations.[60]

---

[58] *See* FAC ¶ 27 ("Trott co-supervised the CIA and DOJ's coordinated effort to keep Wilson [and the courts] … from discovering exculpatory and other relevant evidence acquired after Wilson's Houston criminal trial"); *id.* ¶ 28 ("Trott … directed the investigation into new evidence discovered after Wilson's Houston criminal trial proving the Briggs affidavit was fraudulent.  The new evidence proved Wilson had been working for the CIA during the period of time the DOJ and CIA affirmatively stated he was not"); *id.* ¶ 34 ("Trott … co-supervised the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence acquired … after Wilson's Houston criminal trial").

[59] FAC ¶ 39 ("Barcella helped … supervise the DOJ investigation into Wilson's alleged illegal activities, Wilson's criminal trials and after"); *id.* ¶ 40 ("Barcella was pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence acquired before, during and ***after*** Wilson's Houston criminal trial) (emphasis added); *id.* ¶ 42 ("He also assisted with the investigation into new evidence discovered after Wilson's Houston criminal trial proving the Briggs affidavit was fraudulent.").

[60] *Id.*  ("Greenberg helped … supervise the DOJ investigation into Wilson's alleged illegal activities", Wilson's criminal trials and after"); *id.* ¶ 45 ("Greenberg was pivotal in the DOJ's coordinated effort to keep Wilson … [and

- 37 -

Defendant Powers participated in the post-trial investigation.[61]  Defendant Hedges participated in the post-trial investigation.[62]  Defendants have no absolute immunity for these investigative activities or for withholding the resulting information.  *See Buckley*, 509 U.S. at 273-74.

In *Spurlock*, a prosecutor "provided information and advice to an investigative body" and "participated in an administrative investigation" when he coerced a witness to stick to false testimony.  *Id.*  It is clearly settled that when prosecutors go to trial and later participate in a "continuing investigation" into the same matters, they are "acting solely in an investigative capacity" that is not protected by absolute immunity.  *Partee*, 978 F.2d at 366-67.

### 4.       Identity as prosecutor does not matter

Defendants suggest that even a tangential connection with prosecution should invoke the protection of absolute immunity.  In essence, they argue that they deserve immunity simply because they were prosecutors or "advocates" in a general sense.[63]  But this is not the law.

The prosecutor in *Kalina*, similarly argued that her misconduct was "viewed as a whole, [] the work of an advocate."  522 U.S. at 130 ("petitioner argues that the execution of the certificate was just one incident in a presentation that, viewed as a whole, was the work of an advocate and was integral to the initiation of the prosecution").  But the U.S. Supreme Court did not buy it.  The mere identity of a person as a prosecutor confers no special protection.  *Id.* at 125 ("[o]ur later cases have made it clear that it is the interest in protecting the proper

---

nine different courts] from discovering exculpatory evidence acquired before, during and *after* Wilson's criminal trial"); *id.* ¶ 47 ("Greenberg … assisted in directing the investigation into new evidence discovered after Wilson's Houston criminal trial proving the Briggs affidavit was fraudulent").

[61] *Id.* ¶ 50 ("Powers helped prosecute Wilson and supervise the DOJ investigation into Wilson's alleged illegal activities, criminal trial and after"); *id.* ¶ 51 ("Powers was pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discover[ing] exculpatory evidence *acquired* before, during and *after* Wilson's Houston criminal trial") (emphasis added); *id.* ¶¶ 52-53 ("Powers assisted the other defendants in the investigation into new evidence discovered after Wilson's Houston criminal trial").

[62] *Id.* ¶ 56 ("Hedges helped … supervise the DOJ investigation into Wilson's alleged illegal activities, criminal trial and *after*") (emphasis added); *id.* ¶ 59 ("Hedges assisted the other defendants in the investigation into new evidence discovered after [] Wilson's Houston criminal trial proving the Briggs affidavit was fraudulent").

[63] *See* Barcella Mot. at 5 (misconduct "was undertaken as part of his role as an advocate"), 6 ("[e]ach of these allegations concerns conduct fundamental to a prosecutor's advocatory role during the judicial phase of the criminal process"), 7-8 (prosecutors have "broad" immunity for almost anything they do), 11, 16; Richard Mot. at 2, 5 (same), 6 ("supervisory prosecutors"); Greenberg Mot. at 7, 10, 19 (Virginia prosecutor); Trott Mot. at 4 ("for all actions undertaken"); Jensen Mot. at 8 (advocate).

functioning of the office, rather than the interest in protecting its occupant, that is of primary importance"); *id.* at 127 (courts do not look at "identity of the actor"); *Buckley*, 509 U.S. at 269 ("functional approach … looks to 'the nature of the function performed, not the identity of the actor who performed it'"); *id.* at 273 ("the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor").  In *Mitchell*, the U.S. Supreme Court held that the nation's highest-level prosecutor "is not absolutely immune from suit for damages arising out of his allegedly unconstitutional conduct in performing his national security functions."  472 U.S. at 520.

The U.S. Supreme Court has held that absolute immunity is not "expansive" enough to protect "[a]lmost any action by a prosecutor."  *Burns*, 500 U.S. at 495.  Even activities that are done in the ordinary course of a prosecutor's business, such as making press statements, are still not covered by absolute immunity.  *Buckley*, 509 U.S. at 278 (no absolute immunity for prosecutor who makes statements to press even though "[s]tatements to the press may be an integral part of a prosecutor's job [citation] and they may serve a vital public function"); *Mitchell*, 472 U.S. at 519-22 (Attorney General performing national security functions, although part of his job, is not protected).

Because absolute immunity does not protect the prosecutor's "identity," there are many functions that are "an integral part of a prosecutor's job" which do not receive the protection of absolute immunity.  *Buckley*, 509 U.S. at 278.  Therefore, Defendants mere identities as prosecutors do not shield them from civil liability.

**5.      Timing does not matter**

Defendants make much ado over whether prosecutorial activities took place before or after probable cause, arguing that they have immunity for all actions performed after probable cause.  Barcella Mot. at 8. n.8 ; Greenberg Mot. at 8, 10-11; Jensen Mot. at 13.  This argument is misplaced.  Courts have consistently held that the phase of the judicial proceedings is "not a determinative factor."  *Genzler v. Longanbach*, 410 F.3d 630, 640 (9th Cir. 2005); *Moore v.*

*McDonald*, 30 F.3d 616 (5th Cir. 1994); *Buckley,* 509 U.S. at 274 n.5.  In *Buckley*, the Court noted that probable cause is not a bright line for distinguishing when a prosecutor has absolute immunity.  Even after probable cause findings, "a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity.'"  509 U.S. at 274 n.5.  What matters most for absolute immunity is whether the "truth-finding tools of the judicial process are present" and the precise nature of the "function[]"performed by the Defendants.  *Moore*, 30 F.3d at 619; *Genzler*, 410 F.3d at 640 ("[w]e also focus on whether the character of the meetings was more in the nature of quasi-judicial advocacy or police-type investigative work").  Defendants each participated in investigatory activities that took place before grand jury indictments and trials, but they are equally liable for subsequent misconduct.

**D.     Briggs Is Not Protected By Absolute Immunity For Witnesses**

Because he was not a prosecutor, the doctrine of absolute immunity for prosecutors does not apply to Briggs.  *Spurlock*, 167 F.3d at 1003 ("by no stretch of the imagination" does prosecutorial immunity pertain to non-prosecutors because they do not "fit into that category").  Briggs therefore argues that his improprieties were protected by a circumscribed doctrine known as absolute immunity for witnesses.  Briggs Mot. 11-21.

But "absolute immunity is the exception rather than the rule" for trial witnesses.  *Spurlock*, 167 F.3d at 1003.  The public policy rationale is that witnesses should be able to testify without the threat of lawsuits (*Spurlock*, 167 F.3d at 1003-04), and the truth-finding process is best served when witnesses testify freely.  *Briscoe v. LaHue*, 460 U.S. 325, 333 (1983) ("the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible").  To ensure that witnesses feel comfortable telling the truth, the U.S. Supreme Court has granted absolute immunity to witnesses who testify in court, take an oath, and subject themselves to cross-examination.  *Id*. at 333-36.

The *Briscoe* Court only granted immunity because of "[t]he ability of courts, under carefully developed procedures, to separate truth from falsity."  *Id*. at 335.  The "truth-finding

- 40 -

tools" are the *sine qua non* of absolute immunity for witnesses.  *Moore*, 30 F.3d at 619.  They

include cross-examination of live "testimony in judicial proceedings."  *Briscoe*, 460 U.S. at 330.

These "truth-finding tools" only work inside the "judicial crucible."  It logically follows that,

when the "judicial crucible" is not present, the *Briscoe* rationale mandates that witnesses not be

given absolute immunity, as described below, where Briggs performed non-testimonial, out-of-

court activities and submitted testimony that was not subject to "truth-finding tools."

### 1.        Non-testimonial conduct is not protected

Briggs did much more than submit a declaration in the Texas trial; he also withheld

exculpatory information and fabricated evidence against Wilson, all of which occurred out-of-

court and outside the pale of "procedural safeguards."  FAC ¶¶ 62, 67, 110, 170, 171, 204, 210,

218, 244.  These non-testimonial, out-of-court actions are not protected by absolute immunity.[64]

Briggs personally conducted formal investigations into Wilson's relationship with the

CIA, but he failed to disclose any of the resulting exculpatory information.[65]  Even after the

Texas trial, Briggs continued to play a role in the investigation and cover-up of Wilson's

contacts.  FAC ¶¶ 210-11 ("Sporkin forwarded to the CIA's Executive Director (presumably

Charles Briggs was still in this position) the IG's completed report on contacts between Wilson

and CIA employees … Sporkin asked for the Executive Director's comments"); *id.* ¶ 244.  It is

reasonable to presume that Briggs honored the request of his own General Counsel to provide

comments on the review of Wilson's contacts.  Briggs does not have immunity for these non-

testimonial, out-of-court activities.  Not even prosecutors have immunity in such situations

---

[64] *Carney v. United States*, 2004 U.S. Dist. Lexis 10617, at *34-43, 48 (N.D. Tex. 2004); *Castellano v. Fragozo*, 352 F.3d at 958; *Keko v. Hingle*, 318 F.3d at 644; *Spurlock*, 167 F.3d at 1002-04; *Paine v. City of Lompoc*, 265 F.3d at 983; *Evans v. City of Chicago*, 231 F.R.D. 302, 24-28 (N.D. Ill. 2005).

[65] FAC ¶ 62 ("Briggs directed the review of all CIA records in search of any material that pertained to Wilson or his activities.  In addition, he reviewed results of all previous searches into Wilson's ongoing contacts with the CIA after 1971 … The Briggs[] search found at least eighty non-social contacts between Wilson and CIA employees"); *id.* ¶ 110 ("Briggs, the executive director of the CIA, finally appointed a CIA employee to review records and authorized 'access to all records systems of the Agency for purposes of searching those records for material that in any way pertains to Mr. Wilson or his activities"); *id.* ¶ 166; *id.* ¶ 170 (Briggs … appointed a CIA employee to *review all records* and authorized 'access to all record systems of the Agency for purposes of searching those records for material that in any way pertains to Wilson or his activities'"); *id.* ¶¶ 182, 203-04.  Briggs likely worked with the CIA's Inspector General and others to compile and distort information about Wilson's CIA contacts, requesting "negative reports" about Wilson's involvement.  *Id.* ¶¶ 99-100.

- 41 -

because participation in "a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate." *Spurlock*, 330 F.3d at 799.

Because the former prosecutor Defendants are not entitled to immunity for withholding exculpatory evidence on appeal (see *supra* at 19-28), it is equally clear that Briggs does not have absolute immunity for his non-testimonial role in hiding "the pea" from nine different courts and Wilson.[66]  The pre-trial and post-trial memos and records exchanged between Briggs and other CIA officials were not protected by absolute immunity, even though they related to the Briggs declaration in the Texas trial.  *See Gregory*, 2006 U.S. App. Lexis 8792, at *34.  Indeed, "the creation of the notes was a pretrial, nontestimonial act which does not merit absolute immunity." *Id*., at *35.

Absolute immunity does not extend to witnesses who "committed, and conspired to commit, non-testimonial acts, such as manufacturing probable cause and fabricating evidence." *Spurlock*, 167 F.3d at 1002-04 (fabrication of testimony and participation in cover-up); *Paine v. City of Lompoc*, 265 F.3d 975, 983 (9th Cir. 2001) ("pretrial coverup" and suppression of witness identity).  The Fifth Circuit has agreed with other courts that "non-testimonial pre-trial actions, such as the fabrication of evidence, are not within the scope of absolute immunity because they are not part of the trial." *Castellano*, 352 F.3d at 958.

Briggs's non-testimonial and "pre-testimonial activities were investigative" and he does not have absolute immunity for "shoddy … techniques" in investigation.  *Keko*, 318 F.3d at 644.  The *Keko* plaintiff sued an expert forensic odontologist who had analyzed "dental impressions" on a dead body and concluded that the impressions linked plaintiff to the murder of the bitten victim.  *Keko*, 318 F.3d at 641 n.2.  The plaintiff sued the expert, Dr. West, for his role in examining the evidence and writing a report.  *Keko*, 318 F.3d at 644.  Despite the fact that

---

[66] FAC ¶ 62 ("he failed to disclose his misconduct to Wilson or the courts"); *Wilson,* 289 F. Supp. 2d at 817; *Cignetti v. Healy*, 89 F. Supp. 2d 106 (D. Mass. 2000) (prosecutors do not have absolute immunity for making false tape recording); *Buckley*, 509 U.S. at 276 (prosecutor may not "shield his investigative work with the aegis of absolute immunity"); *Paine*, 265 F.3d at 983.

- 42 -

Dr. West had testified at the plaintiff's criminal trial, the court refused to shield Dr. West's pre-

trial activities with absolute immunity:

> The doctor also seeks absolute immunity for his pre-testimonial
> activities in examining Mrs. Keno's body, obtaining and
> examining [plaintiff] Keko's dental impressions and writing a
> report.  He cites only policy statements enunciated in Briscoe and
> what he asserts are comparable policies surrounding absolute
> prosecutorial immunity to justify broadening the concept of
> testimonial immunity beyond what is introduced in the courtroom.
> While we have some sympathy for the policy views he espouses,
> there is virtually no authority to support them.  Further, to the
> extent Dr. West's pre-testimonial activities were investigative, his
> immunity ought to correlate with the merely qualified immunity
> granted to the police for comparable activities.  Thus, if, as
> alleged, Dr. West used shoddy and unscientific research techniques
> that resulted in a report critical to a baseless murder prosecution of
> Keko, there is no obvious reason why Dr. West should enjoy
> immunity greater than that of other investigators.

*Keko*, 318 F.3d at 644.  Because Briggs performed pre-testimonial activities,[67] there is "no

obvious reason" why he should have absolute immunity for those activities and his

accompanying failure to disclose.  *Id.*  Absolute immunity is also not available to Briggs for

withholding exculpatory information prior to and during Wilson's trials.  *Carney*, 2004 U.S.

Dist. Lexis 10617, at *34-43, 48.

In *Metoyer v. Connick*, 2000 U.S. Dist. Lexis 9470, the Court found that a government

employee performing the same functions as Briggs did not have absolute immunity.  The

government employee was a physician at a state hospital, Dr. Angel, who hid exculpatory

information and later testified at the plaintiff's criminal trial.  The plaintiff was convicted of

attempted manslaughter on the basis of Dr. Angel's in-person courtroom testimony.  Dr. Angel's

courtroom testimony eviscerated the plaintiff's criminal defense.  It turned out that Dr. Angel's

court-room testimony was false and directly contradictory to his own previously-dictated notes

which were not disclosed to the plaintiff.  The plaintiff was convicted on the basis of Dr. Angel's

---

[67] FAC ¶ 62 ("directed the review of all CIA records in search of any material that pertained to Wilson or his activities"), *id*. ¶ 67 ("drafted the Briggs affidavit"), *id*. ¶ 110 ("appointed a CIA employee to review records"), *id*. ¶ 170 (same).

false testimony.  The Court rightly held that Dr. Angel had no immunity for his prior

investigative work:

> It appears from the allegations in the complaint, unsupported by
> evidence at present, that defendant's function was to gather and
> interpret evidence in the course of performing a craniotomy on
> Wilson.  In that role, Dr. Angel is analogous at best to a police
> officer or other official when he or she is investigating a crime.  It
> is well established that such persons are not entitled to absolute
> prosecutorial immunity because they are obtaining evidence, not
> performing traditional prosecutorial functions, such as deciding
> which prosecutions to bring and conducting them in court…[T]his
> Court will not extend absolute prosecutorial immunity to a state-
> employed physician who was gathering and interpreting evidence
> for the prosecution.  Thus, Dr. Angel cannot be absolutely immune
> from liability for his alleged violation of Section 1983 in failing to
> disclose or conspiring to fail to disclose the exculpatory operative
> report.

*Metoyer*, 2000 U.S. Dist. Lexis, at *22-24.  Briggs similarly gathered and interpreted evidence

regarding Wilson's contacts with the CIA.[68]  His actions were investigative, as were those of the

Defendant prosecutors who assisted the records search.  Time and again, courts have refused

absolute immunity to witnesses who fabricate evidence, even if they later testify on the basis of

that same evidence.  *Pierce v. Gilchrist*, 359 F.3d at 1281, 1293-94; *Gregory*, 2006 U.S. App.

Lexis 8792, at *17 (6th Cir. 2006).

 Contrary to Briggs's argument (Briggs, Mot. at 1, 23-24 (the complaint "is narrow as it

relates to Mr. Briggs")), his liability is not limited to the submission of a fraudulent declaration

at Wilson's Texas trial.  Briggs "ignores the fact that plaintiff[] allege[s] that he engaged in

testimonial *and* non-testimonial acts that occurred both before and after he and other defendants

rendered false testimony at trial." *Spurlock*, 167 F.3d at 1002; *Paine*, 265 F.3d at 982 (detective

liable for out-of-court activities even if he later testifies as a witness).  Briggs conducted a

shoddy investigation, failed to disclose exculpatory information,[69] conspired to deprive Wilson

---

[68] FAC ¶ 62 ("directed the review of all CIA records in search of any material that pertained to Wilson or his activities"), *id*. ¶ 67 ("drafted the Briggs affidavit"), *id*. ¶ 110 ("appointed a CIA employee to review records"), *id*. ¶ 170 (same), *id*. ¶¶ 171, 203-04 (responding to Briggs's request for a search, CIA officials told him that CIA-Wilson contacts were "too many to count" and "filled three safe drawers of data").

[69] Briggs cites *Mowbray v. Cameron County*, 274 F.3d 269 (5th Cir. 2001) to argue that the duty to disclose exculpatory evidence only runs to the prosecutor – not to officers or other officials like Briggs.  Briggs Mot. at 24 n.9 and accompanying text (discussing *Mowbray*); *see also* Richard Mot. at 6 (citing *Mowbray*); Powers and

- 44 -

of his Constitutional rights (see Section IV(F), *infra* at 54), and participated in investigations before and after Wilson's trials.  FAC ¶¶ 185-56 (internal CIA memo "acknowledged the Briggs affidavit was false"); *id.* ¶¶ 61-62, 110-13, 144-45, 170-74, 185, 203-06, 210-18, 226, 244.  The CIA reviews and investigations conducted by Briggs "exist[] independently of [his] subsequent testimony" and serve as a "piece of documentary evidence upon which … the prosecutors justifiably relied to continue their prosecution."  *Gregory*, 2006 U.S. App. Lexis 8792, at *32-33.  Wholly ignoring the role of Briggs's declaration at the Texas trial, Briggs's investigations nonetheless affected "the course of the criminal proceedings."  *Id.*, at *33.  His investigations and his withholding emboldened the other Defendants to continue their prosecutions of Wilson.

Wilson was a significant topic of discussion and investigation at the CIA, and Wilson's role in extracting useful intelligence was brought to the attention of the very highest levels of the Agency.[70]  An AUSA told the nation's highest-level prosecutor, U.S. Attorney General William French, that "the information Wilson could provide us with regard to current activities in Libya could prove of uncalculable[sic] value."  *Wilson*, 289 F. Supp. 2d at 806.  Therefore, it is reasonable to presume that Briggs, the number 3 man at the CIA, was familiar with Wilson and the CIA's long-term relationship with him.  Briggs claims to have no knowledge of Wilson's post-retirement contacts with the CIA (Briggs Mot. at 11 n.4) ("when Mr. Briggs signed the affidavit, he believed it to be true").  But he personally ordered a search of CIA records (FAC ¶¶ 170-71) and reviewed a subsequent report listing Wilson's post-retirement contacts with the CIA (*id.* at ¶¶ 110-13).  Briggs now says that he never "review[ed] any of the information or

---

Hedges Mot. at 11 (same).  The actual holding of *Mowbray* dealt with a woman who, factually, could not prove that defendants withheld exculpatory evidence.  Strikingly, the *Mowbray* plaintiff admitted that prosecutors had turned over exculpatory information to her ten days before trial.  *Mowbray*, 274 F.3d at 276.  By contrast, Wilson never received exculpatory information from these Defendants.  To the extent the *Mowbray* court's own "search reveals[] no case extending *Brady* to police officers or lab technicians" (*Mowbray*, 274 F.3d at 278), the Court failed to consider *Buckley*, in which the U.S. Supreme Court expressly held a prosecutor could not "shield his investigative work with the aegis of absolute immunity" or otherwise hide exculpatory information.  Case law has since clarified that non-prosecutors have a duty to hand over exculpatory information.  *See Pierce*, 359 F.3d at 1293 ("several courts have recognized that police officers can be liable under the Due Process Clause, pursuant to § 1983, for withholding exculpatory evidence"); *Metoyer v. Connick*, 2000 U.S. Dist. Lexis 9470, at *18-24 (no absolute immunity for physician at state hospital who withheld exculpatory information).

[70] FAC ¶ 206 ("all Agency components"); *id.* ¶ 252 (CIA's African Division Chief); *id.* ¶ 263 (CIA's Near East Division); *id.* ¶ 266 (CIA's Tehran Station); *id.* ¶ 274 (CIA's Associate Deputy Director for Operations); *id.* ¶ 279 (same); *id.* ¶ 283 (same).

- 45 -

records uncovered by the search." Briggs Mot. 10 n.4. This is a disputed matter of fact. Once and for all, a jury should have the ability to judge Briggs's veracity for itself.[71]

Briggs was armed with his own Office of General Counsel to understand his legal obligations and duties. FAC ¶¶ 183, 244. But he nonetheless failed to comply with discovery orders[72] or provide exculpatory information to Wilson in each and every jurisdiction. Even under a qualified immunity analysis, Briggs is "liable for allowing the untrue testimony to go uncorrected" in Virginia, Texas, D.C., and New York. *Carney*, 2004 U.S. Dist. Lexis 10617, at *32. Briggs was clearly aware of the falsity of his declaration. FAC ¶¶ 213-18, 244. After Wilson's Texas conviction, the CIA's General Counsel forwarded to Briggs the complete CIA Inspector General's report on Wilson's post-retirement contacts with CIA employees. *Id.* ¶ 210.[73] Sporkin said the CIA Inspector General had done a "superb job" of compiling the contacts. And Sporkin expressly asked for Briggs's comments on the CIA IG's report. *Id.* ¶ 210. It is a reasonable presumption that Briggs reviewed and responded to such an important request from his own General Counsel. On June 6, 1983, Sporkin again provided Briggs with an analysis regarding the "uncontested" evidence of Wilson's post-retirement contacts with the CIA. *Id.* ¶ 218. Briggs's role in reviewing, fabricating, and withholding evidence is not

---

[71] Briggs raises 14 separate points of fact – not mentioned in Wilson's Amended Complaint – that he hopes this Court will review. Briggs Mot. at 10-11 n.4. This is neither the time nor the place for Briggs to marshal evidence in his own support. Even assuming that Briggs is more trustworthy now than at the time of Wilson's convictions and appeals, this Court should pay no heed to his promise of what the evidence "will show" (Briggs Mot. at 10) or to his summary of Judge Hughes' opinion (Briggs Mot. at 4-7). Although Briggs may claim that he knew nothing of the contents of the affidavit he voluntarily signed (Briggs Mot. at 11 n.4) ("as to the truth of the affidavit, Brigs relied on the work and judgment of the other CIA officials and the CIA attorneys who drafted the affidavit"), the Defendants at the time were under the impression that Briggs, personally, "made the affidavit with full knowledge of all of Wilson's contact with CIA" and wondered whether "a lower ranking CIA officer [could] later dissent from the affidavit." FAC ¶ 226. Thus, Wilson's FAC indicates that Briggs's subordinates actually "dissent[ed]" from the affidavit at the time rather than supporting Briggs's point of view.

[72] Briggs claims that "he had nothing to do with any decision as to what documents or information should or should not be produced to Mr. Wilson in the Houston case." Briggs Mot. at 10 n.4. Not only does this statement leave out Briggs's failure to produce documents in Wilson's other trials in other states, but it creates a disputed matter of fact that cannot be resolved at this early stage, especially in light of the very serious questions regarding Mr. Briggs's veracity.

[73] Briggs counters that he never "had any part in any decisions or discussions about what records or information should be made available to Mr. Wilson before, during or *after* the trial, or about whether his affidavit needed to be corrected, or about whether any disclosure of any kind about that affidavit should be made … or that he even had any awareness of such decisions or discussions." Briggs Mot. at 24. This runs directly contrary to Wilson's complaint. Even despite the fact that Briggs's veracity has been called into question by Judge Hughes of this Court, Briggs's counter-allegations are not entitled to any weight or consideration on a motion to dismiss.

protected by the submission of a false declaration at the Texas trial.  *Hinchman v. Moore*, 312

F.3d 198, 205 (6th Cir. 2002) (trial testimony "does not 'relate backwards' to events that

transpired prior to testifying, even if they are related to subsequent testimony").

### 2.    Declaration not subject to the judicial crucible

Briggs argues that his declaration is protected by absolute immunity.  Briggs Mot. at 15-

21.  Because Briggs's declaration[74] was not subject to the "truth-finding tools" of the "judicial

crucible," his declaration in the Texas trial was not protected by the absolute immunity afforded

to witnesses.  Briggs cannot, now, disclaim any understanding of the contents of the declaration

to which he personally swore.[75]  If his word was good enough to convict Wilson, then it should

be good enough to stand trial under *Bivens*.

Briggs's declaration evaded critical "truth-finding tools" which include cross-

examination, jurors and judges who can scrutinize facial expressions and discern the truth for

themselves, the ability of the criminal defendant to offer competing affidavits, and other

"procedural safeguards."  *See*, *e.g.*, *Moore*, 30 F.3d at 619-20.  Courts only grant immunity when

these "safeguards" are present.  *Dorman v. Higgins*, 821 F.3d 133, 138 (2d Cir. 1987)

("safeguards" present when plaintiff had opportunity to exclude "factually incorrect" report from

court's consideration); *id*. at 136; *White v. Frank*, 680 F. Supp. 629, 635 (S.D.N.Y. 1988)

("opportunity to present contrary evidence … and witnesses are subject to cross examination …

elements that make the trial a 'crucible' designed to ascertain truth are all present'").  Because

the "truth-finding tools" were not present in Wilson's Texas trial, public policy demands that

---

[74] Because his statement was not notarized or otherwise assured of veracity, it is a "declaration" which is defined as "a formal statement, proclamation, or announcement, esp. one embodied in an instrument."  BLACK'S LAW DICTIONARY at 415 (7th ed. 1999).  Briggs's statement does not meet the legal definition for an "affidavit" even though it is referred to as such.  BLACK'S defines "affidavit" as "a voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths."  BLACK'S at 58.  Briggs did not swear to his statement before any officer authorized to administer oaths.

[75] *U.S. v. Wilson*, 289 F. Supp. 2d at 815 ("The Supreme Court has dismissed the argument that the federal government is too unwieldy to require accuracy in its presentation of evidence, saying, 'To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it'….  Here, it was not that the right hand did not know what the left hand knew.  The right hand knew and still misrepresented the facts.  At justice's blindfolded eyes, the right hand made a fist, concealing the truth.") (internal citation omitted).

Briggs be shorn of absolute immunity for his perjured declaration.[76]  *Contra* Powers and Hedges Mot. at 12 (Wilson had "ample opportunity … to offer rebuttal evidence").

Briggs relies upon *Briscoe v. LaHue*, 460 U.S. 325 (1983), in which the Supreme Court immunized testimony given by an officer at trial.  Briggs Mot. at 11-12.  But the holding in *Briscoe* was strictly limited to witnesses who (1) take the stand in court,[77] (2) take an oath in court,[78] *and* (3) subject themselves to cross-examination.[79]  Of these three procedural safeguards, the right to cross-examination is perhaps the most important.  *See Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 261 (5th Cir. 1984) (denying absolute immunity to government official who testified at a probable cause hearing precisely because of "the absence of cross-examination at probable cause hearings").  The absence of such a powerful "truth-finding" tool "increases the risk that false testimony will go undetected."  *Id*. at 261.  The Fifth Circuit's holding in *Wheeler*, therefore, strikes at the heart of a public policy that supports

---

[76] Understanding that he may not gain immunity from the Texas trial because the "truth-finding tools" were not present, as required by Fifth Circuit case law, Briggs argues that he does "not read these [5th Circuit] cases to mean that absolute immunity and the chance to cross-examine necessarily go hand in hand, so that one cannot exist without the other."  Briggs Mot. at 20 (citing *Keko*, 318 F.3d 639, *Moore*, 30 F.3d 616, *Wheeler v. Cosden Oil & Chem. Co.*, 734 F.2d 254 (5th Cir. 1984), *Enlow*, 962 F.2d 501).  But these cases positively link the right to cross-examination, juror scrutiny, and the ability to submit competing affidavits with absolute immunity.  Where all of these "truth-finding tools" are lacking, it necessarily follows that absolute immunity is not available.

[77] The *Briscoe* defendant "had testified" in person at the trial.  *Briscoe*, 460 U.S. at 327.  Moreover, the *Briscoe* opinion emphasized the public policy importance of protecting testimony "once a witness is on the stand."  *Briscoe*, 460 U.S. at 333; *see also id*. ¶¶ 335-36 ("When a police officer *appears as a witness*, he may reasonably be viewed as acting like any other witness sworn to tell the truth") (emphasis added); *id*. at 336 n.15 ("The general purposes underlying witness immunity at common law applied equally to official and private witnesses.  Both types of witnesses *took the stand*") (emphasis added); *id*. at 342 ("A police officer on the witness stand performs the same functions as any other witnesses").

[78] The *Briscoe* defendant had presumably taken an oath before he gave live testimony.  *Briscoe*, 460 U.S. at 327.  In addition, the *Briscoe* opinion emphasized the historical importance of the oath as a public policy reason justifying absolute immunity, since the oath would help ensure the integrity of the truth-seeking process.  *Id*. at 335-36 ("When a police officer appears as a witness, he may reasonably be viewed as acting like any other witness *sworn to tell the truth* – in which event he can make a strong claim to witness immunity"); *id*. at 336 n.15 ("The general purposes underlying witness immunity at common law applied equally to official and private witnesses.  Both types of witness took the stand and *testified under oath*"); *id*. at 342 ("A police officer on the witness stand performs the same functions as any other witness; he is subject to compulsory process, *takes an oath*…") (all emphases added).

[79] The *Briscoe* decision emphasizes the importance of cross-examination as a means for ensuring the truth when immunized witnesses are otherwise unaccountable at civil litigation, *Briscoe*, 460 U.S. at 333-34 ("the truthfinding process is better served if the witness' testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after *cross-examination*, together with the other evidence in the case to determine where the truth lies"), *id*. at 336 n.15 ("Both types of witness took the stand and testified under oath *in response to the questions of counsel*"); *id*. at 342 ("A police officer on the witness stand performs the same functions as any other witness; he is subject to compulsory process, takes an oath, responds to questions on direct examination and *cross-examination*") (emphases added).

absolute immunity in limited circumstances where witnesses are subject to the procedural safeguards of the "judicial crucible."  Conversely, when those safeguards are lacking, as in the present case, the witness is shorn of absolute immunity.  The Court must resist Briggs's attempt to "inadvisedly extend *Briscoe* beyond the intrinsic limitations."  *Wheeler*, 734 F.2d at 261.

Briggs's declaration (to say nothing of his non-testimonial conduct, *supra* at 41-47) was not exposed to any of the "procedural safeguards" upheld in *Briscoe*.  First, Briggs did not testify live in the courthouse but, rather, he submitted a non-notarized declaration.  Jurors were unable to read his expressions and judge his veracity.  Second, Briggs did not take an oath in court. Third, Briggs was not subjected to cross-examination. *See also Wilson*, 732 F.2d at 413.  Even though this latter deficiency may be remedied by an opportunity to submit competing affidavits, Wilson was incapable of submitting competing affidavits to counter Briggs's declaration because "direct evidence that proves falsity was not available to him before trial, at trial, or after trial."[80] Without access to evidence that would support his own competing affidavits, Wilson was deprived of his Constitutional right to refute Briggs's declaration.[81]  All of the cases cited by Briggs either derive from *Briscoe* (which emphasizes the importance of cross-examination) or involve plaintiffs who submitted competing affidavits, cross-examined unfavorable witnesses, excluded "factually inaccurate" material from the court's consideration, or capably refuted

---

[80] FAC ¶ 156 (quoting *Wilson*, 289 F. Supp. 2d 801).  *See also id.* ¶ 223 ("Wilson could not effectively oppose a government document with his word alone"); *id.* ¶ 224 ("Wilson did not have and was not given the papers that showed what he knew … This position vitiates his right to compulsory process"); *Wilson v. U.S.,* Criminal No. 1:82CR212, 2 (E.D. Va. filed March 9, 2006) (Order) ("Wilson sought before his 1982 trial to subpoena witnesses who could corroborate his claim of having continued to serve the CIA and the intelligence community after retiring. The prosecutors asserted there was absolutely no merit to Wilson's defense and that the subpoenas sought irrelevant and inadmissible information.  The court quashed the subpoena"); *Wilson*, 732 F.2d at 413 (finding some "merit" to Wilson's claim that the Briggs's "affidavit violated [Wilson's] right to confrontation of witnesses" under the Sixth Amendment).

[81] When cross-examination is not available because a party submits an affidavit, the ability to submit competing affidavits replaces cross-examination as the essential truth-seeking tool – the *sine qua non* of absolute immunity. Briggs cites *McQueen v. United States*, 264 F. Supp. 2d 502 (S.D. Tex. 2003) (citing *Briscoe*) (cited at Briggs Mot. at 15), to support his argument that declarations are entitled to immunity, but *McQueen* rests upon two circuit court opinions, both of which gave immunity to declaration testimony that was opposed by competing affidavits. *Sykes v. James*, 13 F.3d 515, 520-21 (2d Cir. 1993) (affidavit testimony "does not weaken the safeguards" when plaintiff "had the opportunity to present affidavits of his own"); *Burns v. County of King*, 883 F.2d 819, 823 (9th Cir. 1989) (affidavit testimony was afforded "all the other protections of the adversary process" including fact that plaintiff was "entitled to present [competing] affidavits and witnesses of his own to refute the statements made by [witness submitting affidavit]").  Briggs also cites *Thomason v. SCAN Volunteer Servs.*, 85 F.3d 1365 (8th Cir. 1996) which cites as authority *Briscoe* with virtually no discussion.  *Briscoe*, however, emphasized the importance of cross-examination as a pre-condition to witness immunity.

unfavorable testimony.[82]  Briggs does not cite a single case in which absolute immunity was given to testimony after a criminal defendant had been deprived of ***both*** the right to cross-examination ***and*** the ability to submit competing affidavits based on produced records.

Briggs attempts to flip-flop public policy.  He asks this Court to immunize false statements made by a witness who never appeared in court, never took an oath, did not respond to cross-examination, and was unopposed by competing affidavits.  He argues that some courts provide absolute immunity to grand jury witnesses who are not subject to cross-examination or adversarial proceedings and, therefore, this Court should do the same for him.  Briggs Mot. at 18-19.  But the Fifth Circuit has rejected this approach.  Precisely because "procedural safeguards" do not exist in grand juries, the Fifth Circuit has flatly refused absolute immunity to witnesses who appear in front of grand juries and other pre-trial hearings.[83]

---

[82] *See* Briggs Mot. at 15-18; *Niedert v. Rieger*, 200 F.3d 522, 524 n.2 (7th Cir. 1999) (plaintiff had full access to records of Loramoor Property Owners Association's Architectural Committee and the amended Declaration of Restrictions, which "amendment was recorded (in the Walworth County Register of Deeds)," all of which was available to plaintiff to refute false affidavit); *Giffin v. Summerlin*, 78 F.3d 1227, 1229 (7th Cir. 1996) (plaintiff's lawyer conducted cross-examination); *Dorman v. Higgins*, 821 F.2d 133, 138 (2d Cir. 1987) (plaintiff had opportunity to exclude "factually inaccurate" report from sentencing court's consideration); *Burns v. County of King*, 883 F.2d at 823 (plaintiff "was entitled to present affidavits and witnesses of his own to refute the [affidavit] statements made by Warwick"); *Laub v. Pesikoff*, 979 S.W.2d 686, *6 (Tex. App. Ct. 1998) (citing *Briscoe*).  In *Strong v. City of Dallas*, 2002 U.S. Dist. Lexis 840, at *39-40 (N.D. Tex. Jan. 17, 2002), the court determined that the supposedly "sworn affidavit containing false information about Plaintiff" was not actually false.

Some of Briggs's cases provide absolute immunity to witnesses testifying in pre-trial proceedings, which the Fifth Circuit has steadfastly refused to do.  *Compare Giffin*, 78 F.3d at 1229 (pre-trial deposition) (cited in Briggs Mot. at 16); *Bird v. W.C.W.* 868 S.W.2d 767, 771 (Tex. 1994) (citing stale case law) (cited in Briggs Mot. at 17-18) *with Foster v. City of Lake Jackson*, 813 F. Supp. at 1266 ("the law in this [5th] circuit is that a witness is absolutely immune only from suits based on his trial, or trial-type, testimony.  The Fifth Circuit has addressed the issue twice, and in both cases, it declined to extend the privilege to witnesses who testify in pretrial proceedings") (citing *Enlow v. Tishomingo County*, 962 F.2d 501 (5th Cir. 1992)); *Strength v. Hubert*, 854 F.2d at 424 n.2 (recognizing that three circuits, including the Fifth, refuse to apply absolute immunity to pretrial proceedings, including grand jury testimony, due to "lack of procedural safeguards"); *Wheeler v. Cosden Oil & Chemical Co.*, 734 F.2d at 261 n.16 ("We note that two circuits have extended *Briscoe* to create immunity for state officers' testimony at grand jury proceedings.  We are not persuaded by these opinions; they are cursory in the extreme [citation], and in our view they inadvisedly extend *Briscoe* beyond the intrinsic limitations of its basis in the common law") (internal citations omitted).  The cases cited by Briggs which rely on *Bird v. W.C.W.* pursue a line of case law that is no longer followed in the Fifth Circuit.  *See Strong v. City of Dallas*, 2002 U.S. Dist. Lexis 840, at *41 (citing *Bird* and stale case law) (cited in Briggs Mot. at 18); *Laub v. Pesikoff*, 979 S.W.2d 686, at *6-7 (citing *Bird*) (cited in Briggs Mot. at 18).

[83] *See Foster v. City of Lake Jackson*, 813 F. Supp. 1262, 1266 (S.D. Tex. 1993) ("In the Court's view, the law in this [5th] circuit is that a witness is absolutely immune only from suits based on his trial, or trial-type, testimony.  The Fifth Circuit has addressed the issue twice, and in both cases, it declined to extend the privilege to witnesses who testify in pretrial proceedings") (citation omitted) *rev'd on other grounds*, *Foster v. City of Lake Jackson*, 28 F.3d 425 (5th Cir. 1994); *Strength v. Hubert*, 854 F.2d 421, 424 n.2 (11th Cir. 1988) (recognizing that three circuits, including the Fifth, refuse to apply absolute immunity to pretrial proceedings, including grand jury testimony, due to "lack of procedural safeguards"); *Enlow v. Tishomingo County*, 962 F.2d 501 (5th Cir. 1992).

Briggs was never subject to "the crucible of the judicial process," and the Texas jury never had a chance to "determine where the truth lies" by watching his cross-examination or assessing his credibility through competing affidavits based on produced evidence. *Briscoe*, 460 U.S. at 334. Consequently, absolute immunity is not available for his false declaration.

**E.    Complaining Witnesses Are Not Protected By Absolute Immunity**

Barcella and Greenberg each performed the functions of a complaining witness, resulting in violations of Wilson's Fourth and Fifth Amendment rights. FAC ¶¶ 39, 42, 154, 159, 169, 231, 285-286, 292-95, 298, 314-17, 327, 341-42. Courts have consistently found that complaining witnesses do not have absolute immunity. *Evans v. City of Chicago*, 231 F.R.D. 302, 24-28 (N.D. Ill. 2005); *Kalina*, 522 U.S. at 120, 129; *Keko*, 318 F.3d at 643; *Foster v. City of Lake Jackson*, 813 F. Supp. 1262, 1266 (S.D. Tex. 1993); *Anthony v. Baker*, 955 F.2d 1395, 1399 n.2 (10th Cir. 1992).

Defendants were "complaining witnesses" when they fabricated evidence and withheld exculpatory information to the extent that a prosecution "could not and would not have been pursued" but for the misconduct. *Evans v. City of Chicago*, 2005 U.S. Dist. Lexis 18507, at *28 and *see* FAC ¶¶ 39, 42, 159, 292-95, 298, 314-17. Defendants were complaining witnesses when they provided information through which several grand juries indicted Wilson, "fabricate[d] false evidence to inculpate" Wilson, generated CIA and other "documents that falsely reported incriminating facts about" Wilson, and testified falsely at Wilson's New York trial. *Pierce v. Pawelski*, 2000 U.S. Dist. Lexis 18229, at *15 (N.D. Ill. Dec. 11, 2000). Defendants do not have absolute immunity for telling CIA officials and others "to include certain facts (which, we note, did not even exist in reality or even in the minds of the [officials]) and swear to them …' and that 'it was the [prosecutors] who creatively 'filled in the gaps' in the evidence." *Spivey v. Robertson*, 197 F.3d 772, 776 (5th Cir. 1999). When Barcella and Greenberg worked with the CIA and other law enforcement officers, including the FBI, to manufacture evidence that led to

- 51 -

Wilson's indictments in D.C., Texas, New York, and Virginia, they performed the functions of complaining witnesses without absolute immunity.  *See* FAC ¶¶ 154, 231, 285-286

At the instigation of Barcella, Greenberg, and CIA officials, Wilson was framed early on by Defendants performing the functions of complaining witnesses.  *See* Joseph J. Trento, PRELUDE TO TERROR: THE ROGUE CIA AND THE LEGACY OF AMERICA'S PRIVATE INTELLIGENCE NETWORK 87-93 (Carroll & Graf Publishers 2005) (chapter entitled "Setting Up Wilson"); FAC ¶ 95 ("In September 1976, a former CIA employee told the FBI that a U.S. corporation – possibly controlled by Wilson and another ex-CIA agent – had contracted to sell Libya 'one complete educational and vocational training laboratory'  The informant believed Libya planned to use the laboratory to train terrorists.").  Barcella used misleading information gathered from his own investigations and interviews to obtain a grand jury indictment against Wilson, as did Greenberg in Virginia and New York.  *Id.* ¶ 159 (Barcella [] convened a federal grand jury in Washington, D.C. to assess the evidence garnered against Wilson."); *id.* 231, 233-242, 285-286, 292-295.  As the result of these complaints, Wilson received substantial adverse publicity (*id.* ¶¶ 97, 105) and eventually had to stand trial in several jurisdictions.

Defendant Barcella was a complaining witness in proceedings before the IRS.  FAC ¶ 39 ("Barcella was also responsible for … initiating the IRS investigation into Wilson's financial affairs"); *id.* ¶¶ 314-17.  Barcella provided administrative support to the IRS to help initiate their investigation and eventual jeopardy assessment.  *id.* ¶ 159 ("He also used information acquired about Wilson's business operations during the grand jury hearings to initiate an IRS investigation and jeopardy assessment against Wilson.").  The IRS proceedings and jeopardy assessment would not have happened but for Barcella's instigation and encouragement.  Barcella stepped outside the scope of his own office, even violating grand jury secrecy rules (*id.* ¶¶ 314, 327, 341-42) to do what no prosecutor should – voluntarily hand over secretive grand jury materials to another agency.

Barcella was a complaining witness and, later, a trial witness in New York when he alleged that Wilson had taken out a contract on his life and attempted to murder Wilson's own

- 52 -

wife. FAC ¶ 42 ("signed a false affidavit stating Wilson paid $250,000 to have prosecutors and

his ex-wife murdered"); *id.* at ¶ 298. But Barcella lied there, too, and denied that Wilson had

any post-retirement contacts with the CIA. Barcella is not protected for his appearance before

the New York grand jury.[84] Not only is testifying before a grand jury non-advocative, it is not

protected by absolute immunity. *See Foster v. City of Lake Jackson*, 813 F. Supp. at 1266 ("In

the Court's view, the law in this [5th] circuit is that a witness is absolutely immune only from

suits based on his trial, or trial-type, testimony. The Fifth Circuit has addressed the issue twice,

and in both cases, it declined to extend the privilege to witnesses who testify in pretrial

proceedings.") (citing *Enlow v. Tishomingo County*, 962 F.2d 501)); *Strength v. Hubert*, 854

F.2d at 424 n.2 (recognizing that three circuits, including the Fifth, refuse to apply absolute

immunity to pretrial and grand jury proceedings due to "lack of procedural safeguards"); *White

v. Frank*, 680 F. Supp. at 638 (no absolute immunity for grand jury testimony because "grand

jury proceeding is almost totally devoid of any procedural check[s] against false testimony");

*Anthony*, 955 F.2d at 1399 ("complaining witness … is not entitled to absolute immunity for any

of his grand jury testimony"); *Kalina*, 522 U.S. at 120, 129; *Keko*, 318 F.3d at 643.

In *Kalina*, the U.S. Supreme Court found that a prosecutor was a "complaining witness"

without absolute immunity to a 42 U.S.C. § 1983 claim when she made false statements of fact

to support an arrest warrant. *Kalina*, 522 U.S. at 120, 129.[85] A "complaining witness" is "one

who instigates, encourages, or continues the prosecution" of a person; complaining witnesses

---

[84] Barcella cites *Briscoe* to support his argument that he is entitled to absolute immunity for his live testimony at the New York trial. Barcella Mot. at 16 n.15. While this may be true, Barcella is not immune for his testimony to the New York grand jury. *Enlow v. Tishomingo County*, 962 F.2d at 506 (affirming lower court's decision that grand jury witness did not have absolute immunity). *Briscoe* did not address grand jury testimony (*Briscoe*, 460 U.S. at 351 n.10), and the Fifth Circuit has since denied absolute immunity to grand jury witnesses.

[85] *See also Keko v. Hingle*, 318 F.3d 639, 643 (5th Cir. 2003); *Anthony*, 955 F.2d at 1399-401 ("complaining witness … is not entitled to absolute immunity for any of his grand jury testimony"); *Anthony*, 955 F.2d at 1401 ("complaining witness is not absolutely immune for testimony given in a pre-trial setting"); *Palma v. Atlantic County*, 53 F. Supp. 2d 743, 749, 766 (D.N.J. 1999) (police officer who testified to grand jury regarding person who said "[w]hat do I look like, the Unabomber" at courthouse security checkpoint); *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988) ("police officer in initiating a baseless prosecution, his role as a 'complaining witness' renders him liable to the victim under section 1983"); *Evans v. City of Chicago*, 231 F.R.D. 302, at *24-28 (N.D. Ill. 2005) (prosecution "could not and would not have been pursued" except for officer fabricating evidence and withholding exculpatory evidence); *Steeves v. McGrath*, 2000 U.S. Dist. Lexis 1706, at *7 (N.D. Ill. Feb. 11, 2000); *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997).

- 53 -

may not claim the protection of absolute immunity. *Keko*, 318 F.3d at 643; *Anthony*, 955 F.2d at 1399 n.2. A prosecutor performs the functions of a "complaining witness" when she "personally attest[s] to the truth of the averments in [a] certification" supporting an arrest warrant. *Kalina*, 522 U.S. at 129. Prosecutors are "acting not as advocates but as complaining witnesses" when they "manufacture[] evidence for the police to place in an affidavit for probable cause." *Spivey*, 197 F.3d at 776. Barcella and Greenberg performed similar roles as complaining witnesses.

To the extent that "disputed factual issues remain regarding [Defendants'] role in actively instigating, encouraging, and/or perpetuating [Wilson's] prosecution," this Court must deny the complaining witnesses' motions to dismiss. *Enlow*, 962 F.2d at 511. The "very determination of who is a complaining witness is a question of fact and thus, should not be resolved on a motion to dismiss." *Evans*, 231 F.R.D. 302, at 28; *Anthony*, 955 F.2d at 1399 (whether person is complaining witness is a factual question); *Franklin v. Fox*, 2000 U.S. Dist. Lexis 19651, at *8-9 (refusing to dismiss plaintiff's claim where there was factual "dispute" as to whether defendant was a complaining witness).

## F.     Co-Conspirators Are Not Protected By Absolute Immunity

Defendants argue that they are immune for participating in a conspiracy. Briggs Mot. at 21-25; Barcella Mot. at 10-11.[86] Defendants conspired to withhold exculpatory evidence and otherwise violate Wilson's constitutional rights. FAC ¶¶ 40, 48, 54, 57, 58, 60, 62, 149, 179, 191, 193, 198-199, 201, 207-209, 210, 213-18, 221-222, 226-228, 232, 292-298. They do not have absolute immunity for participating in the conspiracy. *Spurlock v. Thompson*, 330 F.3d 791 (conspiracy to secure conviction with false testimony); *Metoyer*, 2000 U.S. Dist. Lexis 9470, at *17 ("Plaintiff has alleged violation of his rights to receive exculpatory evidence … and that defendant conspired with others to violate that right … conspiracy under Section 1983 for which defendant does not have absolute immunity."); *White v. Frank*, 680 F. Supp. at 639 ("[a]bsolute immunity does not extend to extra-judicial conspiracies to give false testimony"); *Paine*, 265

---

[86] Jensen, Greenberg, Powers and Hedges, and Trott do not argue they have absolute immunity for their participation in the conspiracy. Hence, it must be presumed that they have waived this argument for protection.

F.3d at 983 ("absolute witness immunity does not shield an out-of-court, pretrial conspiracy to engage in non-testimonial acts such as fabricating or suppressing physical or documentary evidence or suppressing the identities of potential witnesses"); *Milstein*, 257 F.3d at 1006 ("prosecutors Stephen L. Cooley and Robert B. Foltz conspired to deny Milstein due process and subject him to malicious prosecution").

Briggs and other Defendants do not have immunity for participating in an extra-judicial conspiracy to fabricate evidence, hide exculpatory information, use false testimony at trial, and frame Wilson. *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 255 (2d Cir. 1984) (witnesses conspiring to commit perjury) ("does not justify extending that immunity to cover extra-judicial conspiracies between witnesses and the prosecutor to give false testimony"); *White*, 680 F. Supp. at 639 ("Absolute immunity does not extend to extra-judicial conspiracies to give false testimony because the rationale of *Briscoe* is inapplicable outside the scope of judicial proceedings."); *Spurlock*, 167 F.3d at 1002 ("witness immunity does not shield from liability alleged conspiracies to falsify non-testimonial evidence'") (no absolute immunity for non-testimonial activities of police officer who had testified falsely at trial); *Paine*, 265 F.3d at 983 ("pretrial coverup" and "suppressing" exculpatory information); *Metoyer*, 2000 U.S. Dist. Lexis 9470, at *15-16.[87]

Nor does Briggs have some kind of derivative immunity based on the former prosecutor Defendants. Briggs Mot. at 24-25. The U.S. Supreme Court plainly held that participants in a conspiracy may be held liable even though one co-conspirator, *e.g.*, a judge, has absolute immunity. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) ("the judge has been properly dismissed

---

[87] Briggs argues that he is protected from Wilson's conspiracy claims by his purported entitlement to absolute witness immunity. Briggs Mot. at 13 (citing *Mowbray v. Cameron County*, 274 F.3d at 277-78). But his argument rests on the common sense notion that a defendant may not be liable "for conspiring to commit an act that he may perform with impunity." *Mowbray*, 274 F.3d at 277 (citation omitted). Taken conversely, the law does permit claims for conspiracy when the goal of the conspiracy is unlawful. Briggs was not entitled to impunity in conducting a shoddy investigation, hiding exculpatory information before and after trial, and otherwise violating Wilson's constitutional rights. *See* Section IV(C)(1), *supra* at 41-47. Nor is Briggs immune from conspiracy. Whether or not there are "non-immune acts on which the claims asserted in the Complaint could be based" may very well be a disputed question of fact, especially in light of Briggs's denial of Wilson's allegations. Briggs, Mot. at 25. In any event, *Mowbray* is factually distinct in that the plaintiff there vaguely stated that the co-conspirators "met" and "answered [] questions" (*Mowbray*, 274 F.3d at 278) whereas Wilson provides specific and substantive information on the meeting times, agendas, and participants in Defendants' conspiracy.

from the suit on immunity grounds.  It does not follow, however, that the action against the private parties accused of conspiring with the judge must also be dismissed"); *id.* at *28 ("it is of no consequence in this respect that the judge himself is immune from damages liability.  Immunity does not change the character of the judge's action or that of his co-conspirators"); *id.* at *29 ("petitioner has pointed to nothing indicating that, historically, judicial immunity insulated from damages liability those private persons who corruptly conspire with the judge").  Hence, Briggs cannot hide behind his co-conspirators.

Briggs does not have the protection of absolute immunity for those instances in which he participated in the conspiracy.[88]  FAC ¶ 62 ("In cooperation with the DOJ investigation and prosecution of Wilson, Executive Director Briggs directed the review of all CIA records in search of any material that pertained to Wilson ….  At the time the search was initiated, the CIA, including Executive Director Briggs, was well aware Wilson continued to work for the CIA after he technically retired.  Regardless, Executive Director Briggs signed a fabrication declaration, the Briggs affidavit, stating Wilson did not 'perform or provide any services directly or indirectly, for the CIA' after he retired."); ¶¶ 207; 210; 213-18.

Defendants do not have absolute immunity for conspiring to use false testimony to secure Wilson's conviction, especially when they did so in a "persistent and pervasive conspiracy."  *Spurlock*, 330 F.3d at 793.  Defendants conspired in meetings, memos, and phone calls to hide exculpatory evidence, even after the D.C., Virginia, and Texas trials had ended.  FAC ¶ 54 ("Powers supported the effort to keep the courts and Wilson's defense from discovering the evidence proving that the Briggs affidavit was fraudulent.  This effort was coordinated through a series of meetings between DOJ and CIA attorneys after Wilson's Houston criminal trial."), ¶ 57

---

[88] In arguing that witness immunity applies broadly to every aspect of a conspiracy, Briggs says it would be "hard to imagine any conspiracy that has the giving of false testimony as its sole objective."  Briggs Mot. at 23.  But the *Metoyer* court found not only was this scenario easy to imagine but it was, in fact, the only kind of conspiracy that is covered by absolute witness immunity.  *Metoyer*, 2000 U.S. Dist. Lexis 9470, at *16.  All of Wilson's allegations that "go beyond merely alleging conspiracy to give false testimony at trial" present separate conspiracy claims that are not protected by absolute immunity.  For reasons discussed in Section IV(C)(2), *supra* at 47-51, Briggs's false declaration is not protected by absolute immunity.  It therefore follows that none of Briggs's conspiratorial activities are protected since his underlying conduct is not immunized.

- 56 -

("Hedges was pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence"), *id.* ¶ 58 ("Hedges, along with the other defendants, knowingly failed to disclose this information to the courts or Wilson"), *id.* ¶ 60 ("Hedges supported the effort to keep the courts and Wilson's defense from discovering the evidence proving that the Briggs affidavit was fraudulent.  This effort was coordinated through a series of meetings between DOJ and CIA attorneys after Wilson's Houston criminal trial"), *id.* ¶¶ 149, 179 ("The 'Wilson Trial Team' submitted a memorandum to Assistant Attorney General Delwen Lowell Jensen on how the government could disprove the CIA defense and keep any testimony out of the court"); *id.* ¶ 191 ("Hedges then consulted separately with AUSA Powers, Greenberg and Barcella about the Tanes memorandum … they concluded the Tanes memorandum did not constitute new evidence and there was no need for disclosure"); *id.* ¶ 193 (Powers), *id.* ¶¶ 198-99 (Richard and Sporkin); *id.* ¶¶ 201, 207-09 ("a meeting between the CIA, DOJ and at least one State Department official was held on April 5, 1983"); *id.* ¶ 213 (Hedges, Richard), *id.* ¶ 214-16, 219-20 ("meeting was necessary"); *id.* ¶¶ 221-22 ("Several handwritten notes from a meeting or meetings concerning the accuracy of the Briggs[] affidavit were culled from the government's files"); *id.* ¶ 226 (Trott, Greenberg, Barcella, Hedges, others); *id.* ¶ 227 (Jensen, Powers, Richard, Barcella, Greenberg, others); *id.* ¶ 228 ("the group acted in concert to generate and then withhold exculpatory evidence from Wilson"); *id.* ¶¶ 232; 292-98 (conspiracy before and during D.C. trial).

Defendant Barcella participated in the conspiracy.[89]  Defendant Greenberg participated in the conspiracy.[90]  Defendant Trott participated in the conspiracy.  *Id.* ¶ 226.  Neither Barcella and Greenberg's direct role, nor Trott's supervisory role in covering up the exculpatory evidence

---

[89] FAC ¶ 40 ("Barcella was pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence acquired before, during and after Wilson's Houston criminal trial); *id.* ¶¶ 226-27.

[90] *Id.* ¶ 45 ("Greenberg was pivotal in the DOJ's coordinated effort to keep Wilson … [and nine different courts] from discovering exculpatory evidence acquired before, during and after Wilson's criminal trial"); *id.* ¶ 48 ("Greenberg supported the effort to keep the courts and Wilson's defense from discovering the evidence proving the Briggs affidavit was fraudulent.  This effort was coordinated through a series of meetings between DOJ and CIA attorneys after Wilson's Houston criminal trial"); *id.* ¶ 221 ("Richard forwarded Sporkin's request for a meeting to AUSA Greenberg"); *id.* ¶¶ 226-227.

are protected by absolute immunity.  *See Spurlock*, 330 F.3d at 796 (lower court denied absolute and qualified immunity to supervising prosecutor who was sued over conspiracy to secure conviction with false testimony).

**G.     *Heck v. Humphrey* Expressly Permits This Lawsuit**

Defendants Powers and Hughes argue that Wilson's claim for damages related to Virginia and New York are barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) and *Stephenson v. Reno*, 28 F.3d 26 (5th Cir. 1994) (following *Heck*).[91]  Defendants do not argue that Wilson is barred from collecting damages related to his Texas conviction or his D.C. acquittal.  *See* Powers and Hedges Mot. at 15-16.

The U.S. Supreme Court expressly stated that plaintiffs in Ed Wilson's shoes are entitled to recover damages for the deprivation of their constitutional liberties.  In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Court held that a former prisoner may "recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm" once he has proven "that the conviction or sentence has been reversed on direct appeal … [or] declared invalid by a state tribunal."; *see also Stephenson v. Reno*, 28 F.3d 26, 28 (5th Cir. 1994) (plaintiff may sue under *Bivens* after "his conviction has been declared invalid").  Wilson has met this requirement.  His Texas conviction was vacated on October 27, 2003.  *U.S. v. Wilson*, 289 F. Supp. 2d at 818.  The government did not "initiate a new trial" by February 6, 2004, as required by this Court.  289 F. Supp. 2d at 818.  In addition, Wilson's *Bivens* suit does not seek to liberate him from previous convictions in New York or Virginia.

Because he is no longer incarcerated, Wilson does not seek release from jail with this lawsuit.  The concern that rose out of the Seventh Circuit on appeal to the U.S. Supreme Court in *Heck* was that a plaintiff might win his civil suit and, thereby, oblige the government to "release him" from prison.  *Heck*, 512 U.S. at 479.  The Court refused to allow a civil lawsuit to

---

[91] *See* Barcella Mot. at 15 (Virginia, New York); Greenberg Mot. at 18-19 (Virginia); Powers and Hedges Mot. at 15-17 (Virginia, New York); Richard Mot. at 8-9 n.4 (Virginia, New York); Trott Mot. at 3 n.1 (Virginia); Jensen Mot. at 8 n.4 (Virginia, New York).

substitute for a writ of habeas corpus – *i.e.*, the proper mechanism for seeking liberty.  *Id.* at 480.

The Court insisted that "habeas corpus is the exclusive remedy for a [] prisoner who challenges

the fact or duration of his confinement and seeks immediate or speedier release."  *Id.* at 481;

*Stephenson*, 28 F.3d at 27 ("Stephenson's civil rights action does constitute a challenge to the

fact or length of his confinement").  Wilson served his entire Virginia sentence and much of his

Texas sentence.  Because Wilson does not bring this *Bivens* suit to challenge confinement that no

longer exists, the *Heck* decision is inapposite.[92]

## H.      Statute Of Limitations Does Not Bar Suit

Wilson filed his *Bivens* suit within two years after the invalidation of his Texas

conviction by Judge Hughes.[93]  Because Wilson alleges a "conspiracy by federal prosecutors

that reached beyond state bounds from Texas to Washington, D.C., New York, and Virginia"

(Powers and Hedges Mot. at 16), his *Bivens* cause of action did not accrue until the Texas

sentence was vacated on October 27, 2003.  *See Heck*, 512 U.S. at 489-490 ("cause of action for

damages attributable to an unconstitutional conviction or sentence does not accrue until the

conviction or sentence has been invalidated"); *Stephenson*, 28 F.3d at 28.

Wilson's damages are all sought under a *Bivens* claim that first accrued when his Texas

conviction was invalidated.  *Kelly v. Serna*, 87 F.3d 1235, 1239 (11th Cir. 1996) (*Bivens* claim

for violation of Fourth, Fifth, Ninth Amendments regarding arrest and imprisonment did not

accrue until reversal of conviction); *Cannon v. Burge*, 2006 U.S. Dist. Lexis 4040, at *27-41

(N.D. Ill. 2006); *Switzer v. Burkes*, 115 Fed. Appx. 751 (5th Cir. 2004) (unpublished).[94]

---

[92] If this Court, devoid of precedent, is nonetheless persuaded by Defendants into believing that Wilson's recovery of Virginia-related damages might somehow conflict with *Heck*, then Wilson respectfully requests this Court to stay its decision until Wilson's *coram nobis* motion in Virginia has been decided.

[93] The statute of limitations for Wilson's *Bivens* action is determined by reference to the law of the forum state of Texas.  *Wilson v. Garcia*, 471 U.S. 261 (1985).  Even if D.C. law were to apply, as Barcella wrongly argues (Barcella Mot. at 6, 16), Wilson would have three years (D.C. Code § 12-301(8)) from the date of his release (D.C. Code § 12-302(a)(3)) to file suit, up until October 27, 2006.  Wilson's *Bivens* suit was filed well before then.

[94] The case cited by Richard (*Brown v. NationsBank Corp.*, 188 F.3d 579, 590 (5th Cir. 1999)) on statute of limitations is inapposite for three reasons.  Richard Mot. at 9 n.4.  First, the *Brown* plaintiff was never convicted of any crime (*Brown*, 188 F.3d at 585) so *Heck* did not bar the early accrual of his claim.  Second, the *Brown* plaintiff did not seek damages under *Bivens* for conspiracy; Wilson's conspiracy claim did not accrue until his Texas conviction was invalidated.  *Switzer*, 115 Fed. Appx. at 751-52.  Third, the *Brown* opinion did not mention or consider *Heck*.

- 59 -

Because the same operative facts apply towards Wilson's wrongful Texas conviction and the harm he suffered elsewhere, he is entitled to bring suit in one action.  Wilson is not required to file a "multiplicity of suits" or otherwise split his *Bivens* claim.  *Adler v. Beverly Hills Hospital*, 594 S.W.2d 153, 156 (Tex. App. Ct. 1980)**.**

## V.     CONCLUSION

For the foregoing reasons, Wilson respectfully requests the Court to deny Defendants' motions to dismiss in their entirety.


Dated:  June 7, 2006.

Respectfully submitted,


**        s/ Steve W. Berman   via ECF        **
Steve W. Berman (attorney-in-charge),
Washington State Bar No. 12536
Clyde A. Platt, Texas State Bar No. 16063100
Nick Styant-Browne, Washington State Bar
No. 32551
Rob Gaudet, Washington State Bar No. 33842

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

ATTORNEYS FOR PLAINTIFF
EDWIN P. WILSON

- 60 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Plaintiff's Consolidated Response to Defendants Barcella, Briggs, Greenberg, Hedges and Powers, Jensen, Richard, and Trott's Motions to Dismiss was electronically filed with the Court and served on counsel for the parties electronically and via U.S. First Class Mail on this 7th day of June, 2006 to:

| | |
|---|---|
| Deborah J. Jeffrey<br>Zukerman Spaeder<br>1800 M. Street, NW<br>Suite 1000<br>Washington, DC  20036<br>Tel.: 202-778-1827<br>Fax: 202-822-8106<br><br>Melinda M. Sarafa<br>Zuckerman Spaeder LLP<br>1114 Avenue of the Americas, 41st Fl.<br>New York, NY  10036<br>Email:  msarafa@zuckerman.com<br>Tel.: 212-704-4347<br>Fax: 212-704-4256 | Counsel for Defendant Lawrence Barcella |
| Anthony A. Lapham<br>Goodwin Procter, LLP<br>901 New York Avenue NW<br>Washington, DC  20001<br>Email:  alapham@goodwinprocter.com<br>Tel.: 202-346-4105 | Counsel for Defendant Charles A. Briggs |
| Robert S. Bennett<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>1440 New York Avenue NW<br>Washington, DC  20005<br>Email:  rbennett@skadden.com<br>Tel.: 202-371-7180<br>Fax: 202-661-8205<br><br>Charles W. Schwartz<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>1600 Smith Street, Suite 4400<br>Houston, TX  77002<br>Email:  schwartz@skadden.com | Counsel for Defendant Theodore Greenberg |

006074-11  110854 V3

| | |
|---|---|
| Charles W. Blau<br>Meadows Owens Collier Reed<br>901 Main, Suite 3700<br>Dallas, TX  75202<br>Email:  cblau@meadowsowens.com<br>Tel.: 214-744-3700 | Counsel for Defendant Delwen Lowell Jensen |
| Theodore B. Olson<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue NW<br>Washington, DC  20036<br>Email:  TOlson@gibsondunn.com<br>Tel.: 202-955-8668<br>Fax: 202-530-9575<br><br>Karl G. Nelson<br>Gibson, Dunn & Crutcher LLP<br>2100 McKinney Avenue, Suite 1100<br>Dallas, TX  75201<br>Email:  knelson@gibsondunn.com<br>Tel.: 214-698-3100<br>Fax: 214-698-3400 | Counsel for Defendant Stephen Trott |
| Robert S. Litt<br>Arnold & Porter LLP<br>555 Twelfth Street NW<br>Washington, DC  20004<br>Email:  Robert.Litt@porter.com<br>Tel.: 202-942-6380<br>Fax: 202-942-5999<br><br>Henry James Fasthoff IV<br>Stumpf Craddock Massey Farrimon<br>1400 Post Oak Blvd., Suite 400<br>Houston, TX  77056<br>Email:  hfasthoff@scmfpc.com | Counsel for Defendant Mark Richard |
| Lawrence David Finder<br>Casey T. Wallace<br>Haynes & Boone LLP<br>1221 McKinney, Suite 2100<br>Houston, TX  77010<br>Email:  Lawrence.finder@haynesboone.com<br>Email:  casey.wallace@haynesboone.com<br>Tel: 713-547-2000<br>Fax: 713-547-2600 | Counsel for Defendants James L. Powers and Daniel K. Hedges |

s/  Steve W. Berman
Steve W. Berman
Hagens Berman Sobol Shapiro LLP

006074-11  110854 V3