**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EDWIN P. WILSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-3646 |
| | § | |
| LAWRENCE BARCELLA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This case is one of many legal proceedings involving Edwin P. Wilson, a Central

Intelligence Agency (CIA) employee from 1955 to 1971.  Wilson was tried in 1982 and

1983, in four different federal district courts, for crimes ranging from selling weapons and

explosives to Libya to soliciting murders, including the murders of those who prosecuted

him.  Three of those cases resulted in convictions.  Wilson's 1983 conviction in the Southern

District of Texas for conspiring to ship twenty tons of C-4 explosives from Houston to Libya

was overturned in 2003 on a motion under 28 U.S.C. § 2255.[1]  The court found that the

United States had failed to disclose information in the Houston case about Wilson's

involvement in the CIA after 1971 and had presented a declaration during the trial from a

CIA official containing false information about that involvement.  The court found that given

Wilson's defense that his CIA work continued after 1971 and that the agency implicitly

_____

[1]  Wilson remained in custody under the sentences imposed for the other convictions following the
successful appeal of his Houston conviction.  He has since been released.

authorized his activities, the conviction could not stand.  *United States v. Wilson*, 289 F. Supp. 2d 801 (S.D. Tex. 2003).  Wilson's other two convictions have not been overturned.

In 2005, Wilson filed this damages suit against seven individuals who were prosecutors or Department of Justice officials involved in the four criminal cases and in a Tax Court case filed against him.  Wilson also sued the CIA official who signed the declaration introduced into evidence in the Houston criminal trial.  In his complaint, Wilson sought damages for violations of his Fifth Amendment rights under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  The defendants respond that they are absolutely immune from suit and move to dismiss the complaint on that basis.[2]  Wilson amended his complaint and responded to the motions to dismiss.  (Docket Entry No. 77).  The defendants have replied.  (Docket Entry Nos. 78–84).  Wilson moved for leave to file surreplies to some of the defendants' replies, to which some defendants responded.[3]

---

[2]   The pending motions to dismiss are by: Stephen Trott, (Docket Entry No. 58); Theodore S. Greenberg, (Docket Entry No. 59); Charles A. Briggs, (Docket Entry No. 62); Delwen Lowell Jensen, (Docket Entry No. 63); Mark M. Richard, (Docket Entry No. 64); Lawrence Barcella, (Docket Entry No. 65); and Daniel K. Hedges and James L. Powers, (Docket Entry No. 69).  Briggs argues that this court should dismiss based on absolute witness immunity.  The other defendants argue for absolute prosecutorial immunity.

[3]   Wilson has moved for leave to file surreplies to the motions filed by defendants Greenberg, Jensen, and Hedges and Powers.  (Docket Entry Nos. 86, 88, 87).  Greenberg and Jensen have opposed these motions. (Docket Entry Nos. 89, 90).  As noted below, the lengthy consolidated response to all the defendants' motions to dismiss and the surreplies to some of the defendants' responses to the consolidated reply serves the function that a Rule 7 answer under *Schultea v. Wood*, 47 F.3d 1427 (1995), would have provided.  This court grants Wilson's motions to file surreplies.

Based on a careful review of the motions, the response, the replies, and the applicable law, this court grants the motions to dismiss.  The reasons are set out below.

## I.    The Record

Wilson's first amended complaint is both lengthy and detailed.  He draws heavily on the Houston federal district court's opinion granting his federal habeas petition.  The complaint's allegations serve as the basis of this court's decision on the motions to dismiss. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000).  A court deciding a motion to dismiss under Rule 12(b)(6) may also consider matters of public record, such as filings in other proceedings involving Wilson.  *B.H. Papasan v. Allain*, 478 U.S. 265, 269 n.1 (1986); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006); *Ratcliff v. Rainwater*, 93 Fed. App'x 623, 625 (5th Cir. 2004); *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).  In examining the sufficiency of Wilson's allegations in this *Bivens* case, this court may consider Wilson's complaint and public records relating to the various proceedings involving Wilson.

### A.    Background

#### 1.    *The 1980, 1981, and 1982 Indictments*

Wilson worked for the CIA from 1955 to 1971.  (Docket Entry No. 68, Ex. 1, ¶¶ 72, 81).  After resigning from the CIA, Wilson worked for Naval Intelligence on a secret unit until April 1976.  Wilson alleges that he was assigned to gather intelligence by operating several international companies he created as "fronts," which allowed him to infiltrate various networks of arms dealers and other "threats to national security."  (*Id*., ¶¶ 77, 83–84);

3

*United States v. Wilson*, 289 F. Supp. 2d at 804.  Wilson operated these business for his private benefit as well.  (*Id.*, ¶¶ 85, 86).

In 1977, federal authorities, including the Department of Justice, the FBI, the ATF, and the U.S. Customs Service, began investigating Wilson's involvement in selling materials to Libya that could be used for terrorist training and activities.  (Docket Entry No. 68, Ex. 1, ¶¶ 95–96); *United States v. Wilson*, 298 F. Supp. 2d at 803.  In December 1977, the U.S. Attorney's Office for the District of Columbia received a referral memorandum on Wilson from the Department of Justice.  (*Id.*, ¶ 117).  In 1978, Assistant U.S. Attorney Lawrence Barcella was assigned to the Wilson investigation.  Barcella was Deputy Chief of the Major Crimes Division of the U.S. Attorney's Office for the District of Columbia.  In 1978, Barcella began a grand-jury investigation into Wilson's activities.  The investigation was interrupted and resumed in the summer of 1979.  (*Id.*, ¶¶ 117–19).  Wilson alleges that Deputy Assistant Attorney General Mark M. Richard supervised and worked with Barcella.  Wilson alleges that Assistant Attorney General Lowell Jensen also supervised and worked on the Wilson investigation and trials until 1983, when Jensen left DOJ.  (*Id.*, ¶¶ 20, 121).  Wilson alleges that Stephen Trott replaced Jensen as Assistant Attorney General in the summer of 1983.  (*Id.*, ¶ 26).

On April 23, 1980, a federal grand jury in the District of Columbia indicted Wilson on ten counts, including conspiracy to transport explosives in foreign commerce, conspiracy to commit the murder of a Libyan national, acting as an unregistered agent of Libya, and other charges.  (*Id.*, ¶ 120).  Wilson became a fugitive, remaining in Libya to avoid

prosecution.  Wilson does not allege specific misconduct by the defendants in convening the 1980 grand jury or before the 1980 indictment.  Wilson does allege that "as early as 1977, before any official investigation began in 1978, the FBI informed the DOJ Wilson was still a contract employee with the CIA."  (*Id.*, ¶ 158).

In August 1981, a superceding indictment issued in the District of Columbia, alleging that Wilson had conspired to solicit a man named Carlos Quintero, an anti-Castro Cuban, to kill a Libyan dissident in Egypt.  In the *Bivens* action, Wilson alleges that in August 1981, Barcella and Deputy Assistant Attorney General Mark Richard arranged to "lure [Wilson] into a country where he could be arrested."  (Docket Entry No. 68, Ex. 1, ¶ 122).  The individual who lured Wilson into leaving Libya also induced him to provide over $500,000 to finance a "front company" similar to those Wilson had previously operated.  (*Id.*, ¶¶ 127, 133).  Wilson found the deal "irresistible," (*id.*, ¶ 133), and in 1982, left Libya.  He was subsequently arrested.  *United States v. Wilson*, 750 F.2d 7, 7 (2d Cir. 1984).

On July 19, 1982, Wilson was indicted in a federal district court in Houston, Texas. The indictment alleged conspiracy to ship twenty tons of C-4 plastic explosives from Houston to Libya, in violation of 18 U.S.C. § 371; presentation of a falsified Shipper's Export Declaration listing the explosives as drilling mud, in violation of 18 U.S.C. §§ 2 and 1001; exporting cyclotrimethylene trinitramine (the active ingredient in C-4 explosives) without obtaining the required license from the State Department, in violation of 22 U.S.C. § 2778(c), 18 U.S.C. § 2, and 22 C.F.R. §§ 121.01, 121.11, 123.01; and illegally transporting a hazardous material by cargo aircraft, in violation of 49 U.S.C. § 1809(b), 18 U.S.C. § 2,

and 49 C.F.R. §§ 172.100, 172.101.  *See United States v. Wilson*, 289 F. Supp. 2d at 806. Wilson alleges that Daniel K. Hedges, the U.S. Attorney for the Southern District of Texas, and James Powers, an Assistant U.S. Attorney in that office, worked on his case.  In addition, Barcella, Richard, and Jensen were working on the Houston case from Washington.

In September 1982, Wilson was indicted in the Eastern District of Virginia on seven counts relating to selling arms to the Libyan government, including conspiracy to export firearms illegally in violation of 18 U.S.C. §§ 922(a)(3), 922(e), 924(b) and 22 U.S.C. § 2778; exporting firearms without a license, 22 U.S.C. § 2778(b)(2), (c); delivering firearms to a common carrier for shipment in foreign commerce without written notice to the carrier, 18 U.S.C. § 922(e); and transporting firearms in foreign commerce with intent to commit the felony of exporting firearms without a license, 18 U.S.C. § 924(b).  The Virginia case was the first tried.

### 2.    *The Trial and Conviction in the Eastern District of Virginia*

The Virginia trial began in November 1982.  Wilson was convicted on all but one count, unlicenced transport of firearms in interstate commerce.  Wilson received a fifteen-year sentence, later reduced to ten years.  (Docket Entry No. 68, Ex. 1, ¶¶ 234, 349).  Wilson was convicted of illegally exporting M-16 automatic rifles to Libya.  Wilson alleges that in addition to Richard, Jensen, and Barcella, Theodore S. Greenberg, an Assistant U.S. Attorney in the Eastern District of Virginia, was involved in the trial and subsequent proceedings.  (*Id.*, ¶ 44).

The appellate court affirmed Wilson's conviction on direct appeal, *United States v. Wilson*, 721 F.2d 967 (4th Cir. 1983), and on collateral attack, *United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990).  The Fourth Circuit rejected Wilson's challenges, including his claim that he had been denied exculpatory evidence relevant to his defense that he had used his arms-sales business as a good-faith means of establishing the trust of the Libyan government, to benefit United States intelligence operations.  Wilson filed an application for a *coram nobis* writ, which was denied.  *Wilson v. United States*, 77 F.3d 472 (4th Cir. 1996). The Supreme Court denied his application for a writ of *certiorari*.  *Wilson v. United States*, 517 U.S. 1246 (1996).  On May 23, 2005, Wilson filed another application for a writ of *coram nobis*, which is pending.  (Docket Entry No. 68, Ex. 1, ¶ 349).  Wilson's Virginia conviction has not been overturned or invalidated.

Wilson alleges that in June and October 1982, before the Virginia trial began, memoranda to the CIA Inspector General revealed that CIA personnel had maintained both professional and personal relations with Wilson after his 1971 resignation.  Docket Entry No. 68, Ex. 1, ¶¶ 107–09).  Wilson alleges that Barcella and Greenberg obtained these memoranda on November 5, 1982 but did not disclose the information during pretrial conferences in the Virginia case.  (*Id.*, ¶¶ 169–70).  Wilson also alleges that in September 1982, Barcella was advised to disclose recorded conversations of Wilson made during the time Wilson lived in Libya, but did not do so.  (*Id.*, ¶ 165).

Wilson alleges that in late 1982, the Department of Justice was making "numerous requests" to the CIA to research Wilson's contacts with the agency after 1971.  In response,

Charles A. Briggs, then the CIA's Executive Director, assigned an employee to review all agency records to find and review such materials and to review the results of any previous searches (the "Briggs Search"). (*Id.*, ¶ 170). According to Wilson, in response to this request, the CIA's new Inspector General complained in February 1983 that the information would require significant time to research. (*Id.*, ¶ 111). Wilson alleges that a CIA officer named Bill Donnelly (introduced to the prosecutors as "Larson") was appointed to conduct the Briggs Search. In November 1982, the prosecutors prepared Donnelly to testify in both the Virginia and Texas trials on the areas of CIA activities and on Wilson's involvement with the CIA after 1971. (*Id.*, ¶¶ 171–74). Donnelly did not, however, testify in either case.

### 3.    *The Trial in the Southern District of Texas*

Wilson was tried in the Southern District of Texas beginning in January 1983, after the Virginia trial. In the Houston trial, Wilson again argued that he had continued to work for the CIA after his resignation and that he acted with the implicit authority of the CIA. Wilson alleges that the government was expecting this defense in the Houston case because Wilson had raised it in the Virginia trial. Wilson alleges that in preparation for the Houston trial, the trial team submitted a memorandum to Assistant Attorney General Lowell Jensen on how the government could defeat Wilson's contention and keep testimony related to it out of court. (Docket Entry No. 68, Ex. 1, ¶ 180). Wilson alleges that in December 1982, Assistant U.S. Attorney Greenberg, while preparing for the Houston trial and before the Briggs Search was complete, asked the CIA to redact responses of CIA employees to earlier inquiries about their relationship with Wilson. (*Id.*, ¶ 181). Wilson also alleges that

Greenberg asked the CIA to "sanitize[ ]" classified materials the prosecutors expected Wilson would subpoena.  (*Id.*, ¶ 183).

In the Houston trial, Wilson claimed that "from 1976 through 1979, he gave the CIA (a) profiles of Libyan officials, (b) information about Libya's nuclear capability, (c) possible coup information, and (d) Libyan military mobilization along the Egyptian border." *United States v. Wilson*, 289 F. Supp. 2d at 807.  The court allowed Wilson to introduce evidence that he continued to furnish the government with intelligence that he gathered abroad after he resigned; however, the court did not let Wilson present evidence on particular projects. Three witnesses testified on Wilson's behalf:  Richard Secord, Roberta Jean Barnes, and John Keats.  *Id.*

The prosecutors prepared Donnelly to testify in the Houston trial.  The court, however, refused to permit Donnelly's testimony without allowing cross-examination into all aspects of Donnelly's CIA work.  (Docket Entry No. 68, Ex. 1, ¶ 176).  On February 4, 1983, the prosecutors responded by introducing the "Briggs Declaration" into evidence in the Houston trial, in lieu of Donnelly's testimony.  In this declaration, Briggs stated that the CIA records revealed that, with one exception, Wilson had not been asked "directly or indirectly, to perform or provide any service, directly or indirectly, for [the] CIA" after his employment ended in February 1971. (*Id.*, ¶ 144).  The CIA's General Counsel, Stanley Sporkin, certified to the truth of the declaration.  Wilson initially included Sporkin among the defendants in this

case but later dismissed the claims against him.[4]  (Docket Entry Nos. 1, 44).  The Houston court allowed the admission of the Briggs Declaration.  On the jury's request, the declaration was read during deliberations.  On February 5, 2003, the jury convicted Wilson on all four counts.  *United States v. Wilson*, 732 F.2d 404, 406–07 (5th Cir. 1984).

Wilson alleges that three days after his Houston conviction, but before his sentencing, a CIA employee wrote a memorandum detailing five occasions in which Wilson had worked for the CIA and stating that the Briggs Declaration was false.  (Docket Entry No. 68, Ex. 1, ¶ 146).  Wilson alleges that the CIA sent the memorandum to the Department of Justice two days later.  Wilson alleges that a Department of Justice attorney sent a memorandum to Richard outlining the duty to disclose "possibly false testimony."  The memorandum contained a handwritten note that said "Plain meaning of services -> The affid. is inaccurate." (*Id.*, ¶ 147).  Wilson claims that Richard, the Deputy Assistant Attorney General of the Criminal Division, told Jensen, the Assistant Attorney General and head of the Criminal Division, that they should disclose that the Briggs Declaration was false.  (*Id.*, ¶ 149).  On February 11, 1983, Hedges received and documented a telephone call from Richard expressing concerns about the Briggs Declaration.  Investigation within the CIA and the Department of Justice continued.  Various people disagreed as to whether and how to

---

[4]  In the opinion granting Wilson's federal habeas appeal, the court found that Sporkin knew that the declaration was false:  "Among the people who knew the government—through the CIA and  Department of Justice—was both failing to disclose records of Wilson's work and offering a false affidavit was the CIA's general counsel.  Yet the Department of Justice refused his request to correct or not to use the false affidavit. . . . The government must be responsible for its internal fabrication of evidence."  *United States v. Wilson*, 289 F. Supp. 2d at 811.

disclose the problems with the Briggs Declaration to Wilson's counsel and to the Houston court. (*Id.*, ¶¶ 190–92). Wilson alleges that an employee in the CIA's Office of General Counsel drafted a letter in February 1983 to send to Wilson's attorneys in the Houston case, disclosing that the Briggs Declaration was false. The letter was never sent. (Docket Entry No. 68, Ex. 1, ¶¶ 194–96). According to Wilson, the CIA's General Counsel, Sporkin, called Richard and urged that the disclosure issue be resolved before the sentencing hearing. Richard responded that there was "very little sentiment in DOJ to do anything about the Briggs' declaration." (*Id.*, ¶ 199).

The Houston court sentenced Wilson on February 18, 1983. The concerns about the Briggs Declaration were not brought to the defendant's or the court's attention. The court sentenced Wilson to a seventeen-year prison term, to run consecutively to the ten-year Virginia sentence. Wilson filed a notice of appeal on February 25, 1983.

Wilson alleges that on February 22, 1983, Richard sent Jensen documents about the Briggs Declaration and encouraged disclosure to Wilson's counsel or the judge. (Docket Entry No. 68, Ex. 1, ¶¶ 201–02). The CIA also sent additional material to Richard on March 1, 1983. (*Id.*, ¶ 205). Wilson alleges that on March 14, 1983, Richard again encouraged Jensen to disclose the new information. (*Id.*, ¶ 208).

The results of the Briggs Search became available to the prosecutors and the Department of Justice on April 18, 1983. (Docket Entry No. 68, Ex. 1, ¶ 210). The search revealed eighty nonsocial contacts between Wilson and CIA employees after 1971. (*Id.*, ¶ 211); *United States v. Wilson*, 289 F. Supp. 2d at 806. Wilson alleges that on May 9, 1983,

Hedges wrote a letter to Richard about the Briggs Declaration and sent copies to Barcella and Greenberg. The letter stated, "if the CIA feels that any of the contacts with Wilson, other than the one exception noted in the affidavit, constitutes asking for or receiving intelligence, the affidavit may be inaccurate." (*Id.*, ¶ 213). Richard wrote to Jensen, "I don't see how this resolves our concerns about the sufficiency of the Wilson affidavit. Should I solicit the agency's views?" (*Id.*, ¶ 215). Jensen replied, "We should obtain agency review." (*Id*, ¶ 216).

On May 27, 1983, Richard requested CIA review from Sporkin. (*Id.*, ¶ 217). Richard and Sporkin agreed that a meeting was necessary. (*Id.*, ¶¶ 218–21). Notes indicate that a meeting or meetings occurred in which the parties discussed whether the results of the Briggs Search was *Brady* material and whether the Briggs Declaration was inaccurate. (*Id.*, ¶ 222). On September 30, 1983, Trott, Sporkin, Greenberg, Barcella, and others met to discuss whether the Briggs Declaration accurately portrayed the services Wilson performed. (*Id.*, ¶ 226). At another meeting, Jensen, Richard, Sporkin, Powers, Barcella, Greenberg, and other CIA and Department of Justice officials discussed the Briggs Declaration. Wilson alleges that they agreed "they would not disclose despite recognizing the fact that they were withholding exculpatory evidence." (*Id.*, ¶ 228).

Wilson's appeal from his Houston conviction was pending during this period. Hedges was asked to forward copies of the draft government brief in Wilson's appeal so that Greenberg, Richard, and others could "review the brief as it pertains to AAG Trott's decision of September 30, 1983." (*Id.*, ¶ 302). On November 1, 1983, Richard was advised that

Greenberg had received the brief.  (*Id*, ¶ 300).  Wilson alleges that Greenberg was not actually involved in drafting the brief and that Trott "appears to have decided" that it would include a limited disclosure about Wilson's activities.  (*Id*., ¶¶ 303–05).  Hedges and Powers signed the government's brief, which acknowledged two business transactions between Wilson and the CIA in 1974 and 1975 but did not admit that the Briggs Declaration was false.  (*Id*., ¶¶ 301, 307); *United States v. Wilson*, 289 F. Supp. 2d at 808.

The Fifth Circuit affirmed the Houston conviction on May 4, 1984.  *United States v. Wilson*, 732 F.2d 404 (5th Cir. 1984).  The court found no *Brady* violation and no error in the admission of the Briggs Declaration.  *Id.*  Wilson sought *certiorari* from the Supreme Court.  In its November 23, 1983 Supreme Court brief, the Department of Justice referred to the Briggs Declaration but did not disclose that it contained any deficiencies.  (*Id*., ¶ 310). The Supreme Court denied Wilson's petition.  *United States v. Wilson*, 469 U.S. 1099 (1984). In 2003, the trial court overturned this conviction on federal habeas review.

### 4.    *The Trial in the District of Columbia*

In March 1983, Wilson was tried in Washington, D.C. on the August 1981 indictment charging conspiracy to solicit the murder of Omar Abdullah Muhayshi, a Libyan dissident living in Egypt.  (Docket Entry No. 68, Ex. 1, ¶ 292).  Wilson alleges that on August 24, 1980, before the grand jury was convened—but after the April 1980 indictment charging Wilson with transporting explosives in foreign commerce and conspiring to commit the murder of a Libyan national—Barcella interviewed a Cuban national and former CIA operative, Raphael Quintero.  Wilson alleges that Quintero told Barcella that Wilson had not

been involved in any conspiracy to assassinate Muhayshi.  Wilson alleges that Barcella nevertheless "had Quintero sign and date a false affidavit stating that Quintero received money to assassinate Muhayshi."  (*Id.*, ¶ 294).  Wilson alleges that Barcella withheld information about the interview with Quintero.  Wilson alleges that Barcella introduced the fabricated affidavit at trial, but Quintero testified and undermined the affidavit.  The jury acquitted Wilson.

### 5. The Trial in the Southern District of New York

Wilson's final federal criminal prosecution was in the Southern District of New York in 1983.  In that case, Wilson was convicted on eighteen counts arising from plots to solicit the murder of witnesses, potential witnesses, and prosecutors in Wilson's cases in Texas, Virginia, Washington, D.C., and New York, including Barcella, who testified as a government witness in Wilson's New York trial. (Docket Entry No. 68, Ex. 1, ¶ 298). Wilson received a twenty-five year sentence.  Wilson's convictions and sentence were affirmed by the Second Circuit.  *United States v. Wilson*, 586 F. Supp. 1011 (S.D.N.Y. 1983), *aff'd*, 750 F.2d 7 (2d Cir. 1984), *cert. denied*, 479 U.S. 839 (1986).  The New York conviction has not been overturned and, according to Wilson, is not challenged at this time. (Docket Entry No. 77 at 7, n.9).

### 6. The Tax Court and Bankruptcy Court Litigations

In addition to the criminal prosecutions, Wilson alleges that the defendants in this case committed improprieties with respect to claims asserted by the Internal Revenue Service (IRS).  Wilson alleges that beginning in 1980, Barcella wrongfully gave the IRS classified

materials, FBI materials, and grand jury information.  (Docket Entry No. 68, Ex. 1, ¶ 313, 314).  On February 16, 1983, eleven days after Wilson's Houston conviction, the IRS issued Wilson a "Notice of Jeopardy Assessment" for taxes due for 1977 to 1981.  With interest and penalties, the assessment totaled approximately $23,000,000.  Wilson claims that the assessment was "based solely on the uncorroborated statement of Wilson's overseas office manager, Roberta Barnes."  (*Id.*, ¶ 315).  Wilson alleges that the IRS filed a tax lien, froze his assets, and seized cash.  (*Id.*, ¶ 317).  Wilson filed suit in the U.S. Tax Court to challenge the assessment.  Wilson also filed a petition for relief in the Bankruptcy Court for the District of New Jersey to stay efforts by the IRS to sell his property.  The Bankruptcy Court transferred the case to Virginia, where a trustee was appointed for Wilson's bankruptcy estate.  On March 11, 1986, the Bankruptcy Court lifted the stay and the trustee intervened in the Tax Court case.  In 1988, the Tax Court issued disclosure orders to the Department of Justice; Wilson alleges that Department of Justice resisted the orders.  Wilson alleges that the Department of Justice was attempting to avoid disclosing the CIA's use of Wilson and his company after 1971, which would be revealed if information about payments to Wilson for "intelligence gathering" was revealed.  (*Id.*, ¶¶ 332–33, 336–37).  Wilson alleges that Richard was among those refusing to disclose information in the Tax Court case, including information showing that Barcella had violated grand jury secrecy rules.  (*Id.*, ¶ 327).

Wilson alleges that after failed efforts to require compliance with the subpoena, and despite the absence of sufficient proof to support the IRS deficiency assessment, the trustee settled with the IRS.  (*Id.*, ¶ 337).  The settlement gave $2,200,000 to the IRS and 85 cents

on every dollar to unsecured creditors.  (*Id*.).  The settlement ended the Tax Court case.  The Bankruptcy Court case ended with Wilson's discharge.

> 7.      *The Section 2255 Motion and Opinion and this Bivens Action*

Wilson filed his section 2255 motion for federal habeas relief from his Houston conviction on March 14, 1997.  On October 27, 2003, the court overturned Wilson's 1983 conviction from the Houston trial and ordered a new trial.  The court concluded—in no uncertain terms—that the government had suppressed favorable evidence and used false evidence (the Briggs Declaration) in securing the conviction.  *United States v. Wilson*, 289 F. Supp. 2d 801 (S.D. Tex. 2003) (Hughes, J.).  The government neither appealed nor retried Wilson.

On October 24, 2005, Wilson filed this *Bivens* action alleging violations of his civil rights by the defendants and alleging a claim under Texas law for intentional infliction of emotional distress.  (Docket Entry No. 1).  In the amended complaint, Wilson deleted the Texas state-law claim.  As noted, Wilson has dismissed his claim against Sporkin.  The defendants are:  Delwen Lowell Jensen, a former Assistant Attorney General; Stephen Trott, also a former Assistant Attorney General; Mark M. Richard, a former Deputy Assistant Attorney General; Lawrence Barcella, a former Deputy Chief of the Major Crimes Division of the U.S. Attorney's Office for the District of Columbia; Theodore Greenberg, a former Assistant U.S. Attorney for the Eastern District of Virginia; James L. Powers, an Assistant U.S. Attorney for the Southern District of Texas;  Daniel K. Hedges, a former U.S. Attorney for the Southern District of Texas; and Charles A. Briggs, a former Executive Director of the

CIA. Wilson alleges that these defendants entered into a conspiracy to suborn perjury and fabricate evidence, violating Wilson's Fifth Amendment due process rights, resulting in pain and suffering for wrongful conviction and imprisonment and damages from the loss of property and wealth.[5] (Docket Entry No. 68, Ex. 1, ¶ 353). This court stayed discovery until the absolute immunity claims could be resolved.

## II.    The Legal Standard for a Motion to Dismiss

A *Bivens* claim is for constitutional damages caused by federal actors in their official capacities and mirrors section 1983 actions against state actors. *Izen v. Catalina*, 398 F.3d 363, 366 n.3 (5th Cir. 2005). The defendants identify three grounds for dismissing Wilson's *Bivens* claims. One ground applies to Wilson's claim for damages for improper conduct involved in or relating to the two criminal convictions that remain, the Eastern District of Virginia conviction and the Southern District of New York conviction. The defendants assert a defense based on *Heck v. Humphrey*, 512 U.S. 477 (1994), which precludes damages claims under section 1983 or *Bivens* for an allegedly unconstitutional conviction if that conviction has not been overturned or invalidated, or for civil rights violations that would make the conviction or sentence invalid. The second ground is that the statute of limitations has expired for Wilson's damage claims based on the District of Columbia conviction, the IRS settlement and judgment, and the Bankruptcy Court judgment. The third ground for dismissal is that the defendants are absolutely immune from suit.

---

[5] In Wilson's response to the motions to dismiss, he adds allegations that his Fourth and Sixth Amendment rights were also violated. (Docket Entry No. 77 at 11). These allegations do not affect the absolute immunity analysis.

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is a valid means to raise a statute of limitations defense or similar bar to relief if the defense or bar clearly appears on the face of the complaint. *Bush v. United States*, 823 F.2d 909, 910 (5th Cir. 1987). A motion to dismiss is also a proper vehicle to assert a claim of absolute immunity. *See Imbler v. Pachtman*, 424 U.S. 409, 416 (1976) (prosecutorial immunity); *Mowbray v. Cameron County*, 274 F.3d 269, 276, 279 (5th Cir. 2001) (prosecutorial immunity and witness immunity).

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) dismissal is appropriate if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). As with any motion to dismiss under Rule 12(b)(6), allegations in the complaint must be assumed true for the purpose of determining immunity. *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997) ("In determining immunity, we accept the allegations of respondent's complaint as true."); *Tuchman v. DSC Commun'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). But, as with any motion to dismiss, a court will "not accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).

## III.   The Pleading Standards

The defendants state that a heightened pleading standard applies in this circuit to complaints that seek damages from government officials in their individual capacities who

claim absolute or qualified immunity.  Wilson argues that the heightened pleading standard does not apply and that his complaint provides adequate detail.  (Docket Entry No. 77 at 10).

In *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993), the Supreme Court held that a federal court may not apply a heightened pleading standard in civil rights cases alleging municipal liability under section 1983.  The Court in *Leatherman* reasoned that Rule 9(b) of the Federal Rules imposes a particularity requirement for allegations of fraud and mistake, but does not mention complaints alleging municipal liability under section 1983.  *Id.*  The Court rejected the argument that a municipality's freedom from *respondeat superior* liability is the equivalent of immunity from suit.  *Id.* at 166.  The Court did not consider whether a heightened pleading standard was necessary to avoid evisceration of a municipality's immunity from suit or "whether our qualified immunity jurisprudence would require a heightened pleading in cases involving individual government officials."  *Id.* at 166–67.

In *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), the Court considered whether a heightened pleading standard applies in employment discrimination cases.  In holding that a heightened standard does not apply, the Court explained that "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."  *Id.* at 513.  Holding that Rule 9(b) provided for greater specificity only with respect to allegations of fraud or mistake, the Court reiterated that "complaints in [employment discrimination] cases, as in most others, must satisfy only the simple requirements of Rule 8(a)."  *Id.*

Courts have recognized and devised procedural and doctrinal ways to reconcile the inherent tension between federal immunity jurisprudence and the concept of notice pleading. *See Thomas v. Independence Twp.*, 463 F.3d 285, 295 (3d Cir. 2006); *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000) (noting the tension between qualified immunity and the notice pleading requirements of Rule 8).  On the one hand, the Supreme Court has stated that resolution of the qualified (and absolute) immunity defense entails a fact-specific inquiry, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001), which should be made at the earliest possible stage in litigation.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991). The Supreme Court has stated that a defendant properly invoking immunity is entitled to dismissal even before discovery.  *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996). Immunity is "immunity from suit rather than a mere defense to liability."  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  The Supreme Court has made denials of qualified immunity at the dismissal stage immediately appealable.  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  On the other hand, the notice-pleading standard requires a complaint to plead only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In response to the inherent tension recognized by these cases, the Fifth Circuit has held that although a plaintiff need not anticipate an immunity defense in his complaint, once the defense is raised, he must support his claim with precision and factual specificity. *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995).  In *Schultea*, the Fifth Circuit recommended

the use of a Rule 7 reply to enable the court to resolve a motion to dismiss based on immunity:

> Our answer to *Leatherman* is that the district court has an array of procedures that will carry the load as far as pleadings can. First, the district court must insist that a plaintiff suing a public official under § 1983 file a short and plain statement of his complaint, a statement that rests on more than conclusions alone. Second, the court may, in its discretion, insist that a plaintiff file a reply tailored to an answer pleading the defense of qualified immunity. . . . The district court may ban discovery at this threshold pleading stage and may limit any necessary discovery to the defense of qualified immunity.

*Id.* at 1433–34; *see also Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) ("The considerations that had led to the adoption of heightened pleading would henceforth be satisfied, the court held, through the device of a detailed Rule 7 reply, which the district court could order on the defendant's motion or *sua sponte*."); *Truvia v. Julien*, 187 Fed. App'x 346, 349 n.2 (5th Cir. 2006) ("The purpose of the device is to require the plaintiff to satisfy the heightened pleading standards applicable to claims implicating immunity defenses. Although a plaintiff need not anticipate such a defense, the district court in its discretion may require the plaintiff to submit a Rule 7 reply in response to an immunity defense before embarking on potentially costly discovery and litigation."). Other courts have used an order for a more definite statement under Rule 12(e) to ensure "that officials [invoking immunity] are not subjected to unnecessary and burdensome discovery or trial proceedings." *Thomas*, 463 F.3d at 295 (citing *Crawford-El v. Britton*, 523 U.S. 574, 597–98 (1998)).

When the briefing in response to the motions to dismiss raising immunity and other defenses adequately addresses those issues, a district court need not require a Rule 7 response under *Schultea*.  In *Truvia v. Julien*, for example, a qualified immunity defense was presented in a Rule 12(b)(6) motion to dismiss and the plaintiff filed a lengthy response.  *Truvia*, 187 Fed. App'x at 349.  The court did not require the plaintiff to file a Rule 7 reply because "[i]n such a context, the [plaintiff was] afforded ample opportunity to respond, and not only submitted complete briefing on the immunity issue, but after the motion was granted in favor of the Appellee, filed a motion to reconsider."  *Id.* at 349; *see also Fitts v. Crain*, 108 Fed. App'x 865, 867 (5th Cir. 2004) ("[The plaintiff] iterated this contention in her reply to appellees' answer, in her argument against qualified immunity.  Thus, it would not have assisted the district court for [the plaintiff] to have filed another reply pursuant to *Schultea*. Therefore, the district court did not abuse its discretion by dismissing [the plaintiff's] individual-capacity claims without requiring her to file another reply.").  Wilson filed two lengthy and detailed complaints, clearly anticipating immunity defenses.  He has submitted a 261-page response to the motions to dismiss, as well as 36 pages in surreply.  The issues are fully addressed.  A Rule 7 reply or further opportunity to replead is unnecessary.

## IV.  The *Heck v. Humphrey* Defense

Wilson alleges prosecutorial misconduct related to the criminal convictions in Virginia and New York.  Wilson has not pleaded, and the record does not show, that these convictions have been overturned, expunged, or otherwise invalidated.  In *Heck v. Humphrey*, 512 U.S. 477 (1994), the plaintiff sought damages under 42 U.S.C. § 1983,

alleging that the defendants had conducted an "unlawful, unreasonable, and arbitrary investigation' leading to petitioner's arrest; knowingly destroyed evidence which was exculpatory in nature and could have proved [plaintiff's] innocence; and caused an illegal and unlawful voice identification procedure to be used at [plaintiff's] trial." *Heck*, 512 U.S. at 479. The court held that the plaintiff brought the claim prematurely:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 487; *see also Simmonds v. U.S. Court of Appeals, Fifth Circuit*, 178 Fed. App'x 375, 376 (5th Cir. 2007) ("[Because the plaintiff's] due process claim implies the invalidity of this court's decision in the direct appeal from his criminal conviction, it is not cognizable in a civil rights action under *Heck*.").

Wilson's damages claims for the defendants' pretrial, trial, or posttrial conduct by the defendants relating to the criminal trials and appeals in the Eastern District of Virginia and Southern District of New York must be dismissed under *Heck*. Wilson's claims against the prosecutors who did not handle the appellate briefs in the Fourth and Second Circuits but allegedly withheld exculpatory information from those jurisdictions must also be dismissed under *Heck*. (Docket Entry No. 68, Ex. 1, ¶¶ 40–42, 168, 177–79, 233–242, 298–299).

23

Wilson argues that he "is out of jail and *Heck* no longer bars his suit." (Docket Entry No. 77 at 24, 58–59). This argument misstates *Heck*'s application. The *Heck* bar is not lifted when the plaintiff is no longer incarcerated; rather, *Heck* bars suits that "'necessarily imply the invalidity of [a plaintiff's] conviction or sentence,' unless he proves that the conviction or sentence has already been invalidated." *Kutzner v. Montgomery County*, 303 F.3d 339, 340 (5th Cir. 2002) (quoting *Heck*, 512 U.S. at 486).[6] Both the New York and the Virginia convictions stand. Although Wilson has filed a second writ *coram nobis* in the Eastern District of Virginia, it has not been resolved. No challenge to the Southern District of New York conviction is pending. Wilson's allegations that he was denied *Brady* material and that prosecutors presented false evidence call into question the validity of those convictions, which remain intact. *Cf Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006) (allowing claim of excessive force against police despite assault conviction). This court dismisses the claims of improper conduct relating to or affecting Wilson's convictions in Virginia and New York.

## V.    The Statute of Limitations

Wilson also alleges prosecutorial misconduct with respect to the criminal trial against him in the District of Columbia in 1983 on charges of conspiring to commit murder, acting as an unregistered agent of Libya, and conspiring to transport explosives in foreign commerce. Wilson alleges that in August 1980, Barcella met with Quintero, who denied that Wilson had paid him money to assassinate Muhayshi, the alleged target of the murder

---

[6] Greenberg also argues that although Wilson has been released from prison, he is still on parole and "in custody." (Docket Entry No. 79 at 23). Wilson responds that he "served his entire Virginia sentence" but does not otherwise respond to this argument. (Docket Entry No. 77 at 59).

conspiracy.  Wilson alleges that Barcella obtained a false affidavit from Quintero stating that Wilson had asked him to assassinate Muhayshi and paid him to do so, and that Barcella entered that affidavit into evidence in 1983 in the District of Columbia trial.  Quintero testified and denied the statements in the affidavit.  Wilson was acquitted.  The *Heck* bar does not apply, but the statute of limitations does.

Wilson's own filings show that he was aware of the alleged prosecutorial misconduct in the District of Columbia trial in 1983.  Quintero testified and rebutted the allegedly false affidavit Barcella introduced into evidence.  Barcella argues that the three-year District of Columbia statute of limitations for personal injury, D.C. CODE § 12-301, applies to this claim and that it began to run when the District of Columbia trial ended.  (Docket Entry No. 65 at 16–17).  Wilson does not dispute that the three-year limitations applies; instead, he argues that his claim accrued from the date the Houston federal district court overturned the Southern District of Texas conviction.  (Docket Entry No. 77 at 59–60).

In *Wallace*, the Supreme Court stated:

> [T]he *Heck* rule for deferred accrual is called into play only when there exists a conviction or sentence that has not been . . . invalidated, that is to say, an outstanding criminal judgment.  It delays what would otherwise be the accrual date of a tort action until the setting aside of an extant conviction which success in that tort action would impugn.

*Wallace v. Kato*, 127 S. Ct. 1091, 1098–99 (2007) (internal quotation marks omitted).  Wilson was acquitted of the criminal charges against him in the District of Columbia.  There is no "outstanding criminal judgment" or "extant conviction" to allow deferred accrual under

*Heck*.  The Houston court's decision to overturn the Houston conviction did not delay the beginning of, or restart the running of, the limitations period on the *Bivens* claim relating to alleged prosecutorial misconduct period in the District of Columbia case.  Wilson's pleadings in this *Bivens* case make it clear that he knew of the false affidavit during the 1983 trial. Wilson's claims relating to the District of Columbia trial are barred by the three-year statute of limitations.  (Docket Entry No. 77, ¶¶ 292–98).

Wilson also alleges constitutional violations with respect to the IRS tax assessment and subsequent court proceeding.  Wilson alleges that Barcella wrongfully provided information to the IRS to use in its investigation and refused to provide discovery in the Tax Court suit.  As a result, Wilson alleges that the trustee of his bankruptcy estate was forced to settle the tax claim.  Barcella argues that the three-year statute of limitations applies to this claim.  (Docket Entry No. 65 at 17).  Wilson again responds that under *Heck*, his cause of action accrued when his criminal conviction in the Houston case was overturned.

The *Heck* rule for deferred accrual does not apply to the Tax Court or Bankruptcy Court litigation.  That civil proceeding ended in a settlement.  The record shows that Wilson was aware of the government's failure to disclose documents when it occurred in 1988 and 1989.  Wilson alleges that in 1989, he knew that the government had produced "insufficient proof to support the IRS deficiency assessment."  (Docket Entry No. 68, Ex. 1, ¶¶ 329, 337). Wilson's *Bivens* claims relating to the Tax Court and bankruptcy proceedings are barred by limitations.  (*Id.*, ¶¶ 313–40)

## VI.    The Motions to Dismiss Based on Absolute Prosecutorial Immunity

### A.    The Applicable Law

In litigation under 42 U.S.C. § 1983 and *Bivens*, two kinds of immunity may apply to prosecutors: absolute immunity and qualified immunity.  The immunity that applies depends on what function the prosecutor was serving at the time of the misconduct.  *Kalina v. Fletcher*, 522 U.S. 118, 127–29 (1997); *Buckley v. Fitzsimmons*, 509 U.S. 259, 268–69 (1993); *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  When prosecutors act in their roles as advocates, absolute immunity applies.  *Burns*, 500 U.S. at 487–96 (a prosecutor is absolutely immune from liability for presenting false statements in a probable-cause hearing); *Imbler*, 424 U.S. at 430 (a prosecutor is absolutely immune from liability for using false testimony at trial).  Absolute immunity applies even when the plaintiff establishes that the prosecutor acted intentionally, in bad faith, or with malice.  *Kalina*, 522 U.S. at 124; *Imbler*, 424 U.S. at 427.  When prosecutors act not as "advocates," but as "investigators" or "administrators," qualified immunity applies.  *Kalina*, 522 U.S. at 122–23 (a prosecutor who swore to false facts in an affidavit is entitled to qualified immunity, not absolute immunity); *Buckley*, 509 U.S. at 272–76 (a prosecutor who conspired with police to manufacture false evidence is entitled to qualified immunity, not absolute immunity); *Burns*, 500 U.S. at 492–96 (a prosecutor receives qualified immunity for giving legal advice to the police).

The Supreme Court has decided four prosecutorial immunity cases.  In the earliest of the four, the Court held that prosecutors are entitled to absolute immunity under section

1983.  *Imbler*, 424 U.S. at 427.  Imbler was convicted of felony murder and sentenced to death following a trial in which the prosecutor knowingly used false evidence and suppressed exculpatory evidence.  *Id*. at 412–13.  After trial, additional evidence was discovered corroborating Imbler's alibi defense.  *Id.* at 412.  Released on a successful habeas appeal after serving nine years in prison, Imbler sued the prosecutor for money damages under section 1983.  *Id.* at 415–16.  The action was dismissed based on absolute immunity.  The Supreme Court granted *certiorari* to consider prosecutorial immunity.

The Court had previously concluded in cases involving legislators and judges that section 1983 should "be read in harmony with general principles of tort immunities and defenses rather than in derogation of them."  *Id.* at 418.  Presented with its first opportunity to address a state prosecutor's immunity in a section 1983 action, the Court began by exploring "the immunity historically accorded the relevant official at common law and the interests behind it."  *Id*. at 421.  The Court found that the historical immunity of prosecutors was grounded on the same policies as the immunities of judges and grand jurors.  "These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."  *Id*. at 423.  Finding the common-law rule of absolute prosecutorial immunity to be "well settled," *id.* at 424, the Court concluded that public policy supported the continuance of the doctrine under section 1983 because the threat of civil liability would undermine prosecutorial performance and constrain independent decisionmaking.  *Id.* at 427–28.  The

Court anticipated that actions against prosecutors "could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate." *Id*. The potential flood of civil litigation would divert energy, attention, and resources from the performance of prosecutorial functions. The Court explained that even honest prosecutors make mistakes under the constraints of limited time and information. *Id*. Immunity permits prosecutors to exercise their discretion without fear that they will be held civilly liable, a fear that could lead them to withhold relevant and credible evidence lest it might turn out to be false. *Id*. at 425–26. Absolute immunity was necessary because exposure to civil liability would undermine the prosecutorial function and in turn the criminal justice system. *Id*. at 426. In the Court's analysis, imposing civil liability was unwarranted because other corrective mechanisms would safeguard the accused's rights. The Court listed "the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies." *Id*. at 427. The Court acknowledged that its ruling left the "genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Id*. at 427. But it concluded that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id*. at 428 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

Fifteen years later, the Court refined the scope of absolute prosecutorial immunity. *Burns*, 500 U.S. at 478. In *Burns*, a mother reported that an unknown assailant had shot her two sons. The police made the mother the chief suspect. The prosecutor wrongly advised

police that they could seek a confession from the mother while she was hypnotized.  The prosecutor then used that statement to establish probable cause for her arrest.  When these facts were revealed, the trial judge ordered the statement suppressed and the prosecutor dropped all charges.  *Id*. at 481–83.  Burns brought a section 1983 action against the prosecutor.  The action was dismissed on the ground of absolute immunity and the plaintiff appealed.

The Court noted that in *Imbler*, it had held that absolute immunity covered the initiation and presentation of the State's case insofar as that conduct was "intimately associated with the judicial phase of the criminal process" but had declined to consider whether that immunity would extend to a prosecutor's conduct as an administrator or investigator as opposed to conduct as an advocate.  *Id*. at 486 (internal quotation marks omitted) (quoting *Imbler*, 424 U.S. at 430).  The Court applied the functional approach, analyzing whether absolute immunity should be extended to the prosecutor's participation in the probable cause hearing and provision of legal advice to the police.  The Court concluded that the prosecutor was entitled to absolute immunity from liability for participating in the probable cause hearing but only entitled to qualified immunity for providing legal advice to the police.  *Id.* at 487, 495–96.

In addressing the argument that the prosecutor was liable for eliciting misleading testimony in the probable cause hearing, the Court first examined the common-law immunity for testimony in judicial proceedings.  It found that witnesses, prosecutors, and other lawyers were absolutely immune from liability at common law for making false or defamatory

30

statements and for eliciting false and defamatory testimony. *Id*. at 489–90.  In appearing before a judge and presenting evidence, the prosecutor was clearly acting in his role as an advocate, not as an investigator or administrator.  This conduct was "intimately associated with the judicial phase of the criminal process." *Id*. at 491–92. The prosecutor's conduct in providing legal advice to the police was not intimately connected to the judicial process, the function prosecutorial immunity is designed to protect. "Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation.  That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Id*.

The third absolute prosecutorial immunity case, *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), involved whether absolute immunity protected prosecutors who conspired with police to fabricate evidence during the preliminary investigation of a rape and murder case.  The prosecutors retained an expert witness who provided the basis for the prosecution by falsely connecting the defendant's boots to the crime scene. *Id.* at 262–63.  The lower courts found that absolute immunity applied, and the Supreme Court granted *certiorari*.  The Court explained that, under the functional approach, absolute immunity shields adversary functions such as initiating judicial proceedings, evaluating evidence, and preparing presentations before a grand jury or trial. *Id*. at 272–73.  But "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Id*.  Immunity depends on the function the prosecutor was performing.  The Court distinguished between the tasks

31

performed by an advocate in preparing for trial and those of a detective investigating a crime to establish probable cause to arrest a suspect. *Id.* The Court concluded, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Id.* (quoting *Hampton v. City of Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)).

The Court then considered whether the prosecutors had met the burden of establishing that they were functioning as advocates when fabricating evidence. This conduct occurred before the prosecutors had probable cause to arrest and before the grand jury investigation. The Court stated: "[The prosecutors'] mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* The Court rejected the contention that a prosecutor may shield his investigative misconduct by presenting fabricated evidence to a grand jury or introducing it at trial because "every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Id.* at 276. The Court acknowledged that even after probable cause is established, the prosecutor is not necessarily entitled to absolute immunity. "Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5.

In *Buckley*, the plaintiff also alleged that false statements at a press conference violated her civil rights. *Id*. at 261, 276. The Court held that qualified, not absolute, immunity applied to the press conference statements.

The most recent decision on the scope of prosecutorial immunity is *Kalina v. Fletcher*, 522 U.S. 118 (1997). *Kalina* presented the question of whether absolute immunity applied when a prosecutor made false statements of fact in an affidavit supporting an application for an arrest warrant. *Id*. at 120. The prosecutor had initiated criminal proceedings by filing three documents: (1) an unsworn information charging the defendant with burglary; (2) an unsworn motion for the warrant; and (3) a certification summarizing the evidence supporting the charges, which was executed by the prosecutor under penalty of perjury. The third document, the certification (which implicated the suspect in the crime), was factually inaccurate in several respects. Based on these documents, the trial court found probable cause and issued the arrest warrant. After the charges were dismissed on the prosecutor's motion, the plaintiff sued the prosecutor for damages under section 1983. The District Court denied the prosecutor's motion for summary judgment on the basis of absolute immunity and the Ninth Circuit affirmed. The Supreme Court granted certiorari to resolve a circuit split on the issue. *Kalina*, 522 U.S. at 120–32.[7]

---

[7] The Ninth Circuit reasoned that because a police officer would receive qualified immunity for false statements in an application for an arrest warrant under *Malley v. Briggs*, 475 U.S. 335 (1986), a prosecutor should receive the same immunity for the same conduct. *Fletcher v. Kalina*, 93 F.3d 653, 655–56 (9th Cir. 1996). But the Sixth Circuit had reached a different conclusion in *Joseph v. Patterson*, 795 F.2d 549, 555 (6th Cir. 1986). The Supreme Court explained that "[b]ecause we have never squarely addressed the question whether a prosecutor may be held liable for conduct in obtaining an arrest warrant, we granted *certiorari* to resolve the conflict." *Kalina*, 522 U.S. at 123.

Applying the functional approach, the Court held that the prosecutor's conduct in preparing the three documents was protected by absolute immunity because they were prepared as part of an advocate's function. The court reached a different conclusion as to the execution of the certification "[u]nder penalty of perjury." *Id.* at 129. The Court had previously held that complaining witnesses—as opposed to testifying witnesses in a court proceeding—were not entitled to absolute immunity.[8] The Court concluded that in certifying the truth of the statements in the documents, as opposed to preparing the documents, the prosecutor was acting as a complaining witness, not an advocate. Absolute immunity did not extend to signing the false certification under penalty of perjury. While the prosecutor acted as an advocate and could properly claim absolute immunity for evaluating the strength of the evidence to support the warrant and for determining which facts to include, "[t]estifying about facts is the function of the witness, not of the lawyer." *Id.* at 130.

Lower court cases applying the Supreme Court cases make clear that prosecutorial immunity includes conduct as an advocate both before trial and after trial, through postconviction appeals and collateral challenges. Courts recognize that absolute immunity may apply before an indictment issues. *See Spivey v. Robertson*, 197 F.3d 772, 776 (5th Cir. 1999) (finding that the district court erred in ruling that absolute immunity does not attach until charges have been filed, thereby denying protection to prosecutors for evaluating

---

[8] *Malley*, 475 U.S. at 335 (holding that a police officer only received qualified immunity for signing an affidavit in connection with an arrest warrant secured without probable cause). As the Court explained, complaining witnesses did not receive absolute immunity at common law. *Id.* at 340–41. This function is distinguished from that of a witness during the judicial phase of the proceeding. *Id.* at 341–43.

evidence and suggesting legal conclusions on the facts already given to them by the police);
*Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir. 1980) (applying absolute immunity to a prosecutor's actions in initiating, investigating and pursuing a criminal prosecution and approving district court's statement that "[n]ot all of an advocate's work is done in the courtroom.  For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation.").

In *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003), the court addressed the role of the timing of the prosecutor's conduct in the absolute immunity analysis.  The court held that although it does not end the inquiry, "the existence of probable cause with respect to a particular suspect is a significant factor to be sued in evaluating the advocatory, as opposed to investigative, nature of prosecutorial conduct."  *Cousin*, 325 F.3d at 632.  The "timing of events, while not determinative, can be highly relevant to the inquiry into function."  *Id.* at 636.  In *Cousin*, prosecutors were accused of detaining potential witnesses to prevent them from testifying at a trial.  The court found these actions, although improper, were advocatory, and looked to the timing of the actions as a key part of the immunity analysis:

> The question of absolute immunity therefore turns on whether, given the pending criminal trial, [the prosecutors] undertook the detention of these witnesses pursuant to their role as advocates. Because their conduct was directly related to the trial process, was entered into in the context of an ongoing trial, and was designed to secure a conviction, it cannot be characterized as anything other than advocatory.  Therefore, the detention of witnesses to prevent them from testifying in criminal proceedings, while unlawful and improper, is nonetheless shielded by absolute immunity.

*Id.* at 636–37.

Posttrial conduct may also be covered by absolute immunity.  *See Henzel v. Gerstein*, 608 F.2d 654, 657 (5th Cir. 1979) (reasoning that the policy concerns underlying absolute immunity are just as valid after trial and that "[f]ear of civil liability could hinder a prosecutor's judgment in conducting a case at the appellate level as well as at the trial level"); *see also Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994).  In *Houston v. Partee*, 978 F.2d 362, 367 (7th Cir. 1992), prosecutors discovered exculpatory evidence after the plaintiff's convictions and while the direct appeals were pending.  *Partee*, 978 F.2d at 365.  The court noted that the evidence was obtained while the prosecutors were working on an unrelated gang investigation.  *Id*. at 366.  In declining to accept the prosecutors' argument that immunity attaches at trial and continues indefinitely, the court noted that the discovery and concealment of the exculpatory evidence had no connection to the prosecutor's "role as advocate for the State."  *Id.* at 366.  The court found that the prosecutors' conduct in discovering the evidence in *Partee* was similar to that of the police and could not be considered gathering of information and evidence in furtherance of a decision to initiate or pursue a prosecution.  *Id.*  The court emphasized that the exculpatory evidence came to light only after the trial had ended and the prosecutors, although still employed as prosecutors, were no longer associated with the case.  *Id.* at 366–67; *see also Spurlock v. Thompson*, 330 F.3d 791, 801 (6th Cir. 2003) (denying immunity for alleged retaliatory conduct not directly associated with the plaintiff's trial, when such conduct occurred postconviction and in the absence of any ongoing adversarial proceedings); *Reid v. State of New Hampshire*, 56 F.3d 332, 338 n.13 (1st Cir.

1995) (emphasizing that *Partee* denied absolute immunity only because prosecutors had acquired the evidence in their investigative capacity).  In *Partee*, the court further noted that although the claimants' direct appeals were pending before the appellate court, different prosecutors were handling the appeals.  *Partee*, 978 F.2d at 366–67 (noting also that only one of the three prosecutors was even involved in the plaintiffs' trial); *see Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (applying absolute immunity to a prosecutor who was involved in handling postconviction motions and appeal when he learned of and failed to disclose exculpatory evidence).

Contrary to at least part of Wilson's argument, *Imbler* remains important precedent, refined and narrowed by subsequent cases.  The test of whether absolute immunity applies does not turn on whether a prosecutor has "abused his office," as Wilson suggests.  (Docket Entry No. 77 at 12).  Nor does the use of labels in the complaint, such as "investigative" or "administrative" as opposed to "advocatory," resolve the immunity issue.  To determine whether the prosecutors' challenged actions are entitled to absolute immunity, this court must look to the specific functions the defendants were performing when they engaged in the conduct Wilson challenges.

### B.    Analysis

In granting the section 2255 motion, the Houston federal district judge found that in Wilson's Houston trial and appeal, the government knowingly used false evidence—the Briggs Declaration—and failed to disclose exculpatory evidence that would show Wilson's involvement with the CIA after 1971.  *United States v. Wilson*, 289 F. Supp. 2d at 811–16.

Wilson alleges that the prosecutor defendants failed to disclose exculpatory evidence in the Houston pretrial and trial proceedings, presented a false declaration in the Houston trial, and were involved in concealing these acts during the sentencing and appellate proceedings.

Wilson argues that fabricating evidence and withholding evidence are not advocacy that can be protected by absolute prosecutorial immunity. (Docket Entry No. 77 at 18). This broad argument is an overstatement. The cases make clear that a prosecutor engaged in advocatory functions is entitled to absolute immunity even for submitting false evidence or suppressing favorable evidence. *Cousin v. Small*, 325 F.3d at 632 (5th Cir. 2003) (prosecutors suborned perjury and suppressed *Brady* material); *Truvia v. Julien*, 187 Fed. App'x at 348 (prosecutors suppressed *Brady* material). Wilson recognizes this in acknowledging that under the applicable cases, some of the activities he alleges in his first amended complaint are protected by absolute prosecutorial immunity. For example, he acknowledges that he cannot recover against Hedges and Powers for making statements in the Texas courts or for selecting and evaluating evidence to be used in the Texas trial (which Wilson distinguishes from "fabricating evidence"), or against Hedges for filing the appellate brief in the Fifth Circuit. (Docket Entry No. 77 at 17).

Wilson's narrower argument is that the prosecutors engaged in the following categories of activities that are not subject to absolute immunity:

- Fabricating evidence or withholding exculpatory evidence as part of "investigatory" work conducted either pretrial or during trial, or as part of the

appellate process, particularly for lawyers who did not personally handle the appellate brief.

• Performing "administrative" work, which Wilson defines to include supervising the performance of lawyers performing advocatory functions.

• Making statements to the media.

The specific allegations as to each defendant are separately examined to address the arguments that some of the functions are investigative or administrative—and therefore only covered by qualified immunity—as opposed to advocatory, and that statements to the media are not covered.

            1.     *The Allegations as to Activities Before and During the Houston Trial: Investigative or Advocatory?*

Wilson alleges that the defendant prosecutors learned in pretrial investigations that Wilson had worked for the CIA after 1971, but failed to disclose this information. The specific allegations include the following:

• Barcella: Wilson alleges that Barcella was in charge of the investigation that began in 1977, was interrupted for eighteen months, and resumed in 1979. The First Amended Complaint alleges that in 1979, Barcella convened the grand jury in Washington, D.C. to "assess the evidence garnered against Wilson." (Docket Entry No. 68, Ex. 1, ¶ 159). Wilson argues that Barcella is not entitled to absolute immunity for convening that grand jury, but does not specify any misconduct in that proceeding. (Docket Entry No. 77 at 32). In his

brief, Wilson adds an allegation that Barcella acted as a "grand jury advisor" before the 1980 indictment.  (*Id*.).  The investigation Barcella conducted included telephone calls between Barcella and Wilson during the period Wilson lived in Libya, which according to the amended complaint occurred after the 1980 indictment had issued in the District of Columbia; an interview with Wilson in Rome in July 1981, while he was a fugitive; involvement in bringing Wilson to a location from which he could be extradited; and obtaining in November 1982, before the Houston trial began, some information from the CIA about Wilson's postretirement contacts.  Wilson alleges that Barcella obtained exculpatory CIA memoranda on November 5, 1982 but did not disclose that information.  (*Id.*, ¶¶ 169–70).

•       Greenberg:  In the first amended complaint, Wilson alleges that before the Houston trial, Greenberg had learned information about Wilson's contacts with the CIA after 1971, which he did not disclose at trial.  There is no allegation in the first amended complaint that Greenberg was involved in the grand jury empaneled in Houston.  In his consolidated brief, Wilson generally argues that Greenberg was involved in obtaining the indictment against Wilson in the Houston case; however, neither the brief nor the complaint make specific allegations about Greenberg's involvement in the grand jury proceedings. (Docket Entry No. 77 at 51–52).  Wilson also alleges that Greenberg was involved in redacting documents from the CIA that the prosecutors wanted to

40

use in the Houston trial and that they expected Wilson to subpoena in preparation for that trial.  (Docket Entry No. 68, Ex. 1, ¶¶ 181–82).  Wilson alleges that Greenberg, working with the CIA, prepared the false Briggs Declaration for use at trial.  (*Id*., ¶ 154).  Wilson alleges that Greenberg obtained exculpatory CIA memoranda on November 5, 1982 but did not disclose that information.  (*Id.*, ¶¶ 169–70).

•      Powers and Hedges:  Wilson generally alleges that Powers and Hedges were involved in prosecuting Wilson.  There are no specific allegations about their work in obtaining the 1982 indictment in Houston.  Wilson alleges that Powers and Hedges "investigated" before trial but does not make any specific allegations.  (Docket Entry No. 68, Ex. 1, ¶¶ 50, 51, 57).  In Wilson's brief, he states generally that Powers and Hedges "participated in investigations prior to the Texas trial."  (Docket Entry No. 77 at 32).

•      Richard:  Wilson alleges that Richard supervised the "Wilson Trial Team" and was involved in the arrangements to arrest Wilson.  (Docket Entry No. 68, Ex. 1, ¶¶ 121, 123).

•      Jensen:  Wilson does not specifically allege how Jensen was involved before or in Wilson's Houston trial.  In his surreply, Wilson argues that "[e]ven where Wilson's complaint does not mention Jensen by name, Jensen is clearly included in those allegations.  This is particularly true because he was a supervisor with the ability to guide the overall team."  (Docket Entry No. 88 at

41

2, n.2).  Wilson cites to the following allegation: "DOJ" knew of Wilson's CIA service as early as January 1982.  (Docket Entry No. 68, Ex. 1, ¶ 161).

•    Trott:  Trott did not work on Wilson's case until the summer of 1983, when the Houston trial was completed.

The timing of the challenged acts in relation to the existence of probable cause, established by an indictment, is a factor to be considered.  *Cousin v. Small*, 325 F.3d at 635. Only the allegations against Barcella concern events that occurred before the first indictment against Wilson issued on April 23, 1980, in the District of Columbia, charging him with conspiracy to transport explosives in foreign commerce, conspiracy to commit the murder of a Libyan national, acting as an unresigstered agent of the Libyan republic, and other offenses. The Houston indictment, issued in 1982, charged Wilson with conspiring to make an illegal shipment of plastic explosives, presenting a falsified Shipper's Export Declaration, exporting the active ingredient in C-4 explosives, and illegally transporting a hazardous material by cargo aircraft.  *United States v. Wilson*, 732 F.2d at 406–07.

Wilson attempts to avoid absolute immunity by arguing that he has alleged abuses in the prosecutors' activities in obtaining the indictments.  The allegations are that Barcella convened a grand jury in the District of Columbia in 1979 to assess the evidence against Wilson.  (Docket Entry No. 68, Ex. 1, ¶ 159).  Wilson generally argues, but does not specifically allege, that Greenberg was also involved in obtaining the indictments in Houston and Virginia in 1982, and that Powers and Hedges were involved in obtaining the indictment in Houston in 1982.  Wilson alleges that some unnamed members of the Department of Justice

42

knew that he was a CIA agent as early as 1977, but this evidence was not presented to the grand jury. (*Id.*, ¶ 158). Wilson argues that because Barcella and Greenberg (and apparently Powers and Hedges) were involved in obtaining the indictments, they were acting as "complaining witnesses" and are not entitled to prosecutorial immunity. (Docket Entry No. 77 at 51). Wilson attempts to characterize the actions of the prosecutors in obtaining the indictments in the District of Columbia (establishing probable cause) and in Houston (resulting in the conviction that is the basis of the *Bivens* claims) as the actions of a "complaining witness."

In *Burns v. Reed*, the Supreme Court held that a prosecutor's conduct during a probable cause hearing was protected by absolute immunity. *Burns*, 500 U.S. at 492 (noting that a consensus of the Courts of Appeals grant absolute immunity to prosecutorial conduct before grand juries). In *Burns*, the prosecuting attorney was alleged to have elicited false testimony before the grand jury; absolute immunity applied to that allegation. *Id.* at 501. However, "complaining witnesses were not absolutely immune at common law. In 1871, the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause. Given malice and the lack of probable cause, the complainant enjoyed no immunity." *Malley v. Briggs*, 475 U.S. 335, 340–41 (1986).

In *Kalina*, the Supreme Court held that absolute immunity did not apply when a prosecutor performs the function of a complaining witness. *Kalina*, 522 U.S. at 129. The prosecuting attorney in *Kalina* filed three documents in court to obtain an arrest warrant, one

43

of which was a "Certification for Determination of Probable Cause," in which the prosecutor recited and attested to inaccurate factual statements. *Id.* at 121. The Court denied the prosecutor absolute immunity for her actions in personally attesting to the truth of the averments in the certification, an act that any competent witness might have performed. *Id.* at 129. However, the Court did grant her immunity for drafting the certification and the other documents, which are not actions generally performed by a witness. The Court cautioned that it did not depart from earlier decisions granting absolute immunity protection for prosecutors performing the traditional functions of an advocate, including acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial. *Id.*; *cf. Roberts v. Kling*, 144 F.3d 710 (10th Cir. 1998) (affirming, in light of *Kalina*, a district court's grant of qualified immunity for a prosecutor who signed a criminal complaint against plaintiff, thereby acting as a complaining witness); *Van Deelen v. City of Eudora*, 53 F. Supp. 2d 1223, 1230 (D. Kan. 1999) (granting qualified immunity to a prosecutor who signed a complaint under oath to apply for a search warrant); *see also Lyghtle v. Breitenbach*, 139 Fed. App'x 17, 20 (10th Cir. 2005) ("In this case, Breitenbach did not swear or attest to the truth of the information contained in the alias arrest warrant and the bond forfeiture order. Instead, his name and address simply appear on the top of both documents, and he approved the bond forfeiture order by signing it. Applying *Kalina*, these actions are insufficient to strip Breitenbach of his absolute immunity as a prosecutor.").

Wilson argues that he alleged that Barcella and Greenberg used fabricated evidence to obtain indictments in the District of Columbia and in Houston. (Docket Entry No. 77 at

51–52).  Wilson cites to paragraphs 154, 231, and 285–96 of the first amended complaint to support that assertion.   However, these paragraphs allege that Barcella and Greenberg fabricated evidence *at trial*, which is distinct from Wilson's assertion that Barcella and Greenberg acted as complaining witnesses before the grand jury.  Wilson has not identified specific allegations as to actions undertaken by Powers and Hedges in obtaining the Houston indictment.

The complaint does not allege facts that would show that any of the defendants acted as complaining witnesses rather than prosecutors in obtaining the indictments in the District of Columbia or in Houston.  Wilson has not alleged or argued that the prosecutors either testified as witnesses or swore to any statements presented to the grand juries.  *See Kalina*, 522 U.S. at 129 ("The critical question . . . is whether she was acting as a complaining witness rather than a lawyer when she executed the certification.").  Wilson has not pleaded facts that would show that Barcella, Greenberg, Powers, or Hedges acted as complaining witnesses and not prosecutors before the indictments issued, such that absolute immunity would not apply.

Wilson also attempts to avoid immunity as to alleged prosecutorial activities after these indictments issued by characterizing those activities as "investigative" in nature.   The activities alleged are suppressing *Brady* material during pretrial sessions with the Houston court, preparing documents to use at trial, and interviewing witnesses to testify at trial.  These

45

activities are within the prosecutors' advocatory role in preparing for and presenting the government's case after probable cause was established.[9]

In *Cousin v. Small*, the court held that generally, even egregious *Brady* violations are generally protected by absolute immunity if the evidence is withheld after prosecutors have established probable cause. In *Cousin*, a prosecutor allegedly told a witness falsely to implicate the defendant at trial and coached him on how to testify. *Cousin*, 325 F.3d at 635. The court held that this evidence "would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause," and was therefore protected by absolute immunity. *Id.* The plaintiff in *Cousin* also alleged that prosecutors withheld key pieces of exculpatory evidence. The Fifth Circuit declined to examine the severity of the alleged *Brady* violation, instead using the *Imbler* functionality test. *Cousin*, 325 F.3d at 636; *see also Truvia*, 187 Fed. App'x at 348 ("The claims asserted against Sins in his individual capacity by Appellants that stem from his direct participation in the suppression of *Brady* evidence are barred by absolute immunity and were properly dismissed by the district court.").

The allegations as to the postindictment, pretrial investigatory activities do not reveal any basis to limit the defendant prosecutors to qualified as opposed to absolute immunity. Wilson alleges that Powers did not disclose exculpatory prosecutors' notes about Wilson's

---

[9]  *See Ervin v. Hill*, No. Civ. 3:05-1651-k, 2005 WL 3742791, at *2 (N.D. Tex. Nov. 10, 2005) (granting prosecutorial immunity to a district attorney who, following an initial indictment, allegedly conspired with the sheriff to bring a second indictment to hold the plaintiff without bond); *Tellier v. Petrillo*, No. 95 Civ. 211 LAP, 1996 WL 734885, at *3 (S.D.N.Y. Dec. 23, 1996) (giving prosecutors absolute immunity for allegedly fabricating evidence between an indictment alleging racketeering and a later indictment adding a charge of conspiracy to transport stolen property).

CIA service at the Houston trial.  (Docket Entry No. 68, Ex. 1, ¶¶ 167, 180).  Deciding what is *Brady* material is a typical prosecutorial function in preparing for trial.  *See Brodnicki v. City of Omaha*, 75 F.3d 126, 1267 (8th Cir. 1996) (allowing absolute immunity for prosecutor's actions in reviewing the results of a polygraph examination, which the plaintiff claimed was investigative work usually performed by the police).

Wilson cites *Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001), to support his argument that the prosecutors who obtained the Briggs Declaration are not entitled to absolute immunity for that action.  Wilson quotes *Milstein* for the proposition that prosecutors are not entitled to absolute immunity for "acquiring known false statements from a witness for use in a prosecution," because obtaining such activity is "police-type investigative work, not quasi-judicial advocacy."  (Docket Entry No. 77 at 34 (citing *Milstein*, 257 F.3d at 1011)).  In *Milstein*, however, the allegedly false statements were obtained before the defendant was arrested or indicted and before probable cause had been established.  *Milstein*, 257 F.3d at 1010 ("This alleged conduct occurred before the grand jury was empaneled, before Milstein was arrested.").  Under *Cousin*, once probable cause is established and the prosecutors have met with witnesses to prepare them to testify in court at trial, the prosecutors are entitled to absolute immunity for allegedly obtaining a false statement from that witness.  *Cousin*, 325 F.3d at 636–37.

Wilson alleges that Greenberg fabricated the Briggs Declaration and that the other prosecutors involved in the Houston trial failed to disclose this fact.  He also alleges that Greenberg was involved in redacting documents for use in the Houston trial.  He also alleges

that the prosecutors involved in the Houston trial did not inform the defendant or the court of the exculpatory information obtained during the pretrial investigation and preparation. Labeling these activities "investigative" is insufficient to avoid immunity. The specific allegations clearly describe work undertaken by the government's lawyers fulfilling their roles as advocates in preparing the government's case to present at trial, after the indictments against Wilson had issued. Wilson's complaint alleges that the false evidence was created and exculpatory evidence concealed to respond to the defense Wilson was anticipated to and did make at his Houston trial. The activities he challenges are actions of advocates in evaluating and preparing evidence and witnesses to present at trial. As in *Imbler* and *Cousin*, these activities, even if improper, are advocatory functions and entitled to absolute immunity.

### 2. The Allegations as to Posttrial Activities: Investigative or Advocatory?

Wilson attempts to avoid absolute immunity for the defendants' "post-trial investigation." (Docket Entry No. 77 at 35–36). Wilson argues that the internal Department of Justice investigation into the accuracy of the Briggs Declaration was not advocatory and that the decisions by prosecutors to withhold the results of the investigation during the sentencing and appellate phases of the Houston case are not entitled to absolute immunity. Wilson also argues that those prosecutors who were not directly involved in the Fifth Circuit appeal cannot invoke absolute immunity for their failure to disclose exculpatory information to that court during the appeal.

Wilson makes the following allegations of misconduct after the verdict in the Houston case against the prosecutor defendants:

48

- Barcella:  Wilson alleges that Barcella was involved in Department of Justice discussions about the CIA's evidence while Wilson's Fifth Circuit appeal was pending.  (Docket Entry No. 68, Ex. 1, ¶¶ 226, 228).

- Greenberg:  Wilson alleges that Greenberg was involved in Department of Justice discussions about the CIA evidence while Wilson's Fifth Circuit appeal was pending.  (*Id.*, ¶¶ 226, 228).  Wilson alleges that Greenberg attempted to, but could not, supervise The Department of Justice's Fifth Circuit brief.  (*Id.*, ¶¶ 300–06).

- Powers and Hedges:  Wilson alleges that Powers and Hedges were involved in Department of Justice discussions about the CIA evidence while Wilson's Fifth Circuit appeal was pending.  (*Id.*, ¶¶ 226 (Hedges), 228 (Powers)).  Wilson alleges that Powers and Hedges did not disclose Brady material while Wilson's appeal was pending.  (*Id.*, ¶¶ 53, 58).  Wilson alleges that Hedges and Powers drafted the Fifth Circuit brief.  (*Id.*, ¶¶ 301, 304).

- Richard and Jensen:  Wilson alleges that Richard and Jensen sought information and received information from the CIA after Wilson's trial.  (*Id.*, ¶¶ 210–17).  Wilson alleges that Richard and Jensen were involved in Department of Justice discussions about the CIA evidence after Wilson's trial. (*Id.*, ¶ 228).  Wilson alleges that Richard was advised on the status of The Department of Justice's Fifth Circuit brief.  (*Id.*, ¶¶ 300–06).  Wilson argues in his surreply that Jensen is implicated in claims in which he is not named.

(Docket Entry No. 88 at 2, n.2).  Wilson cites to proceedings in 1999, (Docket Entry No. 68, Ex. 1, ¶¶ 345–47), despite Jensen having left the Department of Justice in 1983.

•      Trott: Wilson alleges that Trott participated in discussions about the evidence and made the decision about what exculpatory information to include in the Fifth Circuit brief.  (*Id.*, ¶¶ 226, 303–05).

Wilson cites *Spurlock v. Thompson*, 330 F.3d 791 (6th Cir. 2003), for the proposition that "post-trial investigation" is not entitled to absolute immunity.  In that case, a prosecutor allegedly threatened and coerced a witness a year after the case had concluded.  The court held:

> A prosecutor who injects himself into a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate.  Likewise, coercing a witness to maintain his false testimony during this and other proceedings does not constitute protected advocacy.  Rather, Thompson's retaliatory conduct after the trial was completed is more like the administrative and investigative acts for which prosecutors have been held not to be entitled to absolute immunity.

*Spurlock*, 330 F.3d at 799–800.

In this case, Wilson alleges that the posttrial investigation by the defendant prosecutors into the CIA records and the accuracy of the Briggs Declaration was for the purpose of deciding whether and to what extent to present those facts to the courts.  Wilson's amended complaint alleges that the defendant prosecutors were involved in deciding whether the information about the CIA records and the Briggs Declaration should be presented to the

defense counsel, the sentencing court, and the appellate courts.  (Docket Entry No. 68, Ex. 1, ¶¶ 210–17, 226, 228, 300–06).  Wilson alleges that all of the defendants except Trott and Hedges were present at a meeting in which they all agreed that "they would not disclose despite recognizing the fact that they were withholding exculpatory evidence."  (*Id*., ¶ 228). Wilson alleges that Powers and Hedges wrote the appeals brief to conceal the evidence under direction from Washington.  (*Id*., ¶¶ 300–06).  Wilson alleges that Powers and Hedges first sent the brief to Washington for review before filing.  (*Id*. at ¶¶ 300–06).  Decisions as to what to include in an appellate brief are within the advocatory role.  The allegedly improper actions of learning additional information about the state of the CIA records and the falsity of the Briggs Declaration and deciding to make only an oblique and limited reference to that information in the appellate briefs for the Houston conviction were actions of advocates, not merely "investigators."

Quoting *Partee*, Wilson argues that because only Hedges's name is listed on the Fifth Circuit brief, no other defendant can claim absolute immunity for allegations of failure to disclose exculpatory information during the appeal.  (Docket Entry No. 77 at 20–21).  The court in *Partee* noted that the prosecutors sued in that case were no longer involved in the case in any way when they discovered the exculpatory information and failed to disclose it. Wilson's own complaint shows that all the defendant prosecutors were working on or involved in the appeal, at least the decision not to disclose the Briggs Search results or the concerns about the Briggs Declaration.  Wilson does not cite a case finding that a prosecutor's name must appear on an appellate brief before that prosecutor can invoke absolute immunity

for the contents of the brief, when the plaintiff alleges that the prosecutor made decisions about the contents of the brief.

In a related argument, Wilson argues that one of the defendants, Jensen, was no longer working on the appeal when he left the Department of Justice in the summer of 1983. The argument appears to be that Jensen had a duty to disclose the exculpatory information in an appeal begun while he was at the Department of Justice that continued after he left. (Docket Entry No. 77 at 25). Wilson argues that after Jensen left the Department of Justice, he was no longer an advocate and was not entitled to immunity for his failure to disclose. (*Id.*).

Most of the defendants are no longer prosecutors. The complaint does not disclose when they left the Department of Justice. Wilson does not allege any actionable failure by the defendants other than Trott to disclose exculpatory information after they left the Department of Justice.[10] Wilson's argument appears to be that Jensen had a duty to disclose information that he learned prosecuting a case at the Department of Justice after he left the Department altogether, even if he would have been immune from liability for failing to disclose that information if he continued to work on that case as a Department of Justice employee. Absolute immunity does not apply only to career prosecutors. Wilson's suggestion that prosecutors open themselves to civil liability by leaving the Department of Justice is inconsistent with the basis of *Imbler* and related cases.

---

[10] Wilson does allege that unnamed individuals at "DOJ" failed to disclose Wilson's postretirement work for the CIA in responses filed to Wilson's collateral challenges to the Virginia conviction.

There is no allegation that Jensen was involved in decisions to withhold exculpatory information after he left the Department of Justice in 1983.  Jensen is not immune from liability for actions as a prosecutor after that date; there are no allegations that he could be liable for actions as a prosecutor after that date.

The allegations that the prosecutor defendants withheld exculpatory information about Wilson in sentencing and appellate proceedings and allowed false testimony to go uncorrected after Wilson's Houston trial are allegations about the conduct of these defendants as prosecutors.  They are entitled to absolute immunity for the allegations as to their activities after the Houston trial.  Those allegations are dismissed.

> 3.    *The Allegations as to Certain Defendants' Activities:  Supervisory or Advocatory?*

Wilson argues that absolute immunity does not apply to those defendants who acted in "supervisory" capacities.  "Because they acted in supervisory capacities, Defendants Trott, Richard, Greenberg, Jensen, [and] Barcella do not have absolute immunity for supervising other lawyers, government officials, and agents."  (Docket Entry No. 77 at 25).  A prosecutor whose responsibilities include supervising another prosecutor is entitled to absolute immunity when the prosecutor's actions are intimately associated with the judicial phase of a trial. *Genzler v. Longanbach*, 410 F.3d 630, 643 (9th Cir. 2005) (granting immunity to supervisory prosecutors whose alleged conduct was closely related to prosecutorial decisions associated with the judicial phase of the criminal process); *Hamilton v. Daley*, 777 F.2d 1207, 1213 n.5 (7th Cir. 1985) ("Since absolute immunity protects prosecutorial decisions, supervision of the

prosecutors who make these decisions is similarly immune."). "[W]hen the actions of a prosecutor are subject to absolute immunity, a supervising prosecuting attorney is also covered by that immunity." *Pinaud v. County of Suffolk*, 798 F. Supp. 913, 918 (E.D.N.Y. 1992) (citing *Buckley v. Fitzsimmons*, 952 F.2d 965, 966 (7th Cir. 1992)), *rev'd on other grounds*, 52 F.3d 1139 (2d Cir. 1995). "The same immunity accorded to the prosecutor who is directly performing an adjudicatory function attaches to the supervisor who sets general prosecutorial policies governing the actions of front-line prosecutors." *Jones v. City of Boston*, No. Civ. 03-12130, 2004 WL 1534206, at *3 (D. Mass. July 9, 2004).

Wilson alleges that Trott, Richard, Greenberg, Jensen, and Barcella not only supervised others who were prosecuting Wilson in Houston, they themselves were intimately involved in decisions about disclosure during the appeal. (Docket Entry No. 68, Ex. 1, ¶¶ 210–17, 226, 228, 300–06). Wilson alleges that these defendants themselves participated—as supervisors of prosecutors and as prosecutors—in decisions to suppress information about Wilson's involvement with the CIA and to present false evidence about Wilson's involvement in trial and during the appeal. These decisions fall squarely within the role of a prosecutor to which absolutely immunity applies.

### 4. The Allegations as to Statements to the Media

Wilson alleges that Barcella and Greenberg made statements to the media, for which they do not have absolute immunity. Wilson alleges that Barcella leaked classified information, FBI reports, and grand jury testimony to Peter Maas, an author writing a book about Wilson. (Docket Entry No. 68, Ex. 1, ¶¶ 341–43). Although Wilson does not state

when this conduct occurred, he alleges that the DOJ investigated this conduct in 1987 and 1988. (*Id*). Wilson argues that Greenberg made statements to journalists in the early 1980s, which were rebroadcast on *Nightline* on April 25, 2006, in a broadcast that, according to Wilson, featured the DOJ's Inspector General criticizing the Department. (Docket Entry No. 77 at 28). In his surreply, Wilson alleges that Greenberg's statements were "made in the 1980s and it is then that the damage was done at the time of Wilson's contemporaneous trials." (Docket Entry No. 86 at 1). Wilson argues that absolute immunity does not apply to these media statements. (Docket Entry No. 77 at 28).

In *Buckley*, the Supreme Court held that prosecutors were not entitled to absolute immunity for making false statements to the media. *Buckley v. Fitzsimmons*, 509 U.S. at 276-79; *see also Milstein v. Cooley*, 257 F.3d 1004, 1011–13 (9th Cir. 2001) (denying absolute immunity for comments prosecutors made to the media, while expressing no opinion as to whether the comments gave rise to a valid section 1983 claim); *Marrero v. Hialeah*, 625 F.2d 499, 506–07 (5th Cir. 1980) (denying absolute prosecutorial immunity for media statements that were not made in connection with initiating or following up on a prosecution).

In *Buckley*, the plaintiff claimed that false statements made to the media inflamed the potential jury pool, depriving him of a fair trial. *Buckley*, 509 U.S. at 277. Based on the common-law rule that "the speech of a counsel is privileged by the occasion on which it is spoken," the Court held that such statements were not protected by absolute immunity. *Id.* at 277 n.8 ("[Absolute immunity] does not apply to or include any publication of defamatory matter before the commencement, or after the termination of the judicial proceeding . . . [or]

any person other than those to whom, or in any place other than that in which, such publication is required or authorized by law.").

In this case, unlike *Buckley*, Wilson has not alleged that the defendants' statements to the media deprived him of the constitutional right to a fair trial or other constitutional right. Wilson makes the following allegations as to the statements Barcella made to Maas in the 1980s:

> Barcella slipped confidential materials to Peter Maas as part of his collaboration on the resulting book, "Manhunt," that severely injured Wilson's reputation and continues to do so even today, as the book is sold and resold through Amazon.com and other retail outlets.

(Docket Entry No. 77 at 28).  The book in question was not published until 1986.  It cannot, as a matter of law, have inflamed the jury pool and deprived Wilson of a fair trial in 1983 and appeal in 1984.

Wilson presents Greenberg's statements as "damaging pronouncements about Wilson." (Docket Entry No. 77 at 28).  In his surreply, Wilson argues that Greenberg's statements were made in the 1980s but does not allege or argue that they deprived him of a fair trial in Houston.   (Docket Entry No. 86 at 1).   In his complaint, Wilson alleges that the 2006 *Nightline* broadcast was favorable, in that it condemned the Department of Justice's failure to reveal information about Wilson's long-standing involvement with the CIA. (Docket Entry No. 68, Ex. 1, ¶ 348).

Wilson has not pleaded facts showing that the alleged statements to the media resulted in a constitutional violation.  Those allegations are dismissed.

### C.     Conclusion

The misconduct that resulted in Wilson's 1983 conviction being overturned, suborning perjury and withholding *Brady* material, are squarely within the advocatory functions that *Imbler* is intended to protect.  Because Wilson has not alleged facts that could show that the defendants acted outside their roles as prosecutors, their behavior, even if improper, is entitled to absolute immunity.

This immunity also extends to allegations of conspiracy to commit perjury.  *Mowbray v. Cameron County*, 274 F.3d 269, 277 (5th Cir. 2001) ("We find the reasoning of the majority of circuits persuasive.  As a matter of logic, a person may not be prosecuted for conspiring to commit an act that he may perform with impunity.") (quotations omitted).  The motions to dismiss are granted for the defendant prosecutors.

## VII.   Briggs's Motion to Dismiss

In granting the section 2255 motion and overturning Wilson's Houston conviction, the court stated:

> To rebut Wilson's evidence, on February 4, 1983, the government introduced an affidavit from Charles A. Briggs. Briggs served as the CIA's inspector general until mid-1982 when he became its executive director—the third highest ranking official of the CIA.  In the affidavit, he swore that—with one exception—the CIA did not ask Wilson to work for it after he officially stopped working there.  Briggs declared:
>
> •     "The search [of CIA records] revealed that Mr. Edwin P. Wilson terminated his employment with the CIA on 28 February 1971, and was not re-employed thereafter in any capacity.

57

> • According to Central Intelligence Agency Records, with one exception while he was employed by Naval Intelligence in 1972, Mr. Edwin P. Wilson was not asked or requested, directly or indirectly, to perform or provide any service, directly or indirectly, for [the] CIA."
>
> Briggs signed the affidavit under penalty of perjury, and Stanley Sporkin—the general counsel of the CIA—certified it with his signature and the agency's seal.

*United States v. Wilson*, 289 F. Supp. 2d at 807. Wilson includes this allegation in his first amended complaint. Wilson alleges that Briggs knowingly signed a declaration that was inaccurate and did not reflect the true state of the CIA records of Wilson's post-1971 contacts with the agency. (Docket Entry No. 68, Ex. 1, ¶¶ 13, 61–62, 110–13, 144–47). Wilson also alleges that Briggs conducted a search at the CIA about Wilson's contacts and knew that the declaration was inaccurate when he signed it. (*Id.*, ¶ 62). Wilson alleges that Briggs "failed to disclose his misconduct to Wilson or the courts." (*Id.*). Briggs has moved to dismiss the claims against him based on absolute immunity for witness testimony. (Docket Entry No. 62).[11]

## A.    The Applicable Law

Courts have long recognized the immunity of witnesses for their testimony:

> Because the witness plays such an integral role in the fact-finding process, the reluctant or reticent witness would disserve the ends of justice regardless of the nature of the proceeding. Furthermore, it seems obvious that the prospect of personal liability under a civil rights claim would pose the same risk of intimidation as would the possibility of liability under the common law. It is the

---

[11] Briggs alleges that the key facts in the complaint about him are inaccurate, but acknowledges that they must be taken as true for the purpose of deciding this motion to dismiss. (Docket Entry No. 62 at 10).

> threat of money damages that produces the intimidating effect, and that threat is present under either theory of liability. Consequently, the policies underlying the common law rule of absolute immunity also justify providing a witness with immunity from § 1983 liability.

*Charles v. Wade*, 665 F.2d 661, 666 (5th Cir. Unit B 1982), *cert. denied*, 460 U.S. 1036 (1983).  In *Briscoe v. LaHue*, 460 U.S. 325 (1983), a police officer gave perjured testimony in a trial.  The court found that his testimony nevertheless was entitled to absolute immunity in a civil suit.  "When a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth—in which event he can make a strong claim to witness immunity; alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit afforded to other governmental participants in the same proceeding."  *Id.* at 335–36.

### B.  Witness Immunity

Wilson argues that witness immunity applies only to testimony in court that is subject to cross-examination.  (Docket Entry No. 77 at 40–41).  The courts have, however, extended witness immunity to testimony provided by affidavits or declarations, as long as the testimony is given in an adversarial judicial proceeding, subject to judicial supervision.  In *McQueen v. United States*, 264 F. Supp. 2d 502 (S.D. Tex. 2003), *aff'd*, 100 Fed. App'x 964 (2004), the court extended witness immunity to a declaration submitted at trial in a *Bivens* action.  The court in that case cited to *Sykes v. James*, 13 F.3d 515, 521 (2d Cir. 1993) (affidavit provided in habeas proceeding), and *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989) (affidavit provided at bail revocation hearing).  Other courts have also recognized that

affidavits are entitled to the same immunities as live testimony.  *See, e.g.*, *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 440 (6th Cir. 2006) ("We find that the form of the witness testimony should not affect the status of the immunity attached thereto.") (affidavit in nonadversary proceeding); *Niedert v. Rieger*, 200 F.3d 522 (7th Cir. 1999) (applying absolute immunity to affidavit presented in court); *Giffin v. Summerlin*, 78 F.3d 1227, 1231 (7th Cir. 1996) ("The policy considerations underlying witness immunity for testimony in open court apply with equal force to other forms of testimony such as depositions and affidavits."); *Thomason v. SCAN Volunteer Services, Inc.*, 85 F.3d 1365 (8th Cir. 1996) (applying absolute immunity to an affidavit presented in state court *ex parte* proceeding).

The Fifth Circuit has held that testimony in certain proceedings does not qualify for absolute witness immunity.  In *Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 261 (5th. Cir. 1984), the court ruled that testimony at an *ex parte* probable cause hearing was not entitled to absolute immunity.  In *Keko v. Hingle*, 318 F.3d 639, 642-43 (5th Cir. 2003), the court noted that the Supreme Court "has subsequently bounded absolute immunity within the precise confines of adversarial judicial proceedings."  In that case, an expert witness's report and testimony presented in a probable cause hearing were not entitled to absolute immunity. *Keko*, 318 F.3d at 644.  In this case, however, the declaration was presented in court, during a criminal trial, subject to judicial supervision.  Under *McQueen* and similar cases, that testimony is entitled to absolute immunity.  This court dismisses Wilson's claims based on the Briggs Declaration.

### C.    Other Allegations as to Briggs

Wilson alleges that Briggs was involved in other "non-testimonial" activities, including his investigation into the records of Wilson's CIA contacts. Wilson argues that Briggs's nontestimonial actions of investigating the records are not entitled to immunity. (Docket Entry No. 77 at 41–42).

In *Mowbray v. Cameron County, Texas*, 274 F.3d 269, 277–78 (5th Cir. 2001), the court dismissed a section 1983 claim against a police officer and a lab technician for failing to disclose exculpatory *Brady* material to the defendant's counsel before and during the criminal trial. The court emphasized that while prosecutors have a duty to disclose exculpatory evidence to the defense, police officers, lab technicians, and others who investigate criminal cases do not share that duty. *Id.* at 278. The court noted that a different result might apply if the plaintiff alleged that the police officer or lab technician "elicited false evidence and deliberately concealed exculpatory evidence from all parties, including the prosecution." *Id*. at 278 n.5. The court cited *Geter v. Fortenberry*, 849 F.2d 1550, 1558 (5th Cir. 1988), in which the plaintiff alleged that a police officer "elicited false identifications by unlawful means, testified falsely, and deliberately concealed exculpatory evidence." The court in *Geter* applied absolute immunity to the perjury claim, but stated that as to the nontestimonial actions, neither absolute nor qualified immunity applied. "[A] police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles." *Id.* at 1559.

In *Paine v. City of Lompoc*, 265 F.3d 975 (9th Cir. 2001), police officers were alleged to have withheld the identities of relevant witnesses and fabricated evidence related to an arrest.  The court denied absolute immunity because "a pretrial, out-of-court effort to keep certain witnesses or physical evidence from the opposing party or to fabricate physical evidence need not involve anyone who will participate in the trial as a witness, and so is not 'inextricably tied'—or tied at all—to any witness' own testimony.  If a potential witness does happen to be involved, there is no reason that participation should be insulated from liability simply because of his dual roles as witness and fabricator (although the potential witness of course retains his absolute immunity as to his own testimony in court)."  *Id.* at 982; *see also Spurlock v. Satterfield*, 167 F.3d 995, 1001–03 (6th Cir. 1999) (denying absolute immunity to allegations that a police officer allegedly suborned perjury and withheld evidence).

In this case, Wilson does not allege that Briggs concealed information about Wilson from the prosecutors, as suggested in *Geter*.  To the contrary, Wilson alleges that the Department of Justice knew as early as 1976 or January 1982 that Wilson had post-1971 contacts with the CIA.  (Docket Entry No. 68, Ex. 1, ¶¶ 158, 161).  Wilson alleges that Greenberg and Barcella knew as early as November 1982 that Wilson had such contacts.  (*Id.*, ¶¶ 166, 169).  Wilson alleges that when the prosecutors asked Briggs for information from the CIA, Briggs took steps to obtain the information, ordering the Briggs Search to respond to the prosecutors' request to search CIA records.  In April 1983, the CIA sent the results of the completed Briggs Search to the Department of Justice, detailing the records of Wilson's contacts with the agency.  (*Id.*, ¶ 212).  There is no allegation that Briggs was involved in

redacting CIA documents for use in the Houston trial; Wilson alleges that the prosecutors performed that task.

Wilson alleges that when the prosecutors asked for information, Briggs ordered an agency search for the materials and then disclosed the information the search uncovered. (*Id.*, ¶¶ 170, 210).   There is no allegation that Briggs fabricated evidence (other than the Declaration, which prosecutors allegedly helped prepare) or that he withheld information from the prosecutors or deceived the prosecutors with false evidence.   There is no allegation of falsifying any evidence, other than the Declaration, for which Briggs is entitled to immunity. The allegations against Briggs are dismissed.

## VIII.   Conclusion

This court grants Wilson's motions to file surreplies and grants the defendants' motions to dismiss.   Final judgment is entered by separate order.

SIGNED on March 29, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

63